**ORIGINAL**

**McDERMOTT WILL & EMERY LLP**
JAMES L. SANDERS (State Bar. No. 126291)
GREGORY R. JONES (State Bar No. 229858)
2049 Century Park East, Suite 3800
Los Angeles, CA 90067-3218
Telephone: 310.277.4110
Facsimile: 310.277.4730

Attorneys for Defendants

**FILED**

2008 AUG -7 AM 10: 21

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____KNH_____DEPUTY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

STEVEN SULLIVAN, an individual;
SULLIVAN INTERNATIONAL
GROUP, INC., a California
corporation,

        Plaintiffs,

    v.

TETRA TECH, INC., a Delaware
corporation; TETRA TECH EMI,
INC., a Delaware corporation; JOHN
TEEL, an individual; DANIEL
BATRACK, an individual; RANDY
FETTERS, an individual; MARK
WALSH, an individual; MICHAEL
WANTA, an individual; EDWARD
SUSSENGUTH, an individual; and
DOES 1-50, inclusive,

        Defendants.

CASE NO. 08 CV 1433 JM LSP

**NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1441**

**[FEDERAL QUESTION]**

[San Diego County Superior Court Case
No. 37-2008-00084804-CU-BT-CTL]

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    TO THE CLERK OF THE ABOVE-ENTITLED COURT:

2    PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1331, 1441, and

3    1446, Defendants Tetra Tech, Inc., Tetra Tech EMI, Inc., Daniel Batrack, Randy

4    Fetters, Edward Sussenguth, John Teel, Mark Walsh, and Michael Wanta

5    ("Defendants"), by and through their undersigned attorneys, McDermott Will &

6    Emery LLP, hereby remove the above-captioned action entitled Steven Sullivan, et

7    al., v. Tetra Tech, Inc., et al., Case No. 37-2008-00084804-CU-BT-CTL, from the

8    Superior Court of the State of California, County of San Diego, to the United States

9    District Court for the Southern District of California, on the following grounds:

10    1.    On July 8, 2008, Plaintiffs Steven Sullivan and Sullivan International

11    Group, Inc. ("Plaintiffs") filed a civil action, labeled "First Amended Complaint,"

12    in the Superior Court of the State of California, County of San Diego, Case No. 37-

13    2008-00084804-CU-BT-CTL, entitled Steven Sullivan, et al., v. Tetra Tech, Inc., et

14    al. (the "State Court Action"). Plaintiffs served Defendants Tetra Tech, Inc., Tetra

15    Tech EMI, Inc., Daniel Batrack, Edward Sussenguth, and Michael Wanta with the

16    Summons and First Amended Complaint on July 8, 2008. Defendants' counsel

17    agreed to accept service on behalf of Defendants Randy Fetters, John Teel, and

18    Mark Walsh on July 14, 2008. A true and correct copy of the Summons and First

19    Amended Complaint in the State Court Action that was served on Defendants is

20    attached hereto as Exhibit A.

21    2.    As set forth more fully below, the State Court Action is a civil action

22    over which this Court would have original jurisdiction under 28 U.S.C. § 1331 and

23    which may be removed to this Court pursuant to 28 U.S.C. § 1441(b), in that it is a

24    "civil action of which the district courts have original jurisdiction founded on a

25    claim or right arising under the Constitution, treaties or laws of the United States."

26    28 U.S.C. § 1441(b).

27    3.    This Notice of Removal is timely under 28 U.S.C. § 1446 because it is

28    filed within thirty days from the date on which Defendants Tetra Tech, Inc., Tetra

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Tech EMI, Inc., Daniel Batrack, Edward Sussenguth, and Michael Wanta were

2  served with a copy of the First Amended Complaint and corresponding summons

3  (July 8, 2008).  A true and correct copy of Plaintiffs' Proof of Service of the State

4  Court Action is attached hereto as Exhibit B.  No defendant in the State Court

5  Action was served with any pleading prior to the Plaintiffs filing their First

6  Amended Complaint on July 8, 2008.

7       4.    Written notice of the filing of this Notice of Removal will be given to

8  Plaintiffs promptly after the filing of the Notice of Removal as required by 28

9  U.S.C. § 1446(d).  In addition, as required by 28 U.S.C. § 1446(d), a copy of this

10  Notice of Removal will be filed promptly in the State Court Action with the Clerk

11  of the Superior Court, County of San Diego, after the filing of the Notice of

12  Removal.

13                 **JURISDICTIONAL GROUNDS**

14  **Summary of Essential Allegations**

15       5.    The State Court Action is brought on behalf of Steven Sullivan and his

16  company, Sullivan International Group, Inc. ("Sullivan Inc."), against Tetra Tech,

17  Inc., Tetra Tech EMI, Inc. ("TTEMI"), which is a wholly-owned subsidiary of

18  Tetra Tech, Inc., and several current and former employees and officers of those

19  companies.  (Ex. A.)

20       6.    As summarized in the First Amended Complaint ("Complaint"), the

21  State Court Action "seeks redress for injuries inflicted on the plaintiffs . . . [when

22  TTEMI] undertook to abuse the [U.S.] Small Business Administration's Mentor-

23  Protégé Program and small business contract award procedures . . . in violation of

24  federal regulations governing the award and performance of those contracts."  (Ex

25  A, ¶ 1.)

26       7.    TTEMI is a government contractor.  (Ex A, ¶ 1.)  Sullivan Inc. is a

27  small contractor firm that is alleged to be certified as a "Small Disadvantaged

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Business" by the U.S. Small Business Administration ("SBA") pursuant to the U.S.

2  Small Business Act. (Ex. A, ¶ 21.)

3       8.    The Complaint alleges that to provide Sullivan Inc. with the

4  opportunity to obtain and complete federal government contracts, TTEMI and

5  Sullivan Inc. participated in the SBA's "Mentor-Protégé" Program, which is a

6  federal program created, administered, and regulated by the SBA pursuant to the

7  Small Business Act. (Ex. A, ¶¶ 21-22.)

8       9.    Plaintiffs allege that pursuant to this federal program, TTEMI and

9  Sullivan Inc. entered into an SBA Mentor-Protégé Agreement in February 2003.

10  (Ex. A, ¶ 27.) The Complaint also alleges that pursuant to the agreement, TTEMI

11  and Sullivan Inc. also entered into an SBA Joint Venture Agreement in May 2003.

12  (Ex. A, ¶ 33.) These agreements are created and governed by federal regulations

13  promulgated by the SBA under the Small Business Act. (Ex. A, ¶¶ 38 & 40.)

14      10.    As set forth above, the State Court Action is based on Defendants'

15  alleged violations of SBA regulations and duties arising under the SBA-regulated

16  Mentor-Protégé Program and the agreements the parties entered into pursuant to

17  that federal program. (Ex. A, ¶ 1.)

18      11.    Specifically, the Complaint alleges that Defendants violated numerous

19  SBA regulations, including the prohibitions against a mentor: (i) having more than

20  one protégé at a time (13 C.F.R. § 124.520(b)(2)); (ii) competing with its protégé

21  (13 C.F.R. § 124.520(b)); (iii) performing the vast majority of the work and

22  collecting the majority of the revenue (13 C.F.R. §§ 124.510, 124.513, & 125.6);

23  and (iv) using its protégé only for its small business status (13 C.F.R. §

24  124.513(a)(2)). (Ex. A, ¶¶ 38-42.)

25      12.    In addition, Plaintiffs allege that TTEMI defrauded the SBA regarding

26  TTEMI's compliance with SBA regulations: "TTEMI misled SBA personnel about

27  its compliance with applicable regulations, failing to disclose its competitive efforts

28  against its protégé Sullivan [Inc.]. As a result of TTEMI's concealment of truthful

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    information, SBA personnel were duped into believing that TTEMI was operating

2    in compliance with its duties." (Ex. A, ¶ 48.)

3        13.    As a general matter, Plaintiffs incorporate all of the above-alleged

4    violations of SBA regulations into each of their eleven state law causes of action.

5    (*See* Ex. A, ¶¶ 98, 104, 111, 117, 124, 129, 136, 140, 153, 158, & 163.)

6        14.    As a specific matter, several of Plaintiffs' causes of action are directly

7    based on Defendants' alleged violations of SBA regulations.  For example,

8    Plaintiffs base their unfair competition claim (first cause of action) on two theories:

9    (1) that Defendants acted "unlawfully"; and (2) that Defendants acted

10   "fraudulently." (Ex. A, ¶¶ 100 & 102.)  Both theories are based on alleged

11   violations of SBA regulations.

12       15.    With respect to Defendants' alleged "unlawful" conduct, Plaintiffs

13   allege the following:

14           100.    By perpetrating the conduct alleged herein, defendants acted

15           <u>unlawfully</u> by, among other things:

16               a.    Competing against Sullivan [Inc.] using multiple 8(a)

17           small business protégé firms, <u>in violation of 13 C.F.R. § 124.520(b)</u>;

18               b.    Procuring and performing 8(a) and small business set

19           aside government contracts with shell companies controlled by

20           TTEMI, and by performing a vast majority of the work and reaping the

21           vast majority of the revenues under those contracts, <u>in violation of 13</u>

22           <u>C.F.R. §§ 124.510, 124.513, 124.520 and 125.6</u>;

23               c.    Using [alleged competing protégés] in join ventures,

24           where TTEMI received the vast majority of revenues and net profits,

25           and where [such protégés] brought little, if anything, to the joint

26           venture relationships other than its 8(a) status, <u>which is prohibited by</u>

27           <u>13 C.F.R. §§ 124.513(a)(2) and 124.520(e)(2)</u>.

28   (Ex. A, ¶ 100(a)-(c) (emphasis supplied).)

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1     16.    With respect to Defendants' alleged "fraudulent" conduct, Plaintiffs

2  allege the following:

3            102.    By perpetrating the conduct alleged herein, defendants acted

4     <u>fraudulently</u> by, among other things:

5     [¶]

6            b.     Concealing the nature and extent of TTEMI's mentor-

7     protégé relationships with other firms;

8     [¶, ¶]

9            f.     Affirmatively misrepresenting to Sullivan [Inc.] in

10    September, 2006 that its only mentor-protégé relationship was with

11    Sullivan [Inc.];

12    [¶, ¶]

13           i.     Concealing Defendants' efforts to obtain financing for [an

14    alleged competing protégé] from Home Systems of America in order

15    to help [that protégé] and TTEMI win [a government] contract;

16           j.     Concealing Defendants' true objective of making small

17    business government contractors pass-through agents for TTEMI to

18    obtain government contracts it would not otherwise obtain.

19  (Ex. A, ¶ 102(b), (f), (i), & (j) (emphasis supplied).)  As set forth earlier, each of

20  these purported instances of fraud are alleged to arise out of obligations imposed by

21  SBA regulations.  (*See, e.g.*, Ex. A, ¶¶ 38-42.)

22     17.    Plaintiffs' breach of contract claim (eighth cause of action) is based on

23  the breach of the terms contained in the SBA Mentor-Protégé Agreement.  (Ex. A,

24  ¶¶ 141-149.)  Specifically, Plaintiffs allege that TTEMI failed to adequately mentor

25  Sullivan Inc. as a protégé in violation of the SBA Mentor-Protégé Agreement and

26  the Mentor-Protégé program generally.  (*See* Ex. A, ¶ 146 ("TTEMI materially

27  breached the SBA Mentor-Protégé Agreement, by . . . failing to effectively assist

28  Sullivan [Inc.] in preparing contract bids; . . . failing to provide work and training to

1  expand Sullivan [Inc.]'s capabilities in project management; and, failing to train

2  Sullivan [Inc.] in the use of cost controls and proper sequence of project tasks.").)

3        18.    Similarly, Plaintiffs' fraud, concealment, and negligent

4  misrepresentation causes of action are based on Defendants' alleged failure to

5  disclose their purported violations of SBA regulations.  (Ex. A, ¶¶ 125, 130, &

6  137.)  For example, Plaintiffs base their fraud claim (fifth cause of action) on the

7  allegation that Defendants misrepresented "That other than Sullivan, TTEMI had no

8  other mentor-protégé relationships."  (Ex. A, ¶ 125(a); *compare* Ex. A, ¶ 38 ("The

9  federal regulation governing mentor-protégé relationships, 13 C.F.R. §

10 124.520(b)(2), generally prohibits mentors from having more than one protégé at a

11 time.").)  Plaintiffs' negligent misrepresentation claim (seventh cause of action) is

12 based on the same purported misstatements.  (*See* Ex. A, ¶ 137.)

13       19.    Likewise, Plaintiffs base their concealment claim (sixth cause of

14 action) on the allegation that Defendants concealed "Defendants' formation of

15 mentor-protégé relationships with businesses in direct competition with Sullivan."

16 (Ex. A, ¶ 130(e); *compare* Ex. A, ¶ 39 ("TTEMI competed against Sullivan for

17 numerous contract opportunities with its other protégés during the time that it was

18 obligated, under 13 C.F.R. § 124.520(b)(2), . . . to refrain from competing against

19 Sullivan for those opportunities.").)

20 **Federal Question Jurisdiction**

21       20.    A civil action filed in state court can be removed to federal court if the

22 case could have been originally filed in federal court under federal question

23 jurisdiction.  28 U.S.C. § 1441(b).  Removal under 28 U.S.C. § 1441(b) requires

24 that the action contain "a claim or right arising under the Constitution, treaties or

25 laws of the United States."

26       21.    "To determine whether the claim arises under federal law, [courts]

27 examine the 'well pleaded' allegations of the complaint and ignore potential

28 defenses."  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003); *see also Ansley*

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    *v. Ameriquest Mortg. Co.*, 340 F.3d 858, 861 (9th Cir. 2003) ("For removal to be

2    appropriate under the well-pleaded complaint rule, a federal question must appear

3    on the face of a properly pleaded complaint.").

4         22.    Under the well-pleaded complaint rule, state law claims can be

5    removed to federal court if they "necessarily raise a stated federal issue, actually

6    disputed and substantial, which a federal forum may entertain without disturbing

7    any congressionally approved balance of federal and state judicial responsibilities."

8    *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *see*

9    *also Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27-28

10   (1983) (holding that removal can be premised on the notion "that the plaintiff's

11   right to relief necessarily depends on resolution of a substantial question of federal

12   law"); *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808-809

13   (1986) ("a case may arise under federal law 'where the vindication of a right under

14   state law necessarily turned on some construction of federal law'.") (quoting

15   *Franchise Tax Bd.*, 463 U.S. at 9).

16        23.    As the Supreme Court explained in *Grable*, the rule "captures the

17   commonsense notion that a federal court ought to be able to hear claims recognized

18   under state law that nonetheless turn on substantial questions of federal law, and

19   thus justify resort to the experience, solicitude, and hope of uniformity that a federal

20   forum offers on federal issues." 545 U.S. at 312.

21   **The SBA's Mentor-Protégé Program**

22        24.    The SBA's Mentor-Protégé Program is "designed to encourage

23   approved mentors to provide various forms of assistance to eligible Participants."

24   13 C.F.R. § 124.520(a) (2004).

25        25.    To qualify as a mentor under the program, a company must

26   demonstrate that it meets several criteria, including that it "[p]ossesses good

27   character." 13 C.F.R. § 124.520(b)(1)(ii).

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

26.     SBA regulations state that "[g]enerally, a mentor will have no more than one protégé at a time." 13 C.F.R. § 124.520(b)(2).  The SBA "may authorize a concern to mentor more than one protégé at a time where the concern can demonstrate that the additional mentor/protégé relationship will not adversely affect the development of either protégé firm (e.g., the second firm cannot be a competitor of the first firm)." *Id.*

27.     The Mentor-Protégé Program also allows mentors and protégés to form joint ventures for any government procurement.  13 C.F.R. § 124.520(d).

28.     SBA regulations require that mentors and protégés enter into a written agreement.  13 C.F.R. § 124.520(e).  The agreement is required to contain certain terms (e.g. the relationship must last at least one year, the parties must be able to terminate the agreement on 30 days notice).  *Id.* § 124.520(e)(1) & (3).

29.     In addition, the mentor-protégé agreement must be approved by the SBA and the relationship must be reviewed annually.  13 C.F.R. § 124.520(e)(2) & (4)-(5).  The SBA's annual review includes an examination of whether the mentor "has not provided the assistance set forth in the mentor/protégé agreement or that the assistance has not resulted in any material benefits or developmental gains to the protégé." *Id.* § 124.520(f)(3).

**The State Court Action Confers Federal Question Jurisdiction**

30.     The gravamen of the wrongdoing asserted in the State Court Action is Defendants' alleged violations of SBA regulations and duties arising under the SBA-regulated Mentor-Protégé Program and the agreements the parties entered into pursuant to that federal program.  (Ex. A, ¶ 1.)  More specifically, Plaintiffs' grievance against Defendants in mainly twofold:  (1) that TTEMI did not properly mentor Sullivan Inc. as a protégé according to SBA regulations and contractual terms dictated by SBA regulations and approved by the SBA; and (2) that TTEMI illegally mentored other protégés, concealed this fact from Plaintiffs, and defrauded

1  the SBA regarding its compliance with applicable regulations. (Ex. A, ¶¶ 38-42, &

2  48.)

3      31.   Although the State Court Action does not affirmatively plead a federal

4  right of action, it "necessarily raise[s] a stated federal issue, actually disputed and

5  substantial, which a federal forum may entertain without disturbing any

6  congressionally approved balance of federal and state judicial responsibilities."

7  *Grable*, 545 U.S. at 314.

8      32.   The State Court Action necessarily raises several disputed and

9  substantial federal legal issues.

10     33.   Specifically, the Complaint raises the issue of whether TTEMI

11  violated SBA regulations. (*See* Ex. A, ¶¶ 38-42 (alleging violations of prohibitions

12  against a mentor: (i) having more than one protégé at a time (13 C.F.R. §

13  124.520(b)(2)); (ii) competing with its protégé (13 C.F.R. § 124.520(b)); (iii)

14  performing the vast majority of the work and collecting the majority of the revenue

15  (13 C.F.R. §§ 124.510, 124.513, & 125.6); and (iv) using its protégé only for its

16  small business status (13 C.F.R. § 124.513(a)(2))).)

17     34.   In addition, the Complaint also raises the issue of whether TTEMI

18  adequately failed to mentor Sullivan Inc. as a protégé in violation of the SBA

19  Mentor-Protégé Agreement and the Mentor-Protégé program generally. (*See, e.g.*,

20  Ex. A, ¶ 146 ("TTEMI materially breached the SBA Mentor-Protégé Agreement,

21  by . . . failing to effectively assist Sullivan [Inc.] in preparing contract bids; . . .

22  failing to provide work and training to expand Sullivan [Inc.]'s capabilities in

23  project management; and, failing to train Sullivan [Inc.] in the use of cost controls

24  and proper sequence of project tasks.").)

25     35.   Each of these alleged violations of SBA regulations (or obligations

26  arising out of the SBA's mentor-protégé regulatory scheme) form the basis for

27  Plaintiffs' unfair competition, breach of contract, and fraud-based claims against

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Defendants. (*See* Ex A, ¶¶ 1, 38-42, 48, 98, 100, 102, 104, 111, 117, 124, 125, 130,

2    129, 136, 137, 140,146, 153, 158, & 163.)

3        36.    Therefore, the scope of TTEMI's statutory, contractual, and tort duties

4    to Plaintiffs requires the Court to examine and interpret federal law. *See Franchise*

5    *Tax Board*, 463 U.S. at 9 (state law claims may be removable "where the

6    vindication of a right under state law necessarily turn[s] on some construction of

7    federal law"); *Finisar Corp. v. United States Bank Trust Nat'l Ass'n*, No. 07-4052,

8    2007 U.S. Dist. LEXIS 93637, at *7 (N.D. Cal. Dec. 7, 2007) (state law breach of

9    contract claim incorporating provisions of the Securities Exchange Act and the

10    Trust Indenture Act removable because "determining the scope of [plaintiff's] duty

11    requires the Court to examine and interpret federal law."); *California ex rel.*

12    *Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 840-841 (9th Cir. 2004) (California unfair

13    competition claim based on defendants' failure to comply with a tariff filed

14    pursuant to the Federal Power Act removable because the viability of the claim

15    depended on a violation of the tariff); *Havel v. SunAmerica Secs., Inc.*, No. 06-

16    4543, 2006 U.S. Dist. LEXIS 77244, at *8-9 (N.D. Cal. Oct. 11, 2006) (California

17    unfair competition claim based on violation of duties imposed by the Fair Labor

18    Standards Act to pay overtime compensation removable because conduct was

19    alleged to be " 'unlawful' solely because it constituted a violation of the FLSA").

20        37.    In addition, the State Court Action also implicates other substantial

21    federal issues that justify "the experience, solicitude, and hope of uniformity that a

22    federal forum offers on federal issues." *Grable*, 545 U.S. at 312; *see also In re NSA*

23    *Telcomms. Records Order Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (state

24    law claims seeking to enjoin defendants' alleged disclosure to the National Security

25    Agency of telephone records of its California residential customers were removable

26    because the claims involved the application of the state secrets privilege).

27        38.    The allegations in the Complaint implicitly question the propriety of

28    actions taken by the SBA. Specifically, the allegation that TTEMI illegally

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

LAS99 1669628-2.079048.0014

- 11 -

1   mentored other protégés will necessarily require an examination of whether the

2   SBA properly approved TTEMI's other alleged mentor-protégé relationships under

3   SBA guidelines (*see* 13 C.F.R. § 124.520(b)(2)).  Similarly, the allegation that

4   TTEMI failed to adequately mentor Plaintiffs as a protégé will necessarily require

5   an examination of whether the SBA properly reviewed the efficacy of TTEMI's

6   mentorship pursuant to its mandatory annual review process (*see* 13 C.F.R. §

7   124.520(f)(3)).  Resolving these issues will require the application of federal

8   administrative law and may raise liability issues on behalf of the SBA under

9   applicable federal statutes, such as the Federal Tort Claims Act.

10          WHEREFORE, the above action now pending in the Superior Court of the

11  State of California, County of San Diego, Case No. 37-2008-00084804-CU-BT-

12  CTL, is hereby removed from said state court to this Court.  Defendants pray that:

13  (1) this Court proceed in this action pursuant to 28 U.S.C. § 1447, as if this action

14  had been originally filed in this Court; and (2) further proceedings in the state court

15  action be stayed in all respects.

16

17  Dated:      August 6, 2008          **McDERMOTT WILL & EMERY LLP**
                                        JAMES L. SANDERS
18                                      GREGORY R. JONES

19

20                                      By:_____
                                            Gregory R. Jones
21                                          Attorneys for Defendants

22

23

24

25

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

BLUEBIRDonline.com (888) 477-0700

# SUMMONS　ON FIRST AMENDED COMPLAINT
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
TETRA TECH, INC., a Delaware corporation; TETRA TECH
EMI, INC., a Delaware corporation; JOHN TEEL, an
individual; DANIEL BATRACK, an individual; RANDY
FETTERS, an individual; MARK WALSH, an individual;
MICHAEL WANTA, an individual; EDWARD SUSSENGUTH, an
individual; and DOES 1-50, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**
STEVEN SULLIVAN, an individual; SULLIVAN
INTERNATIONAL GROUP, INC., a California corporation

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*
CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION

2008 JUL -8 A 11: 4⁻

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>(El nombre y dirección de la corte es):<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO<br>330 West Broadway<br>San Diego, California 92101<br>Central | CASE NUMBER:<br>(Número del Caso):<br><br>37-2008-00084804-CU-BT-CTL |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Kenneth M. Fitzgerald (SBN 142505)　　　　(619)236-1234　　(619) 696-7419
LATHAM & WATKINS LLP
600 West Broadway, Suite 1800
San Diego, California 92101

DATE:　JUL  8 2008　　　　Clerk, by　**T. Lusch**　　　　　, Deputy
(Fecha)　　　　　　　　　(Secretario)　　　　　　　　　　　　(Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of (specify):

3. [ ] on behalf of (specify):

　　under: [ ] CCP 416.10 (corporation)　　　　　[ ] CCP 416.60 (minor)
　　　　　[ ] CCP 416.20 (defunct corporation)　　[ ] CCP 416.70 (conservatee)
　　　　　[ ] CCP 416.40 (association or partnership)　[ ] CCP 416.90 (authorized person)
　　　　　[ ] other (specify):

4. [ ] by personal delivery on (date):

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

1  LATHAM & WATKINS LLP
   Kenneth M. Fitzgerald (Bar. No. 142505)
2     Christopher A. Rheinheimer (Bar. No. 253890)
  600 West Broadway, Suite 1800
3  San Diego, California 92101-3375
  Telephone: (619) 236-1234
4  Facsimile: (619) 696-7419

5  Attorneys for Plaintiffs Steven Sullivan and
  Sullivan International Group, Inc.

6

7

8         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                 **COUNTY OF SAN DIEGO**

FILED
CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION

2008 JUL -8  A 11: 4-

CLERK SUPERIOR COURT
SAN DIEGO COUNTY, CA

| | |
|---|---|
| 10  STEVEN SULLIVAN, an individual; SULLIVAN INTERNATIONAL GROUP, 11  INC., a California corporation; | Case Number: 37-2008-00084804-CU-BT-CTL |
| 12      Plaintiff, | **FIRST AMENDED COMPLAINT FOR UNFAIR COMPETITION; INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; FRAUD; CONCEALMENT; NEGLIGENT MISREPRESENTATION; BREACH OF CONTRACT; DEFAMATION; BREACH OF FIDUCIARY DUTY; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |
| 13      v. | |
| 14  TETRA TECH, INC., a Delaware corporation; TETRA TECH EMI, INC., a 15  Delaware corporation; JOHN TEEL, an individual; DANIEL BATRACK, an 16  individual; RANDY FETTERS, an individual; MARK WALSH, an individual; 17  MICHAEL WANTA, an individual; EDWARD SUSSENGUTH, an individual, 18  and DOES 1-50, inclusive, | |
| 19      Defendants. | **JURY TRIAL DEMANDED** |

20

21

22         COME NOW THE PLAINTIFFS, Steven Sullivan ("Mr. Sullivan") and Sullivan

23  International Group, Inc. ("Sullivan" or "plaintiff"), who for their Complaint against defendants,

24  allege as follows:

25                      **INTRODUCTION**

26        1.    This Complaint seeks redress for injuries inflicted on the plaintiffs as a

27  result of defendants' unlawful course of conduct, and their deliberate breach of legal duties to the

28  plaintiffs. Defendant Tetra Tech EMI, Inc. ("TTEMI") is a government contractor that, in

1   concert with the remaining defendants in this action, undertook to abuse the Small Business

2   Administration's Mentor-Protégé Program and small business contract award procedures, in

3   order to illegally garner government contract revenue under false pretenses, in violation of

4   federal regulations governing the award and performance of those contracts.

5          2.      TTEMI agreed to serve as Sullivan's mentor and joint venturer, and

6   therefore owed Sullivan duties of loyalty, candor, confidentiality, good faith and fair dealing. In

7   breach of those duties, and with conscious disregard of Sullivan's rights, TTEMI set out to 1)

8   conceal significant cost information from Sullivan in order to force Sullivan to turn over

9   construction projects and contract positions to TTEMI; 2) siphon cash and profits from Sullivan

10  in order to cripple it financially; 3) disparage Sullivan and destroy its reputation to government

11  contract officers and agencies; and, 4) unlawfully compete against Sullivan using a network of

12  captive, TTEMI-controlled entities masquerading as independent small businesses in contract

13  with TTEMI. Using these companies, TTEMI funneled millions of dollars of profit to itself at

14  the expense of legitimate small businesses. Then, after wreaking havoc on Sullivan's small

15  business, defendants attempted to purchase its assets at a steeply reduced price, hoping to take

16  further advantage of the injuries they inflicted.

17         3.      As a result of defendants' fraudulent and wrongful conduct, Sullivan lost

18  significant revenues, profits and goodwill, and suffered severe economic damage. In addition,

19  Sullivan's founder and owner Mr. Sullivan was forced into the hospital, where he nearly lost his

20  life due to stress-related heart illness. Through this Complaint, plaintiffs seek to recover

21  damages for these injuries.

22                                  **PARTIES**

23         4.      Plaintiff Sullivan is a corporation organized and existing under the laws of

24  the State of California, having its principal place of business in San Diego, California.

25         5.      Plaintiff Mr. Sullivan is an individual residing in San Diego, California.

26         6.      Defendant Tetra Tech, Inc. ("Tetra Tech") is a corporation organized and

27  existing under the laws of the State of Delaware, having its principal place of business in

28  Pasadena, California, and conducting substantial business in San Diego County, California.

1    7.    Defendant Tetra Tech EMI, Inc. ("TTEMI") is a corporation organized

2    and existing under the laws of the State of Delaware, having its principal place of business in

3    Chicago, Illinois.  TTEMI is a wholly owned subsidiary of Tetra Tech, and conducts substantial

4    business in San Diego County, California

5    8.    Plaintiff alleges on information and belief that defendant Daniel Batrack is

6    an individual who resides in California, and is the President of Tetra Tech.

7    9.    Plaintiff alleges on information and belief that defendant Randy Fetters is

8    an individual who resides in Seattle, Washington.

9    10.    Plaintiff alleges on information and belief that defendant John Teel is an

10    individual who resides in Albuquerque, New Mexico and was, at relevant times, a Senior

11    Executive of TTEMI.

12    11.    Plaintiff alleges on information and belief that defendant Mark A. Walsh

13    is an individual residing in San Diego, California and was, at all relevant times, the President of

14    TTEMI.

15    12.    Plaintiff alleges on information and belief that defendant Michael Wanta is

16    an individual who resides in San Diego, California and is the Navy Program Manager for

17    TTEMI.

18    13.    Plaintiff alleges on information and belief that defendant Edward

19    Sussenguth is an individual who resides in San Francisco, California and is the San Francisco

20    Office Manager of TTEMI.

21    14.    Plaintiff is unaware of the true names and capacities of defendants sued

22    herein as DOES 1 through 50, inclusive, and therefore sues these defendants by such fictitious

23    names.  Plaintiff will seek leave of court to amend this complaint to allege the true names and

24    capacities when they are ascertained.  Plaintiff is informed and believes, and on that basis

25    alleges, that each said fictitiously named defendant is responsible in some manner for the

26    wrongful conduct alleged herein, and is liable to plaintiff for the injuries and damages herein

27    alleged.

28

1      15.    In undertaking the acts alleged herein, each defendant was acting as the

2   agent and co-conspirator of the other, acting within the course and scope of his agency, and with

3   authority to act on behalf of and bind the other.

**JURISDICTION AND VENUE**

5      16.    This Court has personal jurisdiction over the defendants pursuant to Cal.

6   Civ. Proc. Code § 410.10 because the defendants transact and have transacted substantial

7   business within the State of California, thereby purposely availing themselves of the privilege of

8   conducting activities within this State, and because the instant dispute arises out of defendants'

9   unlawful and tortious conduct directed at Sullivan, a party whose principal place of business is in

10  this State.

11     17.    Venue in this County is proper pursuant to Cal. Civ. Proc. Code §§ 395

12  and 395.5, in that some of the defendants reside in this County, and because the contracts at issue

13  were entered and were to be performed in this County, and because a substantial amount of the

14  wrongdoing alleged herein took place in this County.

**GENERAL ALLEGATIONS**

16     18.    Sullivan was founded and built by Steven E. Sullivan, a service-disabled

17  veteran of the United States Navy. Sullivan's business is focused primarily on government

18  contracting work.

19     19.    In 2000, Sullivan was first introduced to defendant TTEMI through a

20  mutual federal client, at which time, Sullivan and TTEMI began working together on several

21  small projects with SULLIVAN serving primarily as a subcontractor on Navy work for TTEMI.

22     20.    In or around early 2001, Sullivan and TTEMI discussed the merits of an

23  ongoing relationship by which TTEMI would provide significant advice, guidance, and

24  assistance to Sullivan, in order to allow Sullivan to compete for federal contracting opportunities

25  and complete more government contracts on a profitable basis. During this time period, TTEMI

26  advised Sullivan to move away from commercial consulting work, which represented more than

27  80% of Sullivan revenues in 2001, and to focus on federal government contract work.

28

21.     In or around August of 2001, Sullivan was certified by the U.S. Small Business Administration ("SBA") as an "8(a),  Small Disadvantaged Business," under Section 8(a) of the U.S. Small Business Act.

22.     On or about October 4, 2002, Sullivan and TTEMI entered a Department of Defense Mentor-Protégé Agreement ("DoD Mentor-Protégé Agreement), under which TTEMI agreed to assist Sullivan in order to enhance Sullivan's capabilities to obtain and complete government and commercial contracts.  A true and correct copy of the DoD Mentor-Protégé Agreement is attached at Tab A and incorporated by this reference.

23.     Specifically, in the DoD Mentor-Protégé Agreement, TTEMI agreed to provide Sullivan with technical training and advice, including in the preparation of contract proposals, and to assist Sullivan in developing qualified management personnel and tools necessary to ensure effective and efficient project management, cost control, and schedule maintenance.  More specifically, TTEMI agreed to evaluate Sullivan's contract proposals and to train Sullivan in cost estimating, negotiations and the preparation and review of contract proposals.

24.     In the DoD Mentor-Protégé Agreement, TTEMI also represented and warranted that it had the capability, experience and means required to carry out the services contemplated, and it agreed to perform those services in a diligent and workmanlike manner consistent with professional practices and standards for nationally recognized firms engaged in similar work.

25.     During 2002, Sullivan was able to secure, with TTEMI's support as its mentor, several large 8(a) direct award contracts, causing Sullivan to hire more staff and continue to develop its relationship with the Navy.

26.     In August, 2002, at the suggestion of TTEMI, and as part of its effort to build its capabilities to perform Navy environmental service contract work, Sullivan acquired Pacific Treatment Environmental Services, Inc. ("PTES").  Sullivan and its principals undertook significant risk and personal debt in order to consummate the PTES Acquisition.

27. On or about February 20, 2003, Sullivan and TTEMI entered an SBA Mentor-Protégé Agreement ("SBA Mentor-Protégé Agreement), under which TTEMI agreed to partner with Sullivan in a mentor-protégé relationship, in order to enhance Sullivan's capabilities to satisfy government and commercial contracting requirements, and to increase Sullivan's participation in government and commercial contracting activities. A true and correct copy of the SBA Mentor-Protégé Agreement is attached at Tab B and incorporated by reference.

28. Pursuant to the SBA Mentor-Protégé Agreement, TTEMI agreed to assist Sullivan by: facilitating Sullivan's interaction with federal agencies; assisting Sullivan in preparing contract bids, joint venturing with Sullivan to pursue government contracts; developing Sullivan's quality assurance and quality control methods to meet federal agency standards; evaluating Sullivan's contract bids and training Sullivan in cost estimating and bid preparation; preparing and reviewing Sullivan' s contract bids, guiding Sullivan on money management and financial reporting; providing work and training to expand Sullivan's capabilities in project management; and, training Sullivan in the use of cost controls and proper sequence of project tasks.

29. In the SBA Mentor-Protégé Agreement, TTEMI represented and warranted that it had the capability, experience and means required to carry out the services promised therein, and it agreed to provide those services in a diligent and workmanlike manner consistent with professional practices and standards for nationally recognized firms engaged in similar work.

30. In the SBA Mentor-Protégé Agreement, TTEMI agreed to protect proprietary information provided to it by Sullivan, and to restrict access to Sullivan's proprietary information to those individuals directly participating in providing assistance to Sullivan under the SBA Mentor-Protégé Agreement.

31. When entering the SBA Mentor-Protégé Agreement, TTEMI represented to the SBA that it planned to assist Sullivan in a number of areas, including financial, accounting, project and corporate management, technical capability, quality assurance and control, business development and marketing.

32.     TTEMI and Sullivan renewed the SBA Mentor-Protégé Agreement at the end of each term, until its eventual termination in February, 2007.

33.     On May 9, 2003, pursuant to the SBA Mentor-Protégé Agreement, at TTEMI's suggestion, the parties formed a joint venture called "SulTech," for the purpose of pursuing Navy environmental services contracts. SulTech was formed by Sullivan and TTEMI with Sullivan initially receiving a 15% equity stake, which the parties later agreed to increase to 30%. Pursuant to the SulTech joint venture, Sullivan made a significant investment in infrastructure, equipment and personnel in remote locations to support the development of its Navy environmental service offering.

34.     The DoD and SBA Mentor-Protégé Agreements, the SulTech joint venture agreement and the communications between the parties created a relationship of trust and confidence between them and gave rise to fiduciary duties on the part of TTEMI toward its protégé and joint venturer Sullivan.

35.     In or around July 2003, the U.S. Navy awarded a $50 million environmental services contract to SulTech, representing Sullivan's first incumbent contract with the U.S. Navy, and a significant milestone in the Sullivan/TTEMI relationship. In order to win and perform this contract, Sullivan invested significant money in hiring and training qualified personnel, acquiring necessary equipment and physical resources, and otherwise investing in the infrastructure necessary to perform its obligations under the Navy contract. As Sullivan would later learn, its investment and efforts to perform and compete as a legitimate entity were not in keeping with TTEMI's intentions for the role of its SBA protégé partners.

36.     Instead, on information and belief, TTEMI and its parent company, defendant Tetra Tech, Inc. ("Tetra Tech") routinely partnered with small businesses which lacked the resources necessary to perform the required work levels under governing regulations, teaming agreements or joint venture agreements, pursuant to which TTEMI and Tetra Tech won significant government contract awards. On information and belief, TTEMI and Tetra Tech partnered with these small businesses in order to win government contracts under the false pretense that the small business partners were performing significant work and receiving

1  significant revenues, when in reality, TTEMI and Tetra Tech actually performed the vast

2  majority of work and retained the vast majority of revenues and profits that should have gone to

3  their small business partners.

4          37.    In addition, and contrary to its promises and obligations under governing

5  SBA regulations and the DoD and SBA Mentor-Protégé Agreements, TTEMI systematically

6  worked to compete against its own protégé Sullivan for Navy and other government contracts, by

7  partnering with other small businesses for the same contract opportunities that it could and

8  should have pursued with Sullivan.

9          38.    The federal regulation governing mentor-protégé relationships, 13 C.F.R.

10  § 124.520(b)(2), generally prohibits mentors from having more than one protégé at a time.  A

11  mentor may have more than one protégé only "where the additional mentor/protégé relationship

12  will not adversely affect the development of either protégé firm (e.g., the second firm cannot be a

13  competitor of the first firm)."

14          39.    In violation of this regulation, TTEMI had at least four mentor-protégé

15  relationships in place beyond its relationship with Sullivan during the relevant time frame herein,

16  and TTEMI competed against Sullivan for numerous contract opportunities with its other

17  protégés during the time that it was obligated, under 13 C.F.R. §124.520(b)(2), and under its

18  contractual and fiduciary duties, to refrain from competing against Sullivan for those

19  opportunities.

20          40.    The federal regulations governing contracts awarded to 8(a) small

21  businesses and SBA mentor-protégé joint ventures, impose minimum percentage requirements

22  for the work and revenue earned by 8(a) small businesses and protégé firms.  Generally, those

23  regulations, 13 C.F.R. §§ 124.510, 124.513, require the small businesses to perform a significant

24  portion of the work on any 8(a) contract, and they require joint venture agreements with 8(a)

25  small businesses to specify that the 8(a) small business will receive at least 51% of net profits

26  earned by the joint venture.  For construction contracts, 48 C.F.R. § 508(e) requires that the

27  small business in a mentor-protégé joint venture perform at least 15% of the work with its own

28  employees in any contract which exceeds $100,000.

1             41.      In violation of these regulations, and in breach of its contractual and

2 fiduciary duties to Sullivan, TTEMI and Tetra Tech bid on, procured and performed significant

3 8(a) and small business set aside contracts, using joint venture agreements with 8(a) protégés

4 other than Sullivan, in which TTEMI and Tetra Tech managed the work (steering most of that

5 work to itself), controlled the cash flow (steering most of that cash to itself), and performed a

6 vast majority of the work required to be performed by small businesses. Specifically:

7             a.      On or about March 23, 2006, TTEMI entered a joint venture

8 agreement with St. George Chadux Corporation ("Chadux"), an Alaska native-owned 8(a) small

9 business, pursuant to which the joint venture, named "ChaduxTt JV," would pursue and perform

10 an A-E Firm Fixed Price ID/IQ contract involving CERCLA/RCRA/UST environmental studies

11 on various Navy and Marine Corps installations (the "CERCLA/RCRA Contract"). TTEMI did

12 not agree in the ChaduxTt JV joint venture agreement that Chadux would receive a significant

13 portion of the net profit from the ChaduxTt JV, nor, on information and belief, has Chadux

14 received a significant portion of the net profits from that joint venture, nor has Chadux

15 performed a meaningful percentage of the work, as required by federal regulations. Instead,

16 TTEMI has received the vast majority of revenues and net profits from the ChaduxTt JV, and

17 Chadux brought little, if anything, to the joint venture relationship other than its 8(a) status,

18 which is prohibited by 13 C.F.R. § 124.520(e)(2).

19             b.      In or around 2003, Sullivan approached TTEMI to support bidding

20 on the U.S. Navy SWDIV 8(a) CERCLA/RCRA Contract (the "CERCLA Contract") which

21 called for work Sullivan had been performing with TTEMI for the past two years. TTEMI

22 declined Sullivan's offer, stating that it had chosen another 8(a) firm, Barajas and Associates

23 ("Barajas"), through which to bid the CERCLA Contract. Sullivan is informed and believes, and

24 thereon alleges, that Barajas had not performed any environmental work with the Navy; that the

25 Barajas offices listed in the TTEMI/Barajas joint proposal were not legitimate places of business;

26 and that Barajas could not have performed the 51% of the contract required by applicable federal

27 regulations.

28

1        c.    In or around February 2005, defendants began working to establish

2    an SBA Mentor-Protégé relationship between TTEMI and Heritage Global Corporation, an

3    American Indian-owned company which performed information technology and systems

4    integration work.  On behalf of TTEMI, defendant Fetters falsely represented to Heritage Global

5    Corporation that Sullivan was about to graduate the mentor-protégé program with TTEMI, such

6    that TTEMI was interested in bringing on a new protégé for government contracts construction

7    work when Sullivan graduated.  Shortly thereafter, TTEMI began using a newly formed Heritage

8    Global Corporation subsidiary, Heritage Global Construction ("Heritage Global") to perform

9    government construction contracts, which Sullivan had performed or should have performed.

10    TTEMI used Heritage Global's experience on those contracts to compete against Sullivan for

11    government contracts.  In support of these efforts to compete against Sullivan, with TTEMI's

12    approval, and Heritage Global advertised on its website that it was in a mentor-protégé

13    relationship with TTEMI.  TTEMI even billed Sullivan for Heritage Global work.  Heritage

14    Global, in turn, employed and paid defendant Fetters, in what was effectively a kickback scheme

15    through which Fetters benefited personally at Sullivan's expense, while defendants created and

16    exploited an adverse condition for Sullivan, in violation of  13 C.F.R. § 124.520(b)(2) and their

17    legal duties to Sullivan.

18        d.    On information and belief, in or about March 2005, TTEMI

19    formed a mentor-protégé relationship with a company called TriEco, LLC ("TriEco") a shell

20    company with no meaningful business operations or independent existence, which was created,

21    controlled and maintained by TTEMI for the purpose of unlawfully obtaining government

22    contracts under the Small Business Act.

23        e.    In or about March, 2005, Tetra Tech formed a mentor-protégé

24    relationship with Sealaska Environmental Services ("Sealaska"), a company whose operations

25    are run by TTEMI's Vice President Neil Hart.  On information and belief, Sealaska was

26    effectively controlled by Tetra Tech, did not perform any meaningful portion of work on

27    government contracts awarded to its joint venture with Tetra Tech, and was used by Tetra Tech

28    for the purpose of unlawfully obtaining government contracts under the Small Business Act.  On

1  information and belief, TTEMI and Sealaska won a $20 million dollar U.S. Navy contract at Port

2  Hueneme in Southern California in 2005 under the SBA Mentor-Protégé Program, but Sealaska

3  did not perform any meaningful portion of the work under that contract, or receive any

4  meaningful portion of the contract revenues. On information and belief, Sealaska and Tetra Tech

5  are currently under investigation by the U.S. Navy Inspector General concerning these practices.

6  At all relevant times, TTEMI concealed the existence of its mentor-protégé relationship from

7  Sullivan, and concealed the fact that TTEMI was using Sealaska to compete against Sullivan for

8  small business opportunities in the Navy environmental services sector.

9          42.    On information and belief, TTEMI and TetraTech chose to create adverse

10  conditions for Sullivan, and to actively compete against Sullivan while purporting to be its

11  mentor, because Sullivan actually performed significant work on government contracts, and did

12  not allow TTEMI and TetraTech to use Sullivan as a sham, pass-through entity, as TTEMI and

13  TetraTech used, and continue to use, other 8(a) businesses for its government contracting

14  business. Specifically, TTEMI and Tetra Tech violated 13 C.F.R. §124.520(b)(2), and their

15  contractual and fiduciary duties to Sullivan, as follows:

16          a.    On information and belief, beginning in or about January, 2005,

17  TTEMI competed against Sullivan with a company called Newland Entities, Inc., a company in

18  direct competition with Sullivan, which was used by TTEMI for the purpose of competing

19  against Sullivan for government contracts. By July 15, 2005, defendant Wanta emailed

20  defendants Teel, Fetters and Walsh that a "large Bureau of Reclamation Project will be awarded

21  to the Chadux/Newland Entitites/Tetra Tech team." (Tab C.) At no time did defendants disclose

22  to Sullivan that they were competing against Sullivan to win this government contract, which

23  TTEMI had previously represented to Sullivan that it would perform with Sullivan.

24          b.    On or about March 23, 2006, TTEMI entered a joint venture

25  agreement with St. George Chadux Corporation , an Alaska native-owned 8(a) small business,

26  pursuant to which the joint venture, named "ChaduxTt JV," would pursue and perform an A-E

27  Firm Fixed Price ID/IQ contract involving CERCLA/RCRA/UST environmental studies on

28  various Navy and Marine Corps installations (the "CERCLA/RCRA Contract"). TTEMI did not

1  agree in the ChaduxTt JV joint venture agreement that Chadux would receive a significant

2  portion of the net profit from the ChaduxTt JV, nor, on information and belief, has Chadux

3  received a significant portion of the net profits from that joint venture, as required by federal

4  regulations. Instead, TTEMI has received the vast majority of revenues and net profits from the

5  ChaduxTt JV. Indeed, from the summer of 2006 to December, 2007, defendant Fetters, a

6  TTEMI executive, acted as the President of Chadux, helping TTEMI to effectively control and

7  operate Chadux as an operating division of itself.

8          c.     On information and belief, in or around January 2005, defendants

9  began working to establish an SBA Mentor-Protégé relationship between TTEMI and Heritage

10 Global Corporation, an American Indian-owned company. TTEMI used a Heritage Global

11 subsidiary, Heritage Global Construction ("Heritage Global") to perform government contracts,

12 which Sullivan had performed or should have performed, and used Heritage Global's experience

13 on those contracts to compete against Sullivan for government contracts. TTEMI even billed

14 Sullivan for Heritage Global work. Heritage Global, in turn, employed and paid defendant

15 Fetters, in what was effectively a kickback scheme through which Fetters benefited personally at

16 Sullivan's expense, while defendants created and exploited an adverse condition for Sullivan, in

17 violation of  13 C.F.R. § 124.520(b)(2) and their legal duties to Sullivan.

18         d.     On information and belief, in or about March 2005, TTEMI

19 formed a mentor-protégé relationship with a company called TriEco, LLC, a shell company with

20 no meaningful business operations or independent existence, which was created, controlled and

21 maintained by TTEMI for the purpose of unlawfully obtaining government contracts under the

22 Small Business Act. The efforts of defendants TTEMI, Wanta and Fetters to use TriEco to

23 unlawfully compete against Sullivan for government contracts are evidenced in a PowerPoint

24 presentation attached hereto as Tab D.

25         43.     Defendants knew that their efforts to compete against Sullivan using other

26 small business protégés were unlawful. Thus, in an email dated March 22nd, 2005 (Tab E),

27 defendant Wanta sent an internal email, discussing TTEMI's efforts to obtain SBA approval of a

28 new mentor-protégé agreement with Chadux, or some other American Native Company. In this

1   email, defendant Wanta stated: "Given our existing SBA M-P agreement with Sullivan, we are

2   being careful that there is no conflict – essentially we need to focus on a different region and

3   business line, which is our plan. So, I do not believe we will be able to address the Navy's

4   request to set up an ANC JV for performing A-E environmental work at SWDIV. We will not be

5   using any other SBA M-P to address the Navy's request on this focus area as long as we are in

6   the partnership with Sullivan."

7          44.     In an email dated July 8, 2005 (Tab F), TTEMI executives were warned

8   by Roger Argus to stay "cognizant of our partnership with Sullivan to make sure we don't get

9   into any conflict situations."

10          45.     Despite knowing that using "any other SBA [mentor-protégé]" to bid on

11  Navy environmental services work was unlawful, due to the conflict it created with TTEMI's

12  obligations to its protégé Sullivan, TTEMI went on to do just that, in violation of its legal

13  obligations and duties to Sullivan.

14          46.     In its later internal communications, TTEMI boasted of its success in

15  skirting the SBA regulations, and in abusing the mentor-protégé program as a scheme to obtain

16  significant government contract money that should have gone to small businesses.  Thus, in a

17  January 18, 2006 internal email to TTEMI Regional Managers entitled "Third SBA Mentor-

18  Protégé Firm approved by SBA" (Tab G), TTEMI's Navy Program Manager Michael Wanta

19  acknowledged that the SBA "typically only allows large businesses to have one protégé firm at a

20  time," but went on to describe the SBA's approval of three TTEMI mentor-protégé relationships

21  (Sullivan, Chadux, and TriEco).  In describing TTEMI's success with this scheme, Wanta touted

22  the ability of TTEMI to "form small business ventures with all 3 of these firms **where [TTEMI]**

23  **can manage the work, control cash flow, perform a vast majority of the work, and qualify**

24  **as a small business.**"  In this same email, Wanta bragged of TTEMI's success in using this

25  scheme to win $430 million in government contracts.

26          47.     In an internal presentation, defendant Fetters presented TTEMI executives

27  with a pictorial depiction of the sham, pass-through model TTEMI attempted, without initial

28  success, to impose on Sullivan.  In this model, Sullivan was pictured as winning a direct contract

LATHAM&WATKINS™ SD\637135.1
ATTORNEYS AT LAW
SAN DIEGO

13                                    FIRST AMENDED COMPLAINT

1  award, and TTEMI was pictured as specifying the project superintendent (on Sullivan's payroll),

2  providing "all construction management responsibility" and "project management, and directing

3  all subcontractors (to be paid by Sullivan). A true and correct copy of defendant Fetters'

4  presentation is attached hereto at Tab H. According to Fetters' vision, Sullivan did nothing more

5  than serve as a recipient of a contract award, and the source of payment to TTEMI's project

6  superintendent, project management, and subcontractors. This model violates 13 C.F.R. § 125.6

7  and 48 C.F.R. § 19.508(e), which require a small business to actually perform at least 15% of

8  work on construction projects.

9       48.    On information and belief, TTEMI misled SBA personnel about its

10  compliance with applicable regulations, failing to disclose its competitive efforts against its

11  protégé Sullivan. As a result of TTEMI's concealment of truthful information, SBA personnel

12  were duped into believing that TTEMI was operating in compliance with its duties. As a result,

13  SBA personnel failed to take action to penalize TTEMI.

14       49.    On information and belief, TTEMI misled SBA personnel about its

15  compliance with applicable regulations, failing to disclose its competitive efforts against its

16  protégé Sullivan. As a result of TTEMI's concealment of truthful information, SBA personnel

17  were duped into believing that TTEMI was operating in compliance with its duties. As a result,

18  SBA personnel failed to take action to penalize TTEMI.

19      **TTEMI's Predatory Exploitation of VA Contract Losses**

20       50.    By 2004, Sullivan had performed successfully for approximately eighteen

21  months on small Veterans Administration (VA) construction projects and was considering an

22  expansion of this service focus. Due to Sullivan's ability to win direct award contracts with the

23  VA, a government agency with which TTEMI had no previous relationship, Sullivan and TTEMI

24  agreed to pursue more of this work together.

25       51.    In the summer of 2004, Sullivan and TTEMI began bidding on several VA

26  construction opportunities together. TTEMI agreed to obtain performance and payment bonds

27  on these projects, charging Sullivan a 25% mark-up on the premium for those bonds.

28

1    52.    In or around September 2004, Sullivan was awarded over $12 million in

2   VA contracts, for the construction of facilities at VA hospital facilities in Reno, NV, Palo Alto,

3   CA and Loma Linda, CA (collectively, the "VA Direct Awards"). Before obtaining bonds for

4   these projects, TTEMI reviewed the bids and contracts for them, but failed to warn Sullivan that

5   its bids were too low to permit the projects to be performed profitably, despite TTEMI's

6   purported expertise in construction cost estimating, proposal preparation, and construction

7   project management.

8    53.    According to an internal TTEMI document (Tab I), TTEMI "co-

9   developed" the project bids with Sullivan, and TTEMI was "at the table during negotiations"

10  with the VA.

11    54.    In or around October 2004, TTEMI/Tetra Tech notified Sullivan that

12  TTEMI's Director of Construction, defendant Randy Fetters, would be the overall leader for this

13  VA Construction work, and that Mr. Fetters would be supported by Ron Carol and Dave

14  Takemoto. TTEMI represented to Sullivan that Fetters, Carol and Takemoto had significant

15  construction management training and experience; that these key employees were "top tier"

16  talent that had supported other TTEMI large scale construction projects; and were the best

17  TTEMI people to manage the VA Direct Award projects.

18    55.    In or around November 2004, work on the VA Direct Awards began.

19  TTEMI assumed full and active responsibility for project management of the VA Direct Awards,

20  as required by the TTEMI surety, which issued performance and payment bonds to guarantee

21  Sullivan's performance and payment to subcontractors and materialmen.

22    56.    In March, 2005, defendant Fetters was reassigned by TTEMI to manage

23  TTEMI's Geneva Steel Plant project in Utah. Fetters himself had previously recognized, in an

24  email dated January 24, 2005 (Tab J), that the VA Direct projects "really need full time TtEMI

25  supervision." Despite the need for a full-time project manager on the VA Direct Award projects,

26  TTEMI had Mr. Fetters attempt to manage the VA Direct Award projects remotely from the

27  TTEMI Utah project location. As a result of his reassignment to TTEMI's Geneva Steel Plant

28  project, Fetters failed to devote the necessary time or energy to supervising the VA Direct Award

1  projects. Indeed, one of Fetters' few acts of involvement with Sullivan during this period was to

2  suggest charging Sullivan for part of the lease on real property Fetters had located to use as a

3  staging area for Geneva Steel Plant project.

4         57.    On information and belief, Fetters had no formal construction

5  management education or training, no significant construction management experience, and was

6  incapable of competently managing the VA projects, particularly in light of his relocation to

7  Utah and commitments to other TTEMI business.

8         58.    Indeed, on information and belief, and unbeknownst to Sullivan at the

9  time Fetters served as TTEMI's Director of Construction, Fetters had concealed his prior

10  employment in a construction capacity with the Los Angeles Unified School District, where he

11  had been terminated. On information and belief, Fetters had also previously bankrupted a

12  consulting company devoted to arranging small business partnerships with large companies, and

13  had promoted municipal projects for personal benefit while serving on the Edgewood,

14  Washington City Council. TTEMI knew or should have known of Fetters' history of

15  concealment, self-dealing and unethical conduct, but TTEMI recklessly placed Fetters in a

16  position of trust and authority over Sullivan's construction projects. There, and thereafter,

17  TTEMI aided, abetted and conspired with Fetters as he schemed to violate small business

18  regulations so that TTEMI could, in the words of defendant Wanta, "perform a vast majority of

19  the work, and qualify as a small business" on government contracts for small businesses.

20         59.    On information and belief, the other TTEMI personnel assigned to manage

21  the VA Direct Award projects lacked the necessary construction management education or

22  training, and lacked the necessary construction management experience, and were incapable of

23  competently managing the VA projects.

24         60.    By March 2005, before any significant construction on the VA Direct

25  Award projects had taken place, TTEMI determined that Sullivan would lose significant money

26  on these projects. Rather than attempting to manage this problem for its protégé, TTEMI

27  decided instead to exploit Sullivan's situation for TTEMI's own gain. To that end, TTEMI,

28  defendants Teel, Wanta and Fetters conceived of and executed a plan to conceal their conclusion

1    that construction costs would exceed Sullivan's contract revenues, in order to create financial

2    hardship for Sullivan, which defendants then exploited for their own gain.

3            61.    Rather than assisting Sullivan in completing the projects, TTEMI

4    intentionally withheld the projects' projected losses from Sullivan, in order to create a situation

5    where Sullivan faced cash flow problems due to unpaid subcontractors and materialmen, at

6    which point Sullivan was forced to turn over the projects completely to TTEMI. By concealing

7    information in order to create a situation whereby Sullivan was forced to turn over the projects,

8    TTEMI was able to reap the project revenues from the VA, and from Sullivan itself, as detailed

9    more fully below.

10           62.    In addition, defendants Fetters conceived of and executed a scheme with

11   defendants Teel and TTEMI, by which these defendants conspired to destroy Sullivan's business,

12   in order to facilitate a purchase of that business at a low price by Chadux, one of TTEMI's sham

13   small business protégés. This scheme, called "Fetter's Model" in an internal TTEMI

14   presentation (Tab I), called for TTEMI to take advantage of Sullivan's financial strain by forcing

15   a sale of Sullivan's business to Chadux. TTEMI then planned to reap 85% of the revenue and

16   associated profit from Chadux, in violation of federal regulations governing the work and profit

17   split between small businesses and large business mentor or joint venture firms.

18           63.    Unbeknownst to Sullivan, even while in a mentor-protégé relationship

19   with Sullivan, and while owing Sullivan fiduciary duties, TTEMI was busy preparing to compete

20   against Sullivan, using Chadux and an unlawful financing/securities fraud scam as instruments in

21   its scheme. This plan is evidenced in numerous TTEMI internal emails, including one between

22   defendants Teel and Fetters (Tab K), discussing a plan to hire a key Sullivan employee "when

23   we finally get the other things going..." These "other things" got going a short time thereafter.

24           64.    Thus, in the summer of 2005, the Navy announced that it was re-

25   competing the CERCLA/RCRA Contract, the $50 million dollar contract that SulTech had won

26   earlier. Upon learning that the CERCLA/RCRA Contract was being re-competed, Sullivan

27   contacted TTEMI and was told by defendant Wanta, "we have no intention of bidding on this

28   contract with SULLIVAN in any form or fashion and we have already determined our strategy."

LATHAM&WATKINS^^  SD\637135.1
ATTORNEYS AT LAW
SAN DIEGO                              17                    FIRST AMENDED COMPLAINT

1   When Sullivan inquired as to the TTEMI strategy, Wanta stated, "we are planning to bid with a

2   ANC [American Native Company] so we can perform on the entire contract and just pay the

3   ANC a pass through fee." In subsequent communications, upon which Sullivan reasonably

4   relied, TTEMI recanted these admissions, and represented that it was competing for the

5   CERCLA/RCRA Contract only as a subcontractor, and not as part of a mentor-protégé

6   relationship.

7              65.     In truth, and contrary to TTEMI's representations that it was only pursuing

8   the CERCLA/RCRA contract as a potential subcontractor, defendants Fetters and TTEMI were

9   busy conspiring to compete for the contract against Sullivan. To that end, on information and

10  belief, Fetters negotiated with Home Solutions a $1 million loan to Chadux from Home

11  Solutions of America, then a publicly traded company on the NASDAQ exchange. In exchange

12  for this loan, Fetters promised some participation on the $50 million contract to Home Solutions,

13  as evidenced by a March 13, 2007 press release from Home Solutions (Tab L), touting its

14  participation in the contract as a joint venture partner with Chadux. Subsequent analyst reports

15  and press articles described this press release, which caused Home Solutions' stock to rise 8%, as

16  misleading, in that it falsely implied that Home Solutions would receive one-third of the $50

17  million contract revenues. Home Solutions has since been de-listed from the NASDAQ

18  exchange, amidst a morass of accounting fraud and self-dealing allegations.

19             66.     By no later than October 7, 2005, defendants Teel, Fetters and TTEMI had

20  determined internally to end their efforts to support Sullivan, and to cease supporting Sullivan to

21  compete for government contracts. These defendants decided to complete one of the VA Direct

22  Award projects in order to protect TTEMI's reputation, so that TTEMI could then secretly

23  pursue similar projects with other partners. Defendants Teel, Fetters, and TTEMI concealed this

24  plan from Sullivan, and discouraged Sullivan from entering other mentor-protégé relationships,

25  in order to prevent Sullivan from competing against TTEMI or succeeding in government

26  construction contract projects.

27             67.     TTEMI's fraudulent scheme is detailed in TTEMI's internal emails.

28  Specifically:

LATHAM&WATKINS<sup>LLP</sup>   SD\637135.1
ATTORNEYS AT LAW
SAN DIEGO

1          a.    In an email dated March 8, 2005 (Tab M), defendant Teel

2    informed defendants Fetters and Wanta that he needed a plan to present to Sullivan of how the

3    projects would be managed to completion.  According to Teel, "We need to get them to turnover

4    project completely. . .They cannot charge to the project at all, or minimally as defined by you."

5    Teel went on to propose that TTEMI review Sullivan's remaining projects, so that TTEMI could

6    know "whether or not we need to take those over to [sic]."

7          b.    In an email dated March 9, 2005 (Tab N), defendant Teel

8    instructed defendants Fetters and Wanta not to apprise Sullivan of the anticipated losses.

9    According to Fetters, "I do not think they even have a good idea how much trouble they are in,"

10   to which Teel responded, "Let's not get into with them yet…Let's get the go forward plan

11   together first and then we will meet with them to layout the plan…This will not be a

12   negotiation."

13         c.    In an email dated July 25, 2005 (Tab O), defendant Wanta reported

14   that he had met with Sullivan's founder Steve Sullivan, and that TTEMI's plan to conceal project

15   cost information had succeeded ("We heard he finally realized things aren't going well on the

16   construction projects.")

17         d.    In an email nearly one month later describing an unpaid Sullivan

18   subcontractor, defendants Wanta, Argus and Fetters continued to discuss their concealment of

19   adverse cost information, and the predicted effect it was now having on Sullivan.  In this email,

20   dated August 31, 2005 (Tab P), Wanta apprises Argus and Fetters that Sullivan's unpaid

21   subcontractor Newland was complaining to TTEMI about unpaid invoices, prompting Argus to

22   instruct defendants to continue their pattern of concealment: "Thanks for the heads up; I strongly

23   suggest we stay out of the fray – play dumb."

24         e.    In an email dated October 7, 2005 (Tab Q), defendant Fetters

25   informed TTEMI executives that "[w]e should develop a phase-out plan for construction, and

26   possibly environmental work" with Sullivan.  This proposal was enthusiastically endorsed within

27   TTEMI, but never disclosed to Sullivan or its principal Mr. Sullivan, who TTEMI executives

28   referred to hatefully as "the ballerina."

1          f.     In an internal presentation prepared on or about October 13, 2005

2 (Tab I), the Fetter's Model was presented, which called for Sullivan to sell its business,

3 weakened by TTEMI's actions on the VA Direct Award projects, so that TTEMI could use

4 Chadux to earn 85% of the revenue and profit, and so that TTEMI could use Chadux as its sham

5 small business joint venture partner in order to win government contract awards.  According to

6 the Fetter's Model, TTEMI had a "realistic goal" of earning over $20-50 million per year using

7 this approach.

8          68.     Even while intentionally concealing the fact that Sullivan would suffer

9 losses on the projects, TTEMI itself contributed to Sullivan's losses on these projects, by failing

10 to devote sufficient, experienced, capable project management personnel; and approving

11 significant out-of-scope work with no compensation from the VA and with no prior notification

12 to or consent from Sullivan, at Sullivan's expense.

13          69.     After concealing and contributing to Sullivan's cost overruns on the

14 projects, TTEMI then stepped in and took over the projects, under the guise of helping to

15 mitigate Sullivan's losses.  TTEMI did so by inducing Sullivan to enter a series of Construction

16 Management Agreements, which permitted TTEMI to enrich itself with significant mark-ups on

17 management, labor and material costs charged to Sullivan by TTEMI and its subcontractors.

18          70.     After inducing Sullivan to enter the Construction Management

19 Agreements, TTEMI then proceeded to charge Sullivan significant sums for its purported project

20 management and other services.  Included in the charges to Sullivan were bills from Heritage

21 Global, which was issued an original purchase order of not-to-exceed $100,000, but which

22 ultimately charged Sullivan approximately $940,000.

23          71.     On information and belief, Heritage Global was a shell company

24 dominated and controlled by TTEMI.  On information and belief, Heritage Global employed

25 defendant Fetters, and compensated him in exchange for billings he generated for Heritage

26 Global.  Unbeknownst to Sullivan at the time, Fetters had manufactured the Heritage Global

27 billings to Sullivan, using the services of his wife, who also worked at Heritage Global.  By

28 using Heritage Global to bill Sullivan for work on the VA Direct Award projects, and by

LATHAM&WATKINS  SD\637135.1
ATTORNEYS AT LAW
SAN DIEGO                20                    FIRST AMENDED COMPLAINT

1  receiving compensation from Heritage Global and TTEMI, defendant Fetters was effectively

2  able to skim money from the VA and from Sullivan, for his own personal benefit, in violation of

3  anti-kickback and conflict of interest laws.  At no time did Fetters, Heritage or TTEMI disclose

4  to Sullivan the fact that Fetters was employed by Heritage Global, or that Fetters' wife was

5  generating Heritage Global purchase orders to Sullivan, or that Fetters was effectively receiving

6  compensation from Sullivan through Heritage Global invoices.

7         72.     After completing TTEMI's scheme to take over Sullivan's VA Direct

8  Award projects by taking advantage of its prior concealment of cost information from Sullivan,

9  defendant Fetters communicated the success of TTEMI's fraudulent course of conduct internally.

10  Thus, in an email dated January 23rd, 2006 (Tab R), three days after the Construction

11  Management agreements were signed, Fetters forwarded an email chain dating back nine months

12  - the March 9, 2005 email in which Fetters that indicated that **"I do not think they even have a**

13  **good idea how much trouble they are in yet,"** with the corresponding response from defendant

14  Teel, saying, **"Let's not get into with them yet….Lets get the go forward plan together first,**

15  **and then we will meet with them to lay out the plan….This will not be a negotiation."**

16  When forwarding these emails nine months later, after the Construction Management agreements

17  were signed, defendant Fetters, stated: "For your reading pleasure."  This email clearly conveyed

18  the message: mission accomplished.

19         73.     After inducing Sullivan to enter the Construction Management

20  Agreements, TTEMI refused to allow Sullivan to communicate with the VA, even though

21  Sullivan's reputation was on the line with regard to the VA Direct Award projects.

22         74.     On information and belief, in its communications to the VA, TTEMI made

23  false and defamatory statements about Sullivan and its competence and integrity, in order to

24  boost TTEMI's own reputation at its protégé's expense.

25         75.     On information and belief, in its communications to the VA, TTEMI

26  agreed to significant out-of-scope work, which was then charged to Sullivan, further

27  exacerbating Sullivan's losses.

28

76.    As a result of its exclusion from VA meetings, Sullivan was left unable to protect its reputation from TTEMI's false and misleading statements, and was unable to prevent TTEMI from agreeing to significant out-of-scope work at Sullivan's expense.

77.    Further exploiting the financial strain caused by its own mismanagement and concealment of material financial information, TTEMI then sought to further exploit Sullivan's hardship by engaging in a series of predatory loans, designed to bring a surrender of additional contract revenues to TTEMI from Sullivan, and written with onerous default provisions under which Sullivan would lose significant additional government contract positions to TTEMI.

78.    On January 31, 2006, TTEMI agreed to loan Sullivan $2.5 million to finance the shortfall from the VA Direct Award projects to the extent there was any. Sullivan thereafter executed three promissory notes which were personally guaranteed by Sullivan's founder and principal Steve Sullivan and William Ulmer, the other principal of Sullivan at the time. Sullivan also made an oral agreement with defendant Batrack to ultimately split the total eventual loss even if it exceeded the amounts set forth in the CM Agreements, based on a representation from defendant Fetters that the projects could be completed at a figure below the CM Agreements amounts.

79.    The first promissory note was due for repayment on April 1, 2006 as it was needed for Sullivan to catch up on all of the unpaid contractors for the VA Direct Award Projects through the end of 2005. TTEMI threatened to end Sullivan's participation on the EPA Region 5 RAC Contract if the loan was not repaid on time.

80.    The TTEMI loans were induced by TTEMI's fraud and concealment. Specifically, at the time Sullivan agreed to borrow money from TTEMI to cover project losses on the VA Direct Award projects, Sullivan was unaware of the following facts, which were known to TTEMI, and which TTEMI had a duty to disclose:

a.    Before construction commenced, TTEMI had concluded that Sullivan would lose significant money performing the VA Direct Award projects;

b.    While the projects were being performed, defendants had decided

1   to stop supporting Sullivan as TTEMI's protégé, and were actively competing against Sullivan

2   using other protégés and small businesses;

3                c.     While the projects were being performed, on information and

4   belief, TTEMI was making false and defamatory statements about Sullivan to the VA, and to

5   other government agencies;

6                d.     Fetters was self-dealing and skimming money from the VA Direct

7   Award projects and Sullivan, through his undisclosed compensation from Heritage Global;

8                e.     Fetters and TTEMI were actively working to obtain financing for

9   Chadux from Homes Systems of America in order to help Chadux and TTEMI win the

10   CERCLA/RCRA contract;

11              f.     Defendants were using small business government contractors as

12   pass-through agents for TTEMI to obtain government contracts it would not otherwise obtain.

13       81.    The TTEMI loans were also necessitated by TTEMI's mismanagement of

14   the VA Direct Awards projects, and but TTEMI's failure to competently perform its obligations

15   under the SBA Mentor-Protégé Agreement. But for TTEMI's mismanagement and failure to

16   perform its obligations under the SBA Mentor-Protégé Agreement, Sullivan never would have

17   been forced to enter the loans, and never would have become indebted to TTEMI.

18       82.    By March, 2006, shortly before the first loan was due for repayment,

19   Sullivan became aware of a Mentor-Protégé relationship between TTEMI and TriEco, which had

20   not been previously disclosed to Sullivan. Concerned that TTEMI was violating the adverse

21   condition regulation, 13 C.F.R. § 124.520(b)(2), and concerned that TTEMI would compete

22   against Sullivan using TriEco instead of Sullivan, Sullivan wrote to the SBA and the Navy.

23   TTEMI became aware of Sullivan's correspondence, and engaged in a heavy-handed and

24   fraudulent course of dealing to prevent the SBA or Navy from learning the truth about TTEMI's

25   abuse of the government's small business programs.

26       83.    On September 21, 2006, in a telephonic meeting with Steve Sullivan,

27   defendant Batrack, the Chief Executive Officer of Tetra Tech, demanded that Sullivan send a

28   letter to the SBA, drafted by counsel for Tetra Tech for Sullivan's signature, claiming that

LATHAM&WATKINS LLP   SD\637135.1
ATTORNEYS AT LAW
SAN DIEGO                23                FIRST AMENDED COMPLAINT

1   TTEMI had disclosed to Sullivan all of its mentor-protégé relationships.  In the course of

2   communicating with Sullivan about that issue, Batrack concealed the fact that TTEMI had

3   current or pending mentor-protégé relationships with at least four other small businesses,

4   including Chadux.

5            84.    In addition, in the September 21, 2006 telephonic meeting, Batrack

6   promised Sullivan that TTEMI would pursue at least four EPA contract opportunities with

7   Sullivan, when in truth, TTEMI had already determined not to pursue government contract

8   opportunities with Sullivan.  As Batrack knew, but did not disclose to Sullivan, TTEMI had

9   already decided to discontinue its relationship with Sullivan, and to instead pursue all future

10  government contract opportunities with Chadux, and other sham small business protégés, as part

11  of the scheme to game the government contracts small business system for unlawful gain.  This

12  undisclosed decision and plan are evidenced by, among other things:

13            a.    An October 8, 2005 internal TTEMI email, reflecting TTEMI's

14  undisclosed efforts to obtain government construction contract work with TriEco.  In that email

15  (Tab S), with the subject "Alabama is a go," defendant Teel describes the need to quickly form a

16  joint venture with TriEco in order to win the Alabama construction project: "Call me as soon as

17  we hear something....I would like to make sure we have some kind of paper in place, even if it is

18  a letter of intent. I want to make sure that we can get a job number open and that we have the

19  right set up with Tri-Eco." He then put an exclamation point on TTEMI's efforts to compete

20  against its protégé and joint venturer Sullivan, saying: **"F[uck]... Sullivan on the construction**

21  **stuff!"** (Emphasis added.)

22            b.    A December, 2005 internal TTEMI email exchange about a

23  government contract opportunity, described as "right up our alley" by TTEMI personnel

24  inquiring whether TTEMI would bid the project with Sullivan.  However, in that internal email

25  (Tab T), TTEMI decided it would "rather look at something like this with St. George Chadeaux"

26  instead of its protégé and joint venturer Sullivan.

27            c.    An March 23, 2006 internal TTEMI email (Tab U), reflecting

28  TTEMI's undisclosed decision to place defendant Fetters in charge of Chadux, as its CEO or

1   GM. According to that email exchange between defendants Wanta and Fetters, Fetters would

2   soon be acting as the CEO of another small business, "where we can work on good projects

3   moving forward." A short time later, Fetters began acting as the President of Chadux.

4               d.      When Fetters began acting as the President of Chadux, he did so in

5   concert and for the benefit of TTEMI. Thus, although he was nominally required to devote

6   100% of his efforts to the business of Chadux, and while he spent substantial time using Chadux

7   to assist TTEMI in competing against TTEMI's protégé Sullivan, Fetters also simultaneously

8   worked on Sullivan projects, and billed TTEMI for this time using TTEMI purchase orders to

9   Chadux.

10              e.      Defendant Fetters attempted to conceal TTEMI's effective control

11  of Chadux. Thus, when competing against Sullivan in an attempt to win government contract

12  business from the VA, Fetters represented to the government contracting officer for the VA, in

13  an email attached as Tab V, that Sullivan was about "to graduate" from its mentor-protégé

14  program with TTEMI, which was false. Fetters also stated that he was serving as Chadux's

15  President as part of an "executive sharing SBA program" between TTEMI and Chadux. There is

16  and was no such thing as an "executive-sharing SBA program," but Fetters employed this ruse to

17  deflect suspicion away from the fact that Chadux was being used by TTEMI to compete against

18  its protégé Sullivan, and that Chadux was effectively controlled and operated by TTEMI,

19  through its executive Fetters.

20          85.     In addition, in the September 21, 2006 meeting, Batrack promised

21  Sullivan that TTEMI would make only positive statements about Sullivan, in order to promote

22  Sullivan to government agencies and enhance Sullivan's ability to obtain government contracts.

23  On information and belief, Batrack had no intent to perform this promise, or for TTEMI to

24  perform this promise, because TTEMI had actually already made the decision to compete against

25  Sullivan, and was actively doing so, at the time Batrack gave his false assurances to Sullivan.

26          86.     On information and belief, Batrack made the promises and representations

27  to Sullivan detailed in paragraphs 83-85 above, knowing they were false, and with the intent to

28

1    deceive Sullivan into giving up significant and substantial rights and revenues, which Sullivan

2    did.

3            87.      Sullivan justifiably relied on the assurance by Batrack that TTEMI had no

4    other mentor-protégé relationships, on the promise that TTEMI would pursue additional EPA

5    contract opportunities with Sullivan, and on the promise that TTEMI would make only positive

6    statements about Sullivan.  In reliance on Batrack's representations and promises, Sullivan

7    agreed to and did the following:

8                    a.      Went forward with a bid on the $50 million Navy

9    CERCLA/RCRA contract, unaware that TTEMI was bidding on the same contract with Chadux;

10                   b.      Gave up its 30% position on the $250 million Navy teaming

11   agreement, thereby losing $75 million in potential revenues;

12                   c.      Cancelled a $2 million VA Direct Award project in Loma Linda,

13   CA, in order to accede to TTEMI's request to get a release of the bond that TTEMI had procured

14   for that project;

15                   d.      Invested significant time, energy and money attempting to win

16   Department of Energy contracts with TTEMI, unaware that TTEMI had no intention to pursue or

17   perform such contracts if they had been awarded;

18                   e.      Sacrificed the opportunity to form a relationship with another

19   mentor.

20           88.      Had Sullivan been aware of the true facts, which were concealed and

21   misrepresented by Batrack on behalf of Tetra Tech and TTEMI, Sullivan would not have taken

22   any of the actions described in paragraph 87, above.

23           89.      In November, 2006, as a result of the stress brought about by the

24   defendants' wrongful conduct toward him and the injuries they inflicted on his company, Mr.

25   Sullivan was hospitalized with a life-threatening, stress-related heart condition.  While

26   hospitalized, Mr. Sullivan suffered congestive heart failure and nearly died.

27           90.      In or around December of 2006, while Mr. Sullivan remained hospitalized,

28   Sullivan learned that TTEMI and Chadux had won the CERCLA/RCRA Contract as an SBA

1  Mentor-Protégé joint venture. Sullivan immediately protested the award. TTEMI sought and

2  received advice and assistance from SBA personnel in defeating Sullivan's protest, and TTEMI

3  and SBA personnel worked together to ensure that Sullivan's protest was denied..

4          91.    Ironically, even after Sullivan learned that TTEMI had formed the new

5  illegal mentor-protégé relationship with Chadux, TTEMI demanded that Sullivan continue its

6  mentor-protégé relationship with Sullivan. On information and belief, TTEMI did so in order to

7  prevent Sullivan from pursuing a new mentor-protégé relationship with a TTEMI competitor,

8  and to prevent Sullivan from using its knowledge, experience and relationships to compete in a

9  new relationship. Indeed, when it had renewed its mentor-protégé relationship with Sullivan in

10  early 2006, thereby putting itself in a position of using Sullivan to qualify as a small business and

11  precluding Sullivan from competing against TTEMI, TTEMI's Vice President Ed Bernstein

12  stressed to defendant Fetters that "[s]omeone needs to keep Steve Sullivan under control." This

13  statement is contained in an internal TTEMI email attached hereto as Tab W.

14          92.    While insisting that Sullivan remain in its mentor-protégé relationship

15  with TTEMI, TTEMI secretly continued and continues to attempt to cripple Sullivan's business

16  and disrupt its contractual and prospective economic relationships with government agencies.

17  As part of that effort, in or about April of 2008, defendant Sussenguth, on behalf of TTEMI,

18  made false and defamatory statements about Sullivan to Steve Linder at the EPA, to the effect

19  that Sullivan was not financially solvent, and that there were significant risks in using Sullivan

20  for environmental projects. Implicit in Sussenguth's latter statement was the assertion that

21  Sullivan was not competent in its profession.

22          93.    Sussenguth's statements, evidenced in the email attached as Tab X, were

23  false and defamatory. In truth, Sullivan is financially solvent, and is highly competent and

24  capable of performing environmental projects.

25          94.    Sussenguth also stated to the EPA that TTEMI would be reluctant to work

26  with Sullivan on any contract with the EPA. That statement was true, but is contrary to the

27  representations made to Sullivan by defendant Batrack on September 21, 2006, and the

28  obligations owed to Sullivan under the SBA Mentor-Protégé Agreement.

95.    On information and belief, Sussenguth and other TTEMI personnel have made similarly false and defamatory statements about Sullivan, and have requested government agencies to repeatedly audit Sullivan, based on TTEMI's false accusations and innuendo.  These statements have had the effect of significantly damaging Sullivan's reputation among government agencies and in the industry.

96.    In or about November 2007, TTEMI's executive Roger Argus was discussing the TTEMI promissory notes to Sullivan, and Argus was asked what actions TTEMI would take if Sullivan suspended payment on those notes.  Argus stated that the timing was not right for TTEMI to take aggressive action against Sullivan, but that when the right moment came, TTEMI would use its full power against Sullivan.  At or about this time, after TTEMI and the other defendants had inflicted significant damage on Sullivan through the conduct alleged herein, defendant Fetters contacted Sullivan as the President of Chadux, and offered to purchase Sullivan for substantially less than the most recent valuation of Sullivan.  When he discussed that proposal, dated November 12, 2007 and attached at Tab Y, Fetters stated that he knew that Sullivan was in dire financial condition and that the owners should sell before going bankrupt.

97.    On information and belief, when defendant Fetters contacted Sullivan with a low-ball offer to buy Sullivan, Fetters was still acting on TTEMI's behalf, in direct contact with TTEMI, as part of TTEMI's unlawful scheme to use Chadux to obtain government contracts through bogus relationships with small businesses.  On information and belief, Sullivan further alleges that when making his low-ball offer to buy Sullivan, Fetters was acting pursuant to the concerted plan of action conceived and described in writing within TTEMI roughly two years earlier, called the "Fetter's Model."

### First Cause of Action

### Unfair Competition

### (By Sullivan Against All Defendants)

98.    Plaintiff hereby incorporates each preceding allegation as though set forth in full herein.

1    99.    By perpetrating the conduct alleged herein, defendants engaged, and

2  continue to engage, in a series of business practices which are unlawful, unfair, and fraudulent,

3  in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.

4    100.    By perpetrating the conduct alleged herein, defendants acted unlawfully

5  by, among other things:

6    a.    Competing against Sullivan using multiple 8(a) small business

7  protégé firms, in violation of 13 C.F.R. § 124.520(b);

8    b.    Procuring and performing 8(a) and small business set aside

9  government contracts with shell companies controlled by TTEMI, and by performing a vast

10  majority of the work and reaping the vast majority of the revenues under those contracts, in

11  violation of 13 C.F.R. §§ 124.510, 124.513, 124.520 and 125.6;

12    c.    Using Chadux and TriEco in joint ventures, where TTEMI

13  received the vast majority of revenues and net profits, and where Chadux and TriEco brought

14  little, if anything, to the joint venture relationships other than its 8(a) status, which is prohibited

15  by 13 C.F.R. §§ 124.513(a)(2) and 124.520(e)(2).

16    101.    By perpetrating the conduct alleged herein, defendants acted unfairly, with

17  the purpose and effect of restraining competition for government contracts by legitimate small

18  businesses and other large business mentors.

19    102.    By perpetrating the conduct alleged herein, defendants acted fraudulently

20  by, among other things:

21    a.    Concealing project cost information on the VA Direct Award

22  projects, knowing that Sullivan would encounter cash flow difficulties which would force

23  Sullivan to turn over the projects to TTEMI.

24    b.    Concealing the nature and extent of TTEMI's mentor-protégé

25  relationships with other firms;

26    c.    Affirmatively misrepresenting to Sullivan that TTEMI would

27  complete the VA Direct Award projects within the cost amounts presented to Sullivan, inducing

28  Sullivan to enter into a series of Construction Management Agreements;

1          d.      Concealing Fetters' self-dealing and skimming of VA Direct

2   Award project funds, through his compensation from Heritage Global;

3          e.      Concealing Defendants' decision to discontinue government

4   contracting efforts with Sullivan;

5          f.      Affirmatively misrepresenting to Sullivan in September, 2006 that

6   its only mentor-protégé relationship was with Sullivan;

7          g.      Affirmatively misrepresenting to Sullivan in September, 2006 that

8   TTEMI would pursue at least four EPA contract opportunities with Sullivan;

9          h.      Affirmatively misrepresenting to Sullivan in September, 2006 that

10  TTEMI would make only positive statements about Sullivan, in order to promote Sullivan to

11  government agencies;

12         i.      Concealing Defendants' efforts to obtain financing for Chadux

13  from Homes Systems of America in order to help Chadux and TTEMI win the CERCLA/RCRA

14  contract;

15         j.      Concealing Defendants' true objective of making small business

16  government contractors pass-through agents for TTEMI to obtain government contracts it would

17  not otherwise obtain.

18         103.    Sullivan was damaged by defendants' unlawful, unfair and fraudulent acts,

19  in that Sullivan paid significant monies to TTEMI and its agents in the form of VA Direct Award

20  contract revenues and project costs, interest on predatory loans made to Sullivan by TTEMI, and

21  in that Sullivan conveyed significant interests in government contracts to TTEMI.

22                          **Second Cause of Action**

23                  **Intentional Interference with Economic Advantage**

24                      *(By Sullivan Against All Defendants)*

25         104.    Plaintiff hereby incorporates each preceding allegation as though set forth

26  in full herein.

27

28

1    105.    At all relevant times, Sullivan had relationships with the probability of

2    future economic benefits, including without limitation the plaintiff's relationships with the U.S.

3    Navy, the EPA, the VA, and other government agencies.

4    106.    At all relevant times, defendants knew of plaintiff's relationships.

5    107.    Defendants engaged in a course of wrongful conduct, by which they

6    intentionally disrupted and interfered with plaintiff's relationships.  These acts of wrongful

7    conduct included denying Sullivan access to joint clients, making false and defamatory

8    statements about Sullivan, intentionally concealing project cost information to inflict and

9    exacerbate financial hardship on Sullivan, fraudulently inducing Sullivan to relinquish contract

10    positions and contract revenues, and requesting frequent government audits of Sullivan's

11    financial condition in order to harass Sullivan, distract its management and drain its resources.

12    108.    At all relevant times, defendants intended to disrupt plaintiff's economic

13    relationships.

14    109.    As a proximate result of defendants' acts, Sullivan's economic

15    relationships with the Navy, VA, and EPA were disrupted, and Sullivan has lost significant

16    revenues and incurred significant expenses attempting to deal with the disruption and damage to

17    those relationships.

18    110.    In perpetrating the wrongful conduct alleged herein, defendants acted with

19    malice, fraud and oppression, thereby justifying an award of punitive damages against them.

20    **Third Cause of Action**

21    **Negligent Interference with Prospective Economic Advantage**

22    **(By Sullivan Against All Defendants)**

23    111.    Plaintiff hereby incorporates each preceding allegation as though set forth

24    in full herein.

25    112.    At all relevant times, Sullivan had relationships with the probability of

26    future economic benefits, including without limitation the plaintiff's relationships with the U.S.

27    Navy, the EPA, the VA, and other government agencies.

28

LATHAM&WATKINS<sup>LLP</sup>    SD\637135.1
ATTORNEYS AT LAW
SAN DIEGO

FIRST AMENDED COMPLAINT

1    113.    At all relevant times, defendants knew that plaintiff had relationships with

2  the probability of future economic benefits with the Navy, the EPA, the VA, and other

3  government agencies.

4    114.    Defendants engaged in a course of wrongful conduct, by which they

5  intentionally disrupted and interfered with plaintiff's relationships.  Specifically, defendants

6  blocked Sullivan's access to joint clients, made defamatory statements about Sullivan,

7  intentionally concealed project cost information to inflict and exacerbate financial hardship on

8  Sullivan, and requested frequent government audits of Sullivan's financial condition in order to

9  distract Sullivan's management and drain its resources.

10    115.    At all relevant times, defendants intended to disrupt plaintiff's economic

11  relationships.

12    116.    As a proximate result of defendants' acts, Sullivan's economic

13  relationships with the Navy, VA, and EPA were disrupted, and Sullivan has lost significant

14  revenues and incurred significant expenses attempting to deal with the disruption and damage to

15  those relationships.

16    **Fourth Cause of Action**

17    **Intentional Interference with Contractual Relations**

18    *(By Sullivan Against All Defendants)*

19    117.    Plaintiff hereby incorporates each preceding allegation as though set forth

20  in full herein.

21    118.    At all relevant times, plaintiff had contracts with the government agencies,

22  including the U.S. Navy, EPA, and the VA.

23    119.    Defendants knew of plaintiff's contracts.

24    120.    In perpetrating the conduct alleged herein, defendants intentionally

25  disrupted and interfered with Sullivan's contractual relationships.

26    121.    As a proximate result of defendants' wrongful acts of interference,

27  Sullivan's contractual relationships have been breached or disrupted, such that performance of

28  those contracts by Sullivan has been made more costly and burdensome.

LATHAM&WATKINS™  SD\637135.1
ATTORNEYS AT LAW
SAN DIEGO
FIRST AMENDED COMPLAINT

1    122.    As a proximate result of defendant's wrongful acts of interference,

2  plaintiff has suffered damage, in an amount to be proven at trial.

3    123.    In perpetrating the wrongful conduct alleged herein, defendants acted with

4  malice, fraud and oppression, thereby justifying an award of punitive damages against them.

5    **Fifth Cause of Action**

6    **Fraud**

7    *(By Mr. Sullivan and Sullivan Against All Defendants)*

8    124.    Plaintiffs hereby incorporate each preceding allegation as though set forth

9  in full herein.

10    125.    As alleged more particularly herein, defendants made numerous

11  misrepresentations to plaintiffs, knowing they were false, including the following:

12    a.    That other than Sullivan, TTEMI had no other mentor-protégé

13  relationships (in truth, TTEMI had numerous other mentor-protégé relationships, which it was

14  using to compete against Sullivan);

15    b.    That TTEMI would pursue at least four EPA contract opportunities

16  with Sullivan (in truth, TTEMI had decided to stop pursuing contract opportunities with

17  Sullivan, in favor of its other, undisclosed protégé business partners)

18    c.    That TTEMI would make only positive statements about Sullivan,

19  in order to promote Sullivan to government agencies and enhance Sullivan's ability to obtain

20  government contracts (in truth, TTEMI was making, and intended to and did continue to make

21  false, defamatory, and disparaging statements about Sullivan, and requested government

22  agencies to repeatedly audit Sullivan as a tool of harassment);

23    d.    That TTEMI would complete the VA Direct Award projects within

24  the cost amounts presented at the time Sullivan was induced to enter the Construction

25  Management Agreements (in truth, TTEMI fully expected and intended for the project costs to

26  exceed these amounts, at Sullivan's expense).

27    126.    In making these misrepresentations, defendants intended to, and did,

28  induce plaintiffs to rely on them, which reliance was justified.

1    127. As a proximate result of defendants' misrepresentations, plaintiffs

2 suffered damages in an amount to be proven at trial.

3    128. In perpetrating the wrongful conduct alleged herein, defendants acted with

4 malice, fraud and oppression, thereby justifying an award of punitive damages against them.

5       **Sixth Cause of Action**

6        **Concealment**

7    ***(By Mr. Sullivan and Sullivan Against All Defendants)***

8    129. Plaintiffs hereby incorporate each preceding allegation as though set forth

9 in full herein.

10    130. From 2001 through 2006, defendants concealed from plaintiffs a number

11 of material facts, including:

12     a. Defendants' true objective of abusing small business government

13 contracting programs, by making them pass-through agents for TTEMI to obtain government

14 contracts it would otherwise not obtain;

15     b. Defendants' conclusion that costs on the VA Direct Projects would

16 exceed revenues, and subject Sullivan to serious financial hardship;

17     c. Defendants' formation of mentor-protégé relationships with

18 businesses in direct competition with Sullivan;

19     d. Defendants' efforts to obtain financing for Chadux from Homes

20 Systems of America, in order to help Chadux and TTEMI win the CERCLA/RCRA contract;

21     e. Defendants' decision to discontinue government contracting efforts

22 with Sullivan;

23     f. Fetters' self-dealing and skimming of VA Direct Award project

24 funds, through his compensation from Heritage Global.

25    131. At all relevant times, because TTEMI and Sullivan were in a mentor-

26 protégé relationship, and because they were joint venturers, and because of their confidential

27 relationship of trust and confidence, defendants owed a duty to disclose all material facts to

28 plaintiffs, including those facts identified in paragraph 130, above.

132.    Defendants concealed the facts identified in paragraph 130, above, with the intent to deceive plaintiffs.

133.    Plaintiffs were unaware of the true facts concealed from it by defendants, and would not have acted as they did had they been aware of the true facts.

134.    As a proximate result of defendants' concealment, plaintiffs suffered damages, in an amount to be proven at trial.

135.    In perpetrating the wrongful conduct alleged herein, defendants acted with malice, fraud and oppression, thereby justifying an award of punitive damages against them.

### Seventh Cause of Action

### Negligent Misrepresentation

### *(By Mr. Sullivan and Sullivan Against All Defendants)*

136.    Plaintiffs hereby incorporate each preceding allegation as though set forth in full herein.

137.    As alleged more particularly herein, defendants made numerous misrepresentations to plaintiffs, without regard to the truth of those facts, including the following:

a.    That other than Sullivan, TTEMI had no other mentor-protégé relationships (in truth, TTEMI had numerous other mentor-protégé relationships, which it was using to compete against Sullivan);

b.    That TTEMI would pursue at least four EPA contract opportunities with Sullivan (in truth, TTEMI had decided to stop pursuing contract opportunities with Sullivan, in favor of its other, undisclosed protégé business partners)

c.    That TTEMI would make only positive statements about Sullivan, in order to promote Sullivan to government agencies and enhance Sullivan's ability to obtain government contracts (in truth, TTEMI was making, and intended to and did continue to make false, defamatory, and disparaging statements about Sullivan, and requested government agencies to repeatedly audit Sullivan as a tool of harassment);

1              d.      That TTEMI would complete the VA Direct Award projects within

2  the cost amounts presented at the time Sullivan was induced to enter the Construction

3  Management Agreements (in truth, TTEMI fully expected and intended for the project costs to

4  exceed these amounts, at Sullivan's expense).

5              138.    In making these misrepresentations, defendants intended to, and did,

6  induce plaintiffs to rely on them, which reliance was justified.

7              139.    As a proximate result of defendants' misrepresentations, Sullivan suffered

8  damages in an amount to be proven at trial.

9                              **Eighth Cause of Action**

10                             **Breach of Contract**

11                             *(By Sullivan Against TTEMI)*

12             140.    Plaintiff hereby incorporates each preceding allegation as though set forth

13  in full herein.

14             141.    Sullivan and TTEMI are parties to the SBA Mentor-Protégé Agreement.

15             142.    In the SBA Mentor-Protégé Agreement, TTEMI agreed to assist Sullivan

16  by: facilitating Sullivan's interaction with federal agencies; assisting Sullivan in preparing

17  contract bids, joint venturing with Sullivan to pursue government contracts; developing

18  Sullivan's quality assurance and quality control methods to meet federal agency standards;

19  evaluating Sullivan's contract bids and training Sullivan in cost estimating and bid preparation;

20  preparing and reviewing Sullivan's contract bids, guiding Sullivan on money management and

21  financial reporting; providing work and training to expand Sullivan's capabilities in project

22  management; and, training Sullivan in the use of cost controls and proper sequence of project

23  tasks.

24             143.    In the SBA Mentor-Protégé Agreement, TTEMI warranted that it had the

25  capability, experience and means required to carry out the services promised therein, and it

26  agreed to provide those services in a diligent and workmanlike manner consistent with

27  professional practices and standards for nationally recognized firms engaged in similar work.

28

LATHAM&WATKINS<sup>LLP</sup>  SD\637135.1
ATTORNEYS AT LAW
SAN DIEGO

FIRST AMENDED COMPLAINT

144.    In the SBA Mentor-Protégé Agreement, TTEMI agreed to protect proprietary information provided to it by Sullivan, and to restrict access to Sullivan's proprietary information to those individuals directly participating in providing assistance to Sullivan under the SBA Mentor-Protégé Agreement.

145.    Sullivan performed all of its obligations under the SBA Mentor-Protégé Agreement, except to the extent those obligations were discharged as a result of TTEMI's breaches.

146.    TTEMI materially breached the SBA Mentor-Protégé Agreement, by refusing Sullivan to interact with federal agencies; failing to effectively assist Sullivan in preparing contract bids; failing to develop Sullivan's quality assurance and quality control methods to meet federal agency standards; failing to evaluate Sullivan's contract bids or training Sullivan in cost estimating and bid preparation; failing to competently review Sullivan' s contract bids; failing to guide Sullivan on money management and financial reporting; failing to provide work and training to expand Sullivan's capabilities in project management; and, failing to train Sullivan in the use of cost controls and proper sequence of project tasks.

147.    TTEMI breached its warranty in the SBA Mentor-Protégé Agreement, because it lacked the capability, experience and means required to carry out the services promised in therein.

148.    TTEMI materially breached its promise to provide services under the SBA Mentor-Protégé Agreement, by failing and refusing to provide those services in a diligent and workmanlike manner consistent with professional practices and standards for nationally recognized firms engaged in similar work.

149.    TTEMI materially breached its obligation under the SBA Mentor-Protégé Agreement to protect Sullivan's proprietary information, by providing that information to Heritage Global, Chadux, and other parties in competition with Sullivan.

150.    At all relevant times, TTEMI owed Sullivan a duty of good faith and fair dealing.

1    151. By engaging in the conduct alleged herein, TTEMI breached the implied

2    covenant of good faith and fair dealing.

3    152. As a proximate result of TTEMI's material breaches of the SBA Mentor-

4    Protégé Agreement, Sullivan has suffered direct and consequential damages, in an amount to be

5    proven at trial.

6    **Ninth Cause of Action**

7    **Defamation**

8    ***(By Sullivan Against Defendants Sussenguth and TTEMI)***

9    153. Plaintiff hereby incorporates each preceding allegation as though set forth

10    in full herein.

11    154. Within the last year, defendant Sussenguth, on behalf of TTEMI, made

12    false and defamatory statements about Sullivan, as evidenced in the email attached hereto at Tab

13    Z.

14    155. The statements were of a defamatory nature in that they impugned

15    Sullivan's reputation as a sound, high quality government contractor.

16    156. As a proximate result of the defamatory statements by Sussenguth and

17    TTEMI, Sullivan has lost two significant government contracts, one from EPA Region 9 (where

18    defendant Sussenguth worked for TTEMI) and one for EPA Region 4, and has suffered damage

19    to its reputation.

20    157. In perpetrating the wrongful conduct alleged herein, defendants acted with

21    malice, fraud and oppression, thereby justifying an award of punitive damages against them.

22    **Tenth Cause of Action**

23    **Breach of Fiduciary Duty**

24    ***(By Sullivan Against TTEMI)***

25    158. Plaintiff hereby incorporates each preceding allegation as though set forth

26    in full herein.

27    159. By virtue of its status and duties under the DoD and SBA Mentor-Protégé

28    Agreements, and as a joint venturer with Sullivan, TTEMI owed Sullivan fiduciary duties,

1  including the duty of undivided loyalty, which obligated TTTEMI to act with the utmost good

2  faith and in the best interests of Sullivan.

3       160.   By engaging in the conduct alleged herein, TTEMI breached its fiduciary

4  duties to Sullivan.

5       161.   As a proximate result of TTEMI's breaches of its fiduciary duties, Sullivan

6  suffered damages, in an amount to be proven at trial.

7       162.   In perpetrating the wrongful conduct alleged herein, defendants acted with

8  malice, fraud and oppression, thereby justifying an award of punitive damages against them.

9  **Eleventh Cause of Action**

10  **Intentional Infliction of Emotional Distress**

11  ***(By Mr. Sullivan Against TTEMI, Wanta, Fetters, and Batrack)***

12       163.   Plaintiff hereby incorporates each preceding allegation as though set forth

13  in full herein.

14       164.   By perpetrating the wrongful conduct alleged herein, defendants acted in

15  an outrageous manner beyond all bounds of decency, intending to cause emotional distress or

16  with reckless disregard of the probability that Mr. Sullivan would suffer emotional distress.

17       165.   As alleged more particularly herein, defendants acted in an outrageous

18  manner in an attempt to destroy Sullivan, a small business built from scratch by Mr. Sullivan, a

19  service-disabled veteran of the U.S. Navy. Defendants planned to and did appropriate contract

20  benefits and revenues from Sullivan, by driving it into financial distress. Then, knowing of the

21  damage they had caused, defendants attempted to purchase Sullivan at a deep discount, using a

22  sham small business protégé as their vehicle for doing so, pursuant to TTEMI's "Fetter's

23  Model," conceived and announced internally at TTEMI years earlier.

24       166.   Defendants' outrageous actions in furtherance of the scheme included the

25  following:

26       a.   Before any significant construction on the VA Direct Award

27  projects had taken place, TTEMI determined that Sullivan would lose significant money on these

28  projects. Defendants concealed this information from Sullivan in order to create financial

1   hardship for Sullivan, which defendants then exploited for their own gain.

2                   b.      On information and belief, in its communications to the VA,

3   TTEMI made false and defamatory statements about Sullivan and its competence and integrity,

4   in order to boost TTEMI's own reputation and to damage Sullivan's reputation with an important

5   source of Sullivan's government contracts.

6                   c.      In a September 21, 2006 telephonic meeting with Mr. Sullivan,

7   defendant Batrack, the Chief Executive Officer of Tetra Tech, promised Sullivan that TTEMI

8   would pursue at least four EPA contract opportunities with Sullivan, when in truth, TTEMI had

9   already determined not to pursue government contract opportunities with Sullivan.

10                 d.      In the September 21, 2006 meeting, Batrack also promised Mr.

11   Sullivan that TTEMI would make only positive statements about Sullivan, in order to promote

12   Sullivan to government agencies and enhance Sullivan's ability to obtain government contracts.

13   On information and belief, Batrack had no intent to perform this promise, or for TTEMI to

14   perform this promise, because TTEMI had already made the decision to compete against

15   Sullivan, and was already actively doing so.

16                 e.      Even while insisting that Sullivan remain in its mentor-protégé

17   relationship with TTEMI, TTEMI secretly continued and continues to attempt to cripple

18   Sullivan's business and disrupt its contractual and prospective economic relationships with

19   government agencies.

20                 f.      In or around October 2007, defendant Fetters contacted Sullivan as

21   the President of Chadux, and offered to purchase Sullivan for substantially less than the most

22   recent valuation of Sullivan. In that proposal, Fetters stated that he knew that Sullivan was in

23   dire financial condition and that the owners should sell before going bankrupt. On information

24   and belief, when defendant Fetters contacted Sullivan with a low-ball offer to buy Sullivan,

25   Fetters was still acting on TTEMI's behalf, in direct contact with TTEMI, as part of TTEMI's

26   unlawful scheme to use Chadux to obtain government contracts through bogus relationships with

27   small businesses.

28

1    167.    At all relevant times herein, defendants' wrongful and outrageous conduct

2  was directed primarily at, or occurred in the presence of, Mr. Sullivan.

3    168.    As a proximate result of defendants' wrongful conduct, Mr. Sullivan

4  suffered severe, substantial, and enduring emotional distress.

5    169.    In perpetrating the wrongful conduct alleged herein, defendants acted with

6  malice, fraud and oppression, thereby justifying an award of punitive damages against them.

7    **WHEREFORE**, plaintiffs prays for judgment as follows:

8    a.    For compensatory damages according to proof;

9    b.    For punitive damages;

10    c.    For prejudgment interest at the maximum legal rate;

11    d.    For attorneys' fees and costs;

12    e.    For a preliminary and permanent injunction restraining defendants'

13  acts of unfair competition and wrongful interference, and restraining defendants from soliciting,

14  obtaining, or performing government contracts through the unlawful, unfair and fraudulent

15  means alleged herein;

16    f.    For restitution of defendants' ill-gotten gains;

17    g.    For any other relief as the court may deem appropriate and just.

18

19    Respectfully submitted,

20

21  Dated: July 8, 2008    LATHAM & WATKINS LLP

22

23    By: _____

24    Kenneth M. Fitzgerald
      Christopher A. Rheinheimer
      Attorneys for Plaintiff
25    SULLIVAN INTERNATIONAL GROUP,
      INC.

26

27

28

1

## <u>DEMAND FOR JURY TRIAL</u>

2

3　　　　　Plaintiff hereby demands a trial by jury.

4

5　Dated:　July 8, 2008　　　　　　　　　LATHAM & WATKINS LLP

6

7　　　　　　　　　　　　　　　　　　By: _____

8　　　　　　　　　　　　　　　　　　Kenneth M. Fitzgerald
　　　　　　　　　　　　　　　　　　Christopher A. Rheinheimer
9　　　　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　　　　SULLIVAN INTERNATIONAL GROUP,
10　　　　　　　　　　　　　　　　　　INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    LATHAM & WATKINS LLP
      Kenneth M. Fitzgerald (Bar. No. 142505)
2       Christopher A. Rheinheimer (Bar. No. 253890)
   600 West Broadway, Suite 1800
3    San Diego, California 92101-3375
   Telephone: (619) 236-1234
4    Facsimile: (619) 696-7419

5    Attorneys for Plaintiffs Steven Sullivan and
   Sullivan International Group, Inc.

6

7

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                   **COUNTY OF SAN DIEGO**

| | |
|---|---|
| 10   STEVEN SULLIVAN, an individual; <br> SULLIVAN INTERNATIONAL GROUP, <br> 11   INC., a California corporation; <br><br> 12      Plaintiff, <br><br> 13      v. <br><br> 14   TETRA TECH, INC., a Delaware <br> corporation; TETRA TECH EMI, INC., a <br> 15   Delaware corporation; JOHN TEEL, an <br> individual; DANIEL BATRACK, an <br> 16   individual; RANDY FETTERS, an <br> individual; MARK WALSH, an individual; <br> 17   MICHAEL WANTA, an individual; <br> EDWARD SUSSENGUTH, an individual, <br> 18   and DOES 1-50, inclusive, <br><br> 19      Defendants. | Case Number: 37-2008-00084804-CU-BT-CTL <br><br> **DECLARATION OF SERVICE AS TO <br> DEFENDANTS TETRA TECH, INC., <br> TETRA TECH EMI, INC., DANIEL <br> BATRACK, MICHAEL WANTA, AND <br> EDWARD SUSSENGUTH** |

20

21                    <u>**DECLARATION OF SERVICE**</u>

22       I am a resident of the State of California, over the age of eighteen years, and not a party

23   to the within action. My business address is Latham & Watkins, 600 W. Broadway, Suite 1800,

24   San Diego, California 92101 (619) 236-1234.

25       On July 8, 2008, I served a copy of the following document(s):

26       **SUMMONS ON FIRST AMENDED COMPLAINT;**

27       **FIRST AMENDED COMPLAINT FOR UNFAIR COMPETITION; <br> INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC <br> ADVANTAGE; NEGLIGENT INTERFERENCE WITH PROSPECTIVE**

28

1    **ECONOMIC ADVANTAGE; INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; FRAUD; CONCEALMENT;**
2    **NEGLIGENT MISREPRESENTATION; BREACH OF CONTRACT; DEFAMATION; BREACH OF FIDUCIARY DUTY; INTENTIONAL**
3    **INFLICTION OF EMOTIONAL DISTRESS;**

     **NOTICE OF CASE ASSIGNMENT;**
4
     **ADR PACKET**
5
6    **Party Served**

7        Defendants TETRA TECH, INC., TETRA TECH EMI, INC., DANIEL BATRACK, MICHAEL WANTA, and EDWARD SUSSENGUTH

8    **Person(s) Served**

9        Holly Roth
         McDermott Will & Emery LLP
10       600 13th Street N.W.
         Washington, D.C. 20005
11       HRoth@mwe.com

12   **By delivering copies to the person(s) served, as follows:**

13       Pursuant to agreement with opposing counsel, I caused the above-referenced documents

14   to be converted in digital format (.pdf) and served by electronic mail to the addressee at the

15   addresses listed above.

16       I declare under penalty of perjury according to the laws of the State of California that the

17   above is true and correct. Executed on July 10, 2008 at San Diego, California.

18
19                                                         _____
                                                                Kenneth M. Fitzgerald
20
21
22
23
24
25
26
27
28

LATHAM&WATKINS    SD\639097.1
ATTORNEYS AT LAW
SAN DIEGO                                                   DECLARATION OF SERVICE

1    LATHAM & WATKINS LLP
     Kenneth M. Fitzgerald (Bar. No. 142505)
2      Christopher A. Rheinheimer (Bar. No. 253890)
   600 West Broadway, Suite 1800
3    San Diego, California 92101-3375
   Telephone: (619) 236-1234
4    Facsimile: (619) 696-7419

5    Attorneys for Plaintiffs Steven Sullivan and
   Sullivan International Group, Inc.

6

7

8             **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                  **COUNTY OF SAN DIEGO**

| | |
|---|---|
| 10   STEVEN SULLIVAN, an individual;<br>SULLIVAN INTERNATIONAL GROUP,<br>11   INC., a California corporation;<br>12      Plaintiff,<br>13      v.<br>14   TETRA TECH, INC., et al.<br>15      Defendants.<br>16<br>17 | Case Number: 37-2008-00084804-CU-BT-CTL<br><br>**DECLARATION OF SERVICE** |

18        I am a resident of the State of California, over the age of eighteen years, and not a

19 party to the within action. My business address is Latham & Watkins, 600 West Broadway,

20 Suite 1800, San Diego, California 92101. On July 10, 2008, I served the within document(s):

21         **DECLARATION OF SERVICE AS TO DEFENDANTS TETRA TECH,**
22         **INC., TETRA TECH EMI, INC., DANIEL BATRACK, MICHAEL**
              **WANTA, AND EDWARD SUSSENGUTH**

23

24    ☒      **BY REGULAR MAIL (C.C.P. § 1013(a)):** I caused the above document(s) to be
25          deposited in the United States mail at San Diego, California, with postage thereon
          fully prepaid addressed to the party(ies) listed below. I am readily familiar with the
26         firm's practice of collection and processing correspondence for mailing. Such mail
          is deposited with the United States Postal Service each day and that practice was
27         followed in the ordinary course of business for the service herein attested to.

28

1    ☐   **BY FED EX:** I am readily familiar with Latham & Watkins' practice of collection
2         and processing packages for FedEx. Under that practice, the FedEx package would
          be deposited with FedEx on that same day with billing charges thereon fully prepaid
3         in the ordinary course of business. I placed a sealed envelope or package containing
          the above document(s) with the Latham & Watkins FedEx pick-up box, or other like
4         facility for pick-up by the regularly scheduled Federal Express for receipt of
5         overnight packages addressed to the party(ies) listed below

6    ☐   **BY PERSONAL SERVICE (C.C.P. § 1011(a)(b)):** I caused [a sealed envelope or
          package containing] the above document(s) and addressed as set forth below to be
7         personally delivered to the parties listed below and left with a receptionist or other
          person having charge thereof at the offices of the party(ies) listed below by First
8         Legal Attorney Service [address].

9    ☐   **BY FACSIMILE (C.C.P. § 1013(e)(f)):** I deposited the above document(s) for
10        facsimile transmission in accordance with the office practice of Latham & Watkins
          for collecting and processing facsimiles. I am familiar with the office practice of
11        Latham & Watkins for collecting, processing, and transmitting facsimiles, which
          practice is that when a facsimile is deposited with the Latham & Watkins personnel
12        responsible for facsimiles, such facsimile is transmitted that same day in the
          ordinary course of business. The facsimile of the above document(s) was
13        transmitted to the party(ies) listed below.

14   ☐   **BY E-MAIL:** I caused the above-referenced documents to be converted in digital
15        format (.pdf) and served by electronic mail to the addresses at the addresses listed
          below.

16

17   Holly Roth
     McDermott Will & Emery LLP
18   600 13th Street N.W.
     Washington, D.C. 20005
19   Tel: (202) 756-8396
     HRoth@mwe.com
20

21        I declare under penalty of perjury according to the laws of the State of California

22   that the above is true and correct. Executed on July 10, 2008, at San Diego, California.

23

24                                                    _Ginger Calderon_
25                                                    _____
                                                           Ginger Calderon
26

27

28

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

ORIGINAL

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS

STEVEN SULLIVAN, an individual; SULLIVAN INTERNATIONAL GROUP, INC., a California corporation,

## DEFENDANTS

TETRA TECH, INC., a Delaware corporation; TETRA TECH EMI, INC., a Delaware corporation; JOHN TEEL, an individual; DANIEL BATRACK, an individual; RANDY FETTERS, an individual; MARK WALLACE, an individual; MICHAEL WANTA, an individual; EDWARD SUSSENGUTH, an individual; and DOES 1 to 10, inclusive.

**FILED**
2008 AUG -7 AM 10: 21
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

'08 CV 1433 JM LSP

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Kenneth M. Fitzgerald (Bar No. 142505)
Christopher A. Rheinheimer (Bar No. 253890)
Latham & Watkins LLP
600 West Broadway, Suite 1800
San Diego, CA 92101          Telephone: 619.236.1234

ATTORNEYS (IF KNOWN)
James L. Sanders (State Bar No. 126291)
Gregory R. Jones (State Bar No. 229858)
McDermott Will & Emery LLP
2049 Century Park East, Suite 3800
Los Angeles, CA  90067-3218      Telephone: 310.277.4110

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

This action involves claims asserted under California state law involving the U.S. Small Business Administration and the U.S. Small Business Act, 15 U.S.C. § 631 et seq. Defendants seek to remove this matter from the Superior Court of the State of California, County of San Diego, pursuant to 28 U.S.C. §§ 1441 and 1446.

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [X] 190 Other Contract
- [ ] 195 Contract Product Liability

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury - Medical Malpractice
- [ ] 365 Personal Injury - Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motion to Vacate Sentence
**HABEAS CORPUS:**
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Conditions

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 Original Proceeding
- [X] 2 Removal from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 0.00
CHECK YES only if demanded in complaint:
JURY DEMAND: [X] YES  [ ] NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   Docket Number _____

DATE
August 6, 2008

SIGNATURE OF ATTORNEY OF RECORD
GREGORY R. JONES (State Bar No. 229858)

# 153752  ← AC

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

$350  8/7/08

# UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 153752    — TC

## August 07, 2008
10:22:32

## Civ Fil Non-Pris

USAO #.: 08CV1433
Judge..: JEFFREY T MILLER
Amount.:                    $350.00 CK
Check#.: BC18345

Total—>  $350.00

FROM: STEVEN SULLIVAN
      VS
      TETRA TECH