**McDERMOTT WILL & EMERY LLP**
JAMES L. SANDERS (State Bar. No. 126291)
GREGORY R. JONES (State Bar No. 229858)
2049 Century Park East, Suite 3800
Los Angeles, CA  90067-3218
Telephone:  310.277.4110
Facsimile:  310.277.4730

Attorneys for Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN SULLIVAN, an individual; SULLIVAN INTERNATIONAL GROUP, INC., a California corporation, | CASE NO. 08CV1433 JML SP |
| Plaintiffs, | **SUPPLEMENT TO NOTICE OF REMOVAL OF ACTION** |
| v. | |
| TETRA TECH, INC., a Delaware corporation; TETRA TECH EMI, INC., a Delaware corporation; JOHN TEEL, an individual; DANIEL BATRACK, an individual; RANDY FETTERS, an individual; MARK WALSH, an individual; MICHAEL WANTA, an individual; EDWARD SUSSENGUTH, an individual; and DOES 1-50, inclusive, | |
| Defendants. | |

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

LAS99 1692564-1.079048.0014

1        Defendants Tetra Tech, Inc., Tetra Tech EMI, Inc., Daniel Batrack, Randy

2   Fetters, Edward Sussenguth, John Teel, Mark Walsh, and Michael Wanta hereby

3   supplement the Notice of Removal filed with the Court today pursuant to 28 U.S.C.

4   §§ 1331, 1441, and 1446.  Exhibit A to the Notice of Removal, which is a copy of

5   the First Amended Complaint filed in San Diego County Superior Court, omitted

6   the exhibits that were attached to the First Amended Complaint.  Attached hereto as

7   Exhibit A are the exhibits that were appended to the First Amended Complaint

8   served on Defendants.

9

10  Dated:     August 7, 2008     **McDERMOTT WILL & EMERY LLP**
    JAMES L. SANDERS
    GREGORY R. JONES

11

12

13  By: /s/ Gregory R. Jones
         Gregory R. Jones

14       Attorneys for Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES





# JOINT VENTURE AGREEMENT

# BETWEEN

# TETRA TECH EM  INC.

# AND

# SULLIVAN CONSULTING GROUP

# JOINT VENTURE AGREEMENT

## TABLE OF CONTENTS

Page

**ARTICLE 1 - DEFINITIONS** ........................................................................ 1

**ARTICLE 2 - RELATIONSHIPS OF THE MEMBERS** ............................ 3

  2.1 FORMATION OF JOINT VENTURE . ................................................ 3

  2.2 COMMENCEMENT AND TERMINATION . ...................................... 3

  2.3 JOINT VENTURE RESPONSIBILITY ................................................ 3

  2.4 MANAGEMENT COMMITTEE ........................................................... 4

  2.5 NO PARTNERSHIP ............................................................................. 5

  2.6 MEMBER'S PROPERTY ..................................................................... 5

  2.7 NO AGENCY ....................................................................................... 5

**ARTICLE 3 - SCOPES OF WORK AND PROPORTIONATE VALUES** ........ 6

  3.1 ALLOCATION OF WORK .................................................................. 6

  3.2 SCOPE OF WORK DISPUTES ........................................................... 6

  3.3 PROPORTIONATE VALUES .............................................................. 7

**ARTICLE 4 - JOINT VENTURE COSTS AND SERVICES** ....................... 7

  4.1 JOINT VENTURE COSTS AND SERVICES ...................................... 7

  4.2 PROFESSIONAL AND TECHNICAL SERVICES ............................. 8

**ARTICLE 5 - PROPOSAL PHASE AND CONTRACT NEGOTIATION** ........ 9

  5.1 PROPOSAL PHASE ............................................................................ 9

  5.2 CONTRACT NEGOTIATION ........................................................... 10

## TABLE OF CONTENTS

Page

**ARTICLE 6 - CONTRACT PERFORMANCE PHASE** ................................................. **10**

6.1 JOINT VENTURE MANAGEMENT ..................................................... **10**

6.2 TAXES ........................................................................................ **12**

6.3 EXCUSABLE DELAYS .................................................................. **12**

6.4 OTHER DELAYS ......................................................................... **12**

6.5 PATENTS .................................................................................. **13**

6.6 BANKRUPTCY ........................................................................... **13**

6.7 PAYMENTS ............................................................................... **14**

6.8 INSURANCE .............................................................................. **15**

**ARTICLE 7 - MATERIAL BREACH; DEFAULT** ...................................... **15**

7.1 DEFAULTING MEMBER ................................................................ **15**

7.2 INDEMNITY ............................................................................... **16**

7.3 ALLOCATION ............................................................................. **16**

**ARTICLE 8 - LIABILITY AND INDEMNIFICATION** ................................. **16**

8.1 CLAIMS OF THE CLIENT OR THIRD PARTIES .................................. **16**

8.2 CLAIMS AMONG THE MEMBERS .................................................. **17**

**ARTICLE 9 - GENERAL PROVISIONS** ................................................ **18**

9.1 PROPER BUSINESS PRACTICES .................................................. **18**

9.2 CONFIDENTIALITY ..................................................................... **18**

9.3 DUTY TO INFORM ...................................................................... **19**

9.4 NOTICES ................................................................................... **19**

## TABLE OF CONTENTS

Page

9.5 WAIVER ..................................................................................... 19

9.6  ADDITIONAL MEMBERS ............................................................................ **19**

9.7  ASSIGNMENT ........................................................................................... **19**

9.8  APPLICABLE LAW .................................................................................... **20**

9.9  TERM OF AGREEMENT ............................................................................. **20**

9.10  CONSEQUENTIAL DAMAGES EXCLUDED ................................................ **20**

9.11  ENTIRE AGREEMENT ................................................................................ **21**

9.12  SEVERABILITY ......................................................................................... **21**

9.13  AMENDMENTS ......................................................................................... **21**

9.14  TITLES ..................................................................................................... **21**

9.15  NUMBER OF ORIGINALS .......................................................................... **21**

# APPENDICES

**APPENDIX 1.0 -**   SCOPE OF WORK

**APPENDIX 2.0 -**   STATEMENT OF PRICES

**APPENDIX 3.0 -**   INSURANCE REQUIREMENTS

# JOINT VENTURE AGREEMENT

THIS AGREEMENT is made, effective as of the 9th day of May 2003 by and between Tetra Tech EM Inc. (hereinafter "TtEMI"), a corporation organized and existing under the laws of the State of Delaware with corporate office at 200 East Randolph Drive, Suite 4700, Chicago, Illinois 60601, and Sullivan Environmental Solutions LLC, dba Sullivan Consulting Group (hereinafter "SCG"), a limited liability company organized and existing under the laws of the State of California, with corporate office at 409 Camino Del Rio South, Suite 204, San Diego California 92108.

WHEREAS, the parties hereto intend to submit a proposal as Joint Venturers to the United States Department of Navy Naval Facilities Engineering Command Southwest Division (hereinafter "Client") who desires to award a A-E Firm Fixed Price ID/IQ Contract involving CERCLA/RCRA,/UST environmental studies on Navy, Marine Corps Installations in CA, AZ, NV, UT, NM, AK, WA, OR, ID, and MT (hereinafter "Program"); and,

WHEREAS, in preparing a proposal and in providing such services, including all changes, modifications or amendments to such Contract the parties desire to enter into a Joint Venture for the limited purpose as further detailed in Article 2; and,

WHEREAS, the parties desire to define their respective scopes of work, and their duties, responsibilities, rights and obligations with respect to one another for the Program, and the Administration of a Joint Venture formed for the sole and exclusive purpose of performance and completion of the Contract in accordance with its requirements; and,

WHEREAS, the parties agree to name the Joint Venture, SULTECH.

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth herein, and other good and valuable consideration, the parties hereby agree as follows:

## ARTICLE 1 - DEFINITIONS

For the purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1    "Affiliate" of a Member shall mean any entity which directly or indirectly controls or is controlled by or is under common control with such Member.

1.2    "Agreement" shall mean this document and all of its appendices.

1.3    "Contingency Account" shall mean an account established by the Joint Venture to reimburse Members for Joint Venture Costs incurred by the Members that are not allowable under the Contract.

1

1.4    "Joint Venture" shall mean the limited association of the Members as defined herein for the purpose of submitting Qualifications, Cost and Technical Proposals to the Client for the Program; for the purpose of entering into the Contract with the Client; Administration of the Joint Venture; and performing services and all other work, including provision of materials, equipment, supplies or products of any nature as may be required by said Contract for the Program.

1.5    "Joint Venture Costs" shall be the cost of all materials, supplies, equipment, products and services to be obtained on behalf of, or provided by, the Joint Venture to complete the Scope of Work as specified in Appendix 1.0 excluding Joint Venture Management Meetings and associated costs which are not reimbursed by the Client, but including all other necessary and reasonable Joint Venture Costs which are not reimbursed by Client as an allowable cost of the Program. Such costs shall not include any fee or handling charge of any type or nature of any Member hereunder, but shall include all standard base and cost burdens of each Member including base salaries and wages and overhead costs of its personnel as established by the Contract overhead rates.

1.6    "Joint Venture Leader" or "Leader" shall mean the Member selected to act as such pursuant to the terms of this Agreement.

1.7    "Contract" shall mean the document or documents executed by and between the Joint Venture and the Client.

1.8    "Members" shall mean the parties executing this Agreement, and shall also mean substitute or subsequent parties who may become a signatory to this Agreement.

1.9    "Program" shall mean the entire work to be performed by the Joint Venture under the terms and conditions of the NAVFACENGCOM SWDIVA-E FFP ID/IQ Contract, all as more fully described in the Contract.

1.10    The "Program Manager", an individual, shall be Mr. Michael Wanta .

1.11    "Proportionate Value" shall mean for each Member, the percentage or fraction represented by the ratio of the price of the Member's Scope of Work to the sum of the prices of all Members' Scopes of Work which prices shall include subcontract costs.

1.12    "Qualifications Proposal" shall mean presentation of the capabilities, experience and technical competence of the Joint Venture to the Client.

1.13    "Cost Proposal" shall mean the Joint Venture offer detailing Program charges to the Client with respect to the Program including all fees and handling charges of each of the members.

1.14    "Technical Proposal" shall mean the Joint Venture offer to the client which details the scope, nature and extent of services, materials, equipment, supplies or products to be provided to the Client with respect to the Program in response to individual Client requirements for the Program.

2

1.15    "Scope of Work" shall mean, for each Member, the materials, equipment, supplies or products and services to be provided by such Member as set forth in this Agreement.

## ARTICLE 2 - RELATIONSHIPS OF THE MEMBERS

2.1    FORMATION OF JOINT VENTURE

The Members hereby associate themselves as a Joint Venture for the sole and limited purpose of (i) preparing and submitting a Proposal to the Client for the Program, (ii) jointly negotiating and executing a Contract with the Client based on the Proposal if it is accepted by the Client, (iii) performing such Contract and (iv) defining the rights, duties, responsibilities and obligations between the Members in connection with the performance of the Contract. The Members, and each of them, hereby agree to perform all work for such Contract in accordance with the terms of this Agreement on an exclusive basis, but only for this particular Program including all extensions, changes and amendments thereto.

2.2    COMMENCEMENT AND TERMINATION

This Joint Venture will commence on the date of signing of this Agreement by all Members and contributions to working capital for the Contingency Account as provided by Article 4.1.1 herein. This Agreement shall remain in full force and effect until terminated by written Agreement of all the Members or until all of the purposes for which this Joint Venture has been undertaken have been accomplished and completed, whichever is later. In no event shall this Joint Venture be terminated until all rights and liabilities of this Agreement have been determined and satisfied.

2.3    JOINT VENTURE RESPONSIBILITY

The Members, and each of them, shall be and remain jointly and severally liable to the Client for performance and satisfactory completion of the Program including any contractual, statutory or applicable common law provisions which by their nature survive completion and final acceptance of all Work for the Program as detailed in the Contract.

## 2.4    MANAGEMENT COMMITTEE

Upon the signing of this Agreement, the Members will establish a Committee ("Management Committee") to provide policy decisions on all major contractual issues, comprised of two representatives of each Member. One of the TtEMI representatives shall serve as the Joint Venture Leader, the chairperson of the Management Committee. Should any of the foregoing representatives die, become disabled, resign, or for any reason cease to be connected with the Member which nominated him, such Member shall promptly, by written notice served upon the other Members, name his successor.

Any of the Members hereto may at any time replace either the principal or alternate representatives designated by it, or all such representatives, by a notice in writing served upon the other Members. Such notice shall be executed by an authorized corporate signatory for the Member providing the notice. The Management Committee shall consult on all matters affecting the relationship between the Joint Venture as a whole and the Client or third parties and shall resolve any disputes among the Members with respect to this Agreement and the Contract. The Management Committee shall have meetings for the management of the Joint Venture ("Joint Venture Meetings") from time to time during the term of this Agreement. Joint Venture Meetings may be called by any Member upon fourteen days written notice to the other Members. However, in the event the Joint Venture Leader determines the need for an immediate meeting, the Joint Venture Leader may call a Joint Venture Meeting upon forty-eight (48) hours notice by facsimile or other written means to the other Members, which notice shall specify the matters to be decided at the Joint Venture Meeting and the urgent need for such meeting. Joint Venture Meetings shall be held at such locations as the Members may agree upon. The representatives attending such Joint Venture Meetings shall be authorized to act on behalf of their respective Members. Except as provided in Article 6.1.6, below, all decisions made at such meetings shall be by unanimous concurrence of the Members and, for the purpose of this Agreement, each Member shall have one vote in the decision making process. The Leader shall convene and preside over such Joint Venture Meetings and shall take minutes. Within ten working days following each Meeting, the Leader will deliver copies of the minutes by facsimile transmission or other electronic transmission means followed by a hard copy form to each Member. If a Member does not give notice to the Leader of an objection to the minutes within fourteen days of receipt thereof, such Member shall be deemed to have approved such minutes.

The Program Manager shall attend Management Committee meetings and shall serve as a non-voting member of the Management Committee. The Program Manager shall have authority to carry out day-to-day Management responsibilities of the Joint Venture for the execution of the Program.

2.5    NO PARTNERSHIP

Nothing contained in this Agreement shall be construed as creating a partnership among the Members, nor is anything contained in this Agreement to be construed as creating or requiring any continuing relationship or commitment between the Members except as set forth in this Agreement.

2.6    MEMBER'S PROPERTY

Any individually-owned property that any member may provide for use in connection with the performance of its respective Scope of Work shall remain the individual property of said Member and shall not be the property of the Joint Venture, subject, however, to the terms of Article 6.6, and Article 7.1, below.

2.7    NO AGENCY

2.7.1    Nothing contained in this Agreement shall be construed as creating any representative, agency, or employment relationship between any Members.

2.7.2    Nothing contained in this Agreement shall be construed as creating any fiduciary relationship of any nature between any Members as individual corporations except as provided herein for the Program.

2.7.3    No Member shall have the authority or right, nor shall any Member hold itself out as having the authority or right, to assume, create or undertake any obligation of any kind whatsoever, expressed or implied, on behalf of or in the name of the Joint Venture or any other Member without the express prior written consent of such other Member which consent shall include any authorizations agreed upon during management committee meetings as documented in the meeting minutes or as otherwise specifically provided for in this Agreement.

2.7.4    No member shall have the authority or right, nor shall any Member hold itself out as having the authority or right, to accept service of any legal process addressed to or intended for any other member.

2.7.5    No Member shall have the authority or right to borrow money on behalf of or in the name of the Joint Venture or any other Member, nor shall any Member pledge the credit of the Joint Venture or any other Member without the express prior written consent of all Members or of such other Member.

2.7.6    Nothing herein contained shall in any manner limit the Members, or any of them, in the conduct of their respective business or corporate activities in the making of other contracts or the performance of other work, except as specifically provided herein.

2.7.7    Unless otherwise agreed upon the joint venture shall have no employees. All necessary personnel shall be provided from the staffs of the Members.

5

2.7.8   Records of the Joint Venture which are required to be kept subsequent to the completion of the Program pursuant to the provisions of law shall be kept at TtEMI offices. Record retention expenses shall be borne by respective Members in accordance with their respective interests as described in Article 3.3 herein. Prorated portions of records retention expenses shall be estimated upon completion of the Program and paid in accordance with the respective interests of the parties in accordance with Article 3.3 herein utilizing the final Proportionate Values upon completion of all the work by each Member.

2.7.9   Upon termination of the Joint Venture, all facilities and Joint Venture property shall be disposed of at the best possible price and the proceeds shared in proportion to the respective interest of each Member as adjusted upon completion of the work, based upon the final Proportionate Values of the Members for their portion of the work as further detailed in Article 3.3 herein.


## ARTICLE 3 - SCOPES OF WORK AND PROPORTIONATE VALUES

3.1     ALLOCATION OF WORK

It is the goal of the Joint Venture to divide and allocate all of the work, responsibilities and requirements for the performance of the Program among the Members as set forth in Appendix 1.0. It is acknowledged and agreed by each Member that allocations of work may temporarily depart from intended participation objectives because of the nature of particular work scope requirements or specific directives of the Client. It shall be the responsibility of the Program Manager to make such allocation and division with concurrence of the Management Committee. Such division and allocation for each Member shall constitute such Member's Scope of Work. Each Member's Scope of Work is subject to and is to be performed strictly in accordance with the terms and conditions of the Contract to be signed with the Client.

3.2     SCOPE OF WORK DISPUTES

For the purposes of (i) resolving any dispute regarding Scope of Work among the Members or (ii) assigning to a Member's Scope of Work any work or responsibility included in the Contract which had been omitted from Appendix 1.0, or (iii) assigning to a Member's Scope of Work any extra work requested by the Client, the unanimous decision of the Members shall be required; provided that in the event that there is no unanimity, the Program Manager, in accordance with Article 6.1.6, below, may resolve such dispute or assign any such extra or omitted work to the Scope of Work of one or more Members.

3.3    PROPORTIONATE VALUES

Each Member's price for its Scope of Work shall be set forth in the Cost Proposal in the form required by the Client and as specified in Appendix 2.0, attached hereto and made a part hereof. After execution of the Contract, Proportionate Values shall be determined by the price of each Member's Scope of Work to the sum of the prices of all Members' Scope of Work. The price of each Member's Scope of Work shall be the total cost of the materials, equipment, products, supplies, and services provided by that Member including fees or profit provided under the Contract for each Member. Any calculation of rights or obligations which is based upon Proportionate Values under this Agreement shall use the calculation in effect at the time the obligation arises.

## ARTICLE 4 - JOINT VENTURE COSTS AND SERVICES

4.1    JOINT VENTURE COSTS AND SERVICES

4.1.1    The Leader will maintain a Contingency Account with a balance deemed by the Management Committee to be sufficient for the purposes identified, but in no event shall such balance be less than $1,000.00. The Contingency Account shall include such amounts as may be determined necessary by the Management Committee to cover costs expended by the Joint Venture that the Client or Management Committee determines are not allowable under the Contract. Such costs shall include expenses reasonably incurred which result from, are uniquely attributable to, or are caused by, the Joint Venture contemplated by this Agreement, such as, but not limited to; any reporting of Joint Venture activities, revenues or other information to cognizant Federal, State, Municipal authorities or agencies by outside organizations; special equipment costs for equipment not presently available from any Member, as decided by the Management Committee; Joint Venture stationery and logo materials; Joint Venture bank and other necessary financial expenses; Joint Venture licensing and legal fees not otherwise attributable to any of the Members as provided herein; performance bond costs and/or payment bond costs; record retention expenses; and any other expenses uniquely relating to Joint Venture operations as provided herein. Members of the Joint Venture shall, from time to time, contribute such sums to the Contingency Account as determined to be necessary by the Management Committee. The Leader shall provide a monthly report to the Management Committee of amounts in the Contingency Account.

4.1.2    At any time should the Leader notify the Management Committee that adequate funds are not available to fund the Contingency Account and provides reasonable documentation that such a shortfall exists, the Management Committee shall assess the Members for the amount of the deficiency based upon the Proportionate Value for each Member at that time. If any Member should fail to timely deliver such funds, such Member shall be in default under this Agreement. Unless otherwise agreed, the other Members shall provide the defaulting Member's funds and they shall be entitled to interest on the funds so advanced at three percent (3%) above the prime rate of interest charged from time to time by the Bank of America (but not exceeding the maximum rate of interest allowed by law) accruing from the date of said advance.

4.1.3   The Leader shall deposit the Contingency Account funds in interest bearing accounts approved by the Management Committee, and thereafter shall invest excess Contingency Account funds as directed by the Management Committee.  Any interest earned on the deposit or investment of Contingency Account funds shall remain in the Contingency Account unless otherwise directed by the Management Committee but shall be allocated among the Members based upon the Proportionate Values of each Member on not less than an annual basis for the purpose of ascertaining any income tax liability. Each Member shall be responsible for any income taxes attributable to the portion of such interest which is allocated to it.

4.1.4   The Members shall contribute an initial amount to the Contingency Account, $6,500 from TtEMI and $3,500 from SCG.  In the event that the actual amount of Joint Venture Costs incurred during the performance of the Program is less than the amount contributed by the Members, the Joint Venture Leader will distribute the excess to the Members periodically, proportionate to the contribution of each member, and upon completion of the Program and closeout of the Contract.  In the event that the actual amount of Joint Venture Costs is greater than the estimated amount contributed by the Members, the Members will reimburse the Joint Venture amounts as determined by their respective Proportionate Values for such extra costs, to the extent such costs are not allowable and can not be recovered from the Client or any responsible third parties; provided that if the Joint Venture Leader shall subsequently recover any part of such costs, it shall distribute same among the Members as provided herein.  Any distribution of excess or reimbursement as provided herein shall require the unanimous agreement of the Management Committee.

It is the intent of this Article to provide a continuous record of contributions from and disbursements to each Member, and to distribute the difference between such contributions and disbursements to each Member based upon the final proportionate value of each Member upon completion of all work and closeout of the Contract.

4.2   PROFESSIONAL AND TECHNICAL SERVICES

If it becomes necessary or advisable for the Joint Venture to obtain any professional or technical services (including, without limitation those provided by law firms, accounting firms, engineering firms, architectural firms, land surveyors, drillers, analytical laboratories, and remediation/construction contractors), such services shall be retained by the Joint Venture.  Such services shall be performed for the Members jointly and the cost therefore shall be included in each Member's invoice to the Joint Venture.  If any fault or mistake or neglect of any firm performing such services results in rework, additional work, or increased costs of any Member's Scope of Work, the resulting liabilities and costs shall be borne by the Joint Venture to the extent costs for such fault, mistake or neglect cannot be recovered from said firm or the Client and to the extent such costs were not caused or contributed to by the Member administering such subcontract.  Nothing herein shall relieve any firm of any responsibility or liability for such fault or neglect, or restrict any Member's right to seek redress from such firm if such Member decides to seek redress.

## ARTICLE 5 - PROPOSAL PHASE AND CONTRACT NEGOTIATION

5.1    PROPOSAL PHASE

5.1.1    The Members will jointly prepare the Proposal. The Proposal shall be in the name of Joint Venture, SULTECH, on behalf of the Members, each of whom shall sign the Proposal. Each Member shall bear its own costs for (i) the preparation of its individual prices, and technical work scope Proposal (ii) participating in the preparation and submittal of the Proposal, and (iii) any resulting negotiations with the Client or any third party in connection with said Proposal.

5.1.2    Each Member shall promptly, when requested by any other Member, submit such data and answer such questions as may be required by the requesting Member in the preparation of its pricing except that no Member shall be required to reveal proprietary information whether of a technical or financial nature, except as may be required by the Client, in which event, such proprietary information shall be submitted by the Member of whom the request was made, directly to the Client with appropriate confidentiality notations including, but not limited to protection afforded by FAR 52.215-12, Restriction on Disclosure and Use of Data.

5.1.3    The Members shall establish a Proposal preparation schedule. In accordance with such schedule, each Member will provide information and details as required and will be present at the appointed time and place with its final pricing and Proposal segment for collation into the overall Proposal to the Client.

5.1.4    Each Member shall have the sole discretion to establish its prices included in the Cost Proposal for its respective Scope of Work. Each Member will establish its price in good faith and in accordance with its approved cost accounting standards. No Member, however, shall be required to change its prices at the vote or demand of any other Member and no Member shall withdraw from the Joint Venture solely because of dissatisfaction with any other Member's prices.

5.1.5    The Members acknowledge that each Member may desire or be required by law to make certain qualifications in the Proposal; and the Members shall discuss the nature of any such qualifications. There shall be unanimous agreement on the Proposal and its qualifications prior to any submittal to the Client. In the event that there is no unanimous agreement, no Proposal shall be submitted by the Joint Venture, and this Agreement shall immediately terminate in accordance with Article 9.9, below.

5.1.6    The Joint Venture shall not incur any sales commissions or representation expenses with respect to the Program. If a Member incurs sales commissions or representation expenses for its Scope of Work, the cost thereof will be borne solely by such Member.

5.2    CONTRACT NEGOTIATION

5.2.1    If the Proposal is accepted, the resulting Contract between the Joint Venture and the Client

shall be signed by all of the Members. In the event that the Client requires one of the Members to sign the Contract on behalf of all Members, each non-signing Member shall provide a special Power of Attorney to the signing Member authorizing the signing Member to sign the Contract on its behalf. Additionally, the non-signing Member shall evidence its agreement to the Contract by initiating and signing a conformed copy of such Contract prior to or simultaneously with the signing of the original Contract.

5.2.2  The Members shall jointly negotiate the Contract with the Client and each Member shall have its representative present at all the pre-Contract meetings and discussions with the Client. No Member shall be authorized to make commitments for any other Member without the prior written approval of such other Member.

5.2.3  Any Member shall have the right to refuse to lower its price or to accept terms and conditions, other than those contained in the Proposal, and which said Member, in good faith, determines shall expose it to unacceptable risks and liabilities. In such event the Members covenant not to sue or seek redress from each other for any damages or losses that may result.

## ARTICLE 6 - CONTRACT PERFORMANCE PHASE

6.1    JOINT VENTURE MANAGEMENT

6.1.1  TtEMI shall act as the Joint Venture Leader for the term of this Agreement.

6.1.2  The management of the Joint Venture will be accomplished at the Joint Venture Meetings. The Leader will carry out the decisions of the Members reached at Joint Venture Meetings. The Leader will not take any action or make any commitments with regard to any Member's Scope of Work without the prior written approval of such Member except as set forth in Article 6.1.6, below.

6.1.3  The Leader's ministerial functions shall include but not be limited to:

    (a)  Acting as spokesman for the Joint Venture in negotiations with the Client, and arranging meetings between the Members and the Client or third parties;

    (b)  Establishing and maintaining a checking account in the name of the Joint Venture, for general operating purposes;

    (c)  Invoicing, collecting, and disbursing fees according to procedures set forth in Appendix 3.0;

    (d)  Transmitting to Members copies of all correspondence and documents between the Client and the Joint Venture;

    (e)  Implementation of all actions, directives and instructions of the Management

10

Committee.

6.1.4    All Members shall give the Leader and the Program Manager their utmost support in the implementation of its functions, and, in particular, all documents required by the Leader for the proper implementation of the Contract shall be made available to the Leader in the form and at the time reasonably requested by the Leader.

6.1.5    The Leader shall not be required to take any action with respect to the enforcement, prosecution or defense of any claims suits, actions, demands, cases or actions by or against the Client, any other Member or any third party, but shall at all times inform the Members of the existence and status, to the extent reasonably known by Leader, of any such claims, suits, actions, demands, or causes of action relating to the Program.

6.1.6    In the event of any questions or disputes among the Members concerning the allocation or assignment of any extra or omitted work affecting a particular Member's Scope of Work, which cannot be resolved by the unanimous vote of the Members, such work shall, nevertheless, be performed expeditiously in accordance with the decision of the Program Manager.  Subject to the terms of Article 9.10, below each Member reserves all rights and remedies with respect to any other Member or third party whose acts or omissions may have caused such allocation or assignment; provided, however, there shall be no interruption or cessation of work pending or during any proceedings to pursue such rights and remedies.

6.1.7    The Leader shall maintain complete, accurate, and current records and books of account pertaining to the Program, including such as pertain to Joint Venture Costs, and shall present such records and books to the scheduled Joint Venture Meetings, and shall make such records and books, or true copies thereof, available to the Members at all reasonable times. Such records and books of account shall clearly separate the business of the Joint Venture from all other business of the Members.

6.2    TAXES

6.2.1    Each Member shall have full and sole responsibility for the payment of any taxes, duties, fees or assessments of any nature whatsoever levied upon it individually in connection with its Scope of Work and any subcontracts entered into by it, including, but not limited to, any personal income taxes levied or imposed on any of its employees or personnel or any of its subcontractor's employees or personnel. Each Member shall arrange its financial affairs and tax reporting procedures to enable inclusion of its respective share of my profit or loss hereunder in its federal, state, municipal or other required tax returns as required by applicable laws and regulations.

6.3    EXCUSABLE DELAYS

6.3.1    For purposes of this Article 6, an Excusable Delay shall be a delay in performance of any Member's Scope of Work in respect of which the Contract would grant an extension of time to perform or other relief.

6.3.2    In the event any Member ("Delayed Member") shall become aware of an actual or potential Excusable Delay in the performance of any portion of its Scope of Work, such Delayed Member shall promptly give notice thereof to other Members.

6.3.3    The Delayed Member shall promptly submit to the Leader a fully supported claim for such Excusable Delay, including documentation and corroboration, and the Leader shall submit such supported claim to the Client with a request for an extension of time for performance or for other appropriate relief including any additional payment required.

6.3.4    Whether or not the Client extends the time for performance or grants other relief, if any Members incur additional costs as a result of such delay, the Leader shall promptly call a Joint Venture Meeting for the purpose of attempting to agree upon an equitable plan for sharing or mitigating such additional costs, but if the Members fail to reach unanimous agreement, the Members incurring such additional costs shall be solely responsible for such additional costs subject to any right of such Member to contribution from other Members as decided in accordance with Article 8.2 or the Client, as provided by Article 6.3.5.

6.3.5    Nothing in this Article 6.3 shall prevent or restrict any Member from pursuing all rights and remedies available under law or the Contract against the Client arising out of the Client's failure to grant an extension of time for performance or other relief in the event of an Excusable Delay.

6.4    OTHER DELAYS

6.4.1    In the event any Member ("Delinquent Member") shall become aware of an actual or potential delay, other than an Excusable Delay, in the performance of any portion of its Scope of Work relating to Program Management responsibilities, such Delinquent Member shall promptly give notice thereof to the other Members.

12

6.4.2   The Delinquent Member shall promptly take such measures as may be necessary to prevent or minimize such delay, and shall notify the other Members of the measures intended to be taken.

6.4.3   Any other Member which is not satisfied with the adequacy or effectiveness of such measures shall notify the Leader, and the Leader shall promptly call a Joint Venture Meeting to review the measures which the Delinquent Member intends to take, and to determine whether other measures should be recommended to the Delinquent Member; provided, however, such recommendations shall not be binding on the Delinquent Member.

6.4.4   All costs and expenses incurred in taking any measures to prevent or minimize such delays shall be borne by the Delinquent Member.

6.4.5   Upon the request of the Delinquent Member, the Leader may elect to attempt to recover such costs and expenses from the Client in accordance with the provisions of the Contract, but if the Leader does not timely take such action, the Delinquent Member shall have the right to do so at its own expense.   The other Members shall provide all assistance reasonably required for such action including, but not limited to testimony, access to any records which would be relevant to such action and other cooperation which either is or reasonably believed by the delinquent Member to be essential to such action. Such assistance shall not include provision of legal services or payment of legal fees, costs or expenses.

6.4.6   Any liability of the Delinquent Member to any other Member arising out of the delay shall be as set forth in Article 8.2, below.

6.5   PATENTS

If an invention is made exclusively by the employees of one Member in connection with this Program, title to said invention and to any patent issuing thereon shall be in said Member. Jointly made inventions shall be owned jointly by TtEMI and SCG. Any ownership rights provided for by this paragraph shall survive the termination of this Agreement. No license under any patents of either Member is granted by this Agreement or by any disclosure of proprietary information hereunder. Each Member shall be solely responsible for any claim or damages due to infringement which arises out of or is connected with its Scope of Work and shall indemnify and save harmless the other Members against any loss or damage that may result from such claims.

6.6   BANKRUPTCY

The following provisions shall, in any event, be given effect solely in accordance with the relevant laws of the United States of America:

6.6.1   In the event that any Member ("Insolvent Member") (a) makes an assignment for the benefit of creditors, or petitions or applies for or arranges for the appointment of a trustee, liquidator or receiver, or commences any proceeding relating to itself under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation or

13

similar law of any jurisdiction, now or hereafter in effect or otherwise, or shall be adjudicated bankrupt or insolvent; or (b) permits or acquiesces in the filing against it of any petition or application for the appointment of a trustee, liquidator or receiver, or any proceeding relating to it as debtor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar law of any jurisdiction now or hereafter in effect, or the entry of an order appointing any such trustee, liquidator or receiver then:

(i)     The Insolvent Member (and/or its receiver, trustee, liquidator or custodian) shall cease to have any further decision making authority or vote under this Agreement and the Joint Venture shall not require the vote, approval or authority of Insolvent Member as otherwise may have been required under this Agreement;

(ii)    The other Members shall have the right to take over and complete Insolvent Member's Scope of Work and in so doing, the other Members shall be entitled to and have assigned to them all of Insolvent Member's accounts receivable and payments in connection with the Program except to the extent any court of competent jurisdiction shall direct that such accounts receivable and payments due such Insolvent Member be paid to others;

(iii)   The other Members shall have the exclusive use and possession and a preferred lien on all of Insolvent Member's equipment, (excluding manufacturing facilities) temporary works, materials and all other things used or supplied by Insolvent Member in connection with the Program, and Insolvent Member will take whatever actions as may be required to establish this preferred lien;

(iv)    Allocation of the costs of completing Insolvent Member's obligations under this Agreement and allocating Insolvent Member's liability under (v) below shall be in proportion to the respective Proportionate Values of the remaining Members:

(v)     Insolvent Member shall be fully responsible for and shall remain liable for all additional costs which are in excess of receipts paid by the Client for such completed work incurred in the completion of its Scope of Work.

6.7     PAYMENTS

6.7.1   Each Member shall submit to the Leader its statements for payment, including the costs of the Member's subcontractors, consistent with the payment provisions provided in the Contract in order to permit the Leader to submit statements to the Client on behalf of the Members. Each Member shall include in the statement for payment percent completion of each delivery order and the associated costs. The Leader shall compile the percent completion and the associated costs for all active Delivery Orders under the Program in a statement to the Client and submit the statement to the Client. Upon receipt of the payments from the Client, the Leader shall promptly, by wire transfer, distribute to each Member the amounts received from the Client relating to their respective applications for payment.

6.7.2   In the event that the Client should pay a lump-sum in connection with the termination of the

14

Contract or in similar cases, the total amount of such payments including payments already received from the Client shall be divided among the Members in accordance with the termination provisions of the Contract to equitably reflect an apportionment of such payment based upon the actual termination costs and expenses incurred by each member.

6.8    INSURANCE

6.8.1    Each Member shall be responsible for arranging the insurance coverage for its firm as described in Appendix 4.0, attached hereto and made a part hereof.

6.8.2    Should joint insurance coverage be deemed necessary by the Management Committee, or required by Client or other applicable law or regulation, the insurance premiums shall be paid by the Members in proportion to their respective "Proportionate Values."

6.8.3    Each Member hereby waives and shall obtain from all of its insurance carriers to the extent permissible by the carrier a waiver of any rights of subrogation against the other Members and their directors, agents, employees, assignees, and subcontractors with respect to any insurance covering risks associated with the Program.


## ARTICLE 7 - MATERIAL BREACH; DEFAULT

7.1    DEFAULTING MEMBER

In the event any Member ("Defaulting Member") is in material breach or default under this Agreement or the Contract and such material breach or default is not cured within sixty days after written notice thereof from any of the other Members not in default under this Agreement or the Contract, or reasonable action to cure has not been diligently initiated and pursued in the event that a cure cannot be effected within sixty days, the other Members shall have the right to take over and complete the Defaulting Member's Scope of Work. In such event, the other Members shall automatically have the right to receive any and all payments, including fees, which would otherwise be due the Defaulting Member and apply the proceeds thereof (i) to cover all expenses incurred by the other Members in taking over and completing (by subcontracting or otherwise) the Defaulting Member's Scope of Work and (ii) to establish a contingency fund to cover any and all outstanding warranties or other obligations of the Defaulting Member. In addition, the other Members (iii) shall have the exclusive use and possession of all the Defaulting Member's equipment (excluding manufacturing facilities), temporary works, materials and all other things in connection with the Program, and (iv) shall have a preferred lien on all such equipment (excluding manufacturing facilities), temporary works, materials and all other things used or supplied by the Defaulting Member in connection with the Program in order to satisfy any expenses incurred by the other Members in completing the Defaulting Member's Scope of Work.

7.2    INDEMNITY

In the event of a material breach or default as described above, the Defaulting Member shall

15

indemnify and hold the other Members harmless from any and all liability, including but not limited to fines or penalties of whatever nature and to excess costs and expenses associated with completing the Defaulting Member's Scope of Work, incurred by the other Members as a result of such material breach or default.

7.3    ALLOCATION

Allocation of costs and expenses under Article 7.1, above, and of Defaulting Member's indemnity and reimbursement under Article 7.2, above, shall be in proportion to the respective Proportionate Values of the remaining Members.

## ARTICLE 8 - LIABILITY AND INDEMNIFICATION

8.1    CLAIMS OF THE CLIENT OR THIRD PARTIES

The Members of the Joint Venture shall be jointly and severally liable to the Client under the Contract. However, it is the express intention of this Agreement that each Member's responsibility and liability to the Client or other third parties be limited to its respective Scope of Work. Therefore, except as expressly provided otherwise herein, the Members shall indemnify each other as follows: Each Member (Indemnifying Member) agrees to indemnify and hold each other Member (Indemnified Member) harmless from any claim made against the Indemnified Member by the Client or other third parties to the degree that such claim arises in connection with said Indemnifying Member's Scope of Work or is due to the Indemnifying Member's fault or negligence, including personal injury or death of any person and property damage of whatever kind and nature whether or not damages for such liability shall be payable by the Indemnifying Member's Insurance as provided herein. In the event that claims are made by the Client or by third parties under such circumstances that it is not possible to establish that fault or cause lies with a particular Member's Scope of Work or is due to a particular Member's fault or negligence, liability for such claims under such circumstances will be borne by the members in proportion to their respective Proportionate Values.

8.2    CLAIMS AMONG THE MEMBERS

8.2.1    Each Member shall be solely responsible for the performance of its Scope of Work and any and all liabilities that may arise in connection therewith unless specifically provided otherwise herein. Any loss sustained by any Member in connection with its Scope of Work shall be solely the responsibility of and for the account of such Member.

Each Member shall mitigate its damages in the event of any other Member's default under this Agreement or the Contract. If one Member becomes aware of a situation in which any other Member may be damaged by default of such Member under the Contract, the Member with such knowledge will meet with the other Members and will attempt to come to an agreement on the best way to mitigate or avoid such damages including the possibility of doing extra work (at the expense of the Defaulting Member) to avoid or to mitigate such

damages.

8.2.2    In the event of any dispute or difference of any kind whatsoever, arising out of or in relation to or in connection with the validity or invalidity, construction, execution, meaning, operation or effect or breach of this Agreement, which cannot be settled amicably by the Management Committee, such dispute or difference shall be referred to the Members' respective Presidents who shall meet together with a view to resolving the same within a period of not more than 30 days from the date of the submission. Should the respective Presidents fail to resolve a dispute or difference, then such dispute or difference shall be submitted to binding arbitration and finally settled under the Construction Industry Rules of the American Arbitration Association then in effect. The arbitration, if any, shall be conducted in a city mutually agreeable to the Members involved.

Pending resolution of such dispute or difference, and without prejudice to their rights, the Members shall continue to respect all their obligations and to perform all their duties under this Agreement and the Contract.

8.2.3    In the event that any Member suffers additional cost in the performance of its Scope of Work due to or traceable to the information provided by or the performance of any other Member, then said other Member shall be liable for such additional costs.

8.2.4    If the Client withholds funds from payments made under the Contract due to a default of any Member, such withholding shall be deemed to be a claim for which such Member shall indemnify the other Members pursuant to Article 8.1, above, and such Member shall promptly make such indemnification and take whatever action is required at its sole cost and expense to correct such default.

## ARTICLE 9 - GENERAL PROVISIONS

### 9.1    PROPER BUSINESS PRACTICES

No Member shall pay, promise, offer or authorize payment of anything of value in any form to any person or organization, either directly or indirectly, through an agent, representative, subcontractor or other third party, to obtain or retain business, where such payment, promise, offer or authorization is contrary to applicable law.

### 9.2    CONFIDENTIALITY

No Member shall use any confidential or proprietary information supplied by any other Member for any purpose other than that intended, nor disclose any such information in any form, to any third party without the prior written consent of the Member who supplied the information. With respect to such information, the Members agree as follows:

a.     In order for information to be protected in accordance with this Agreement, it must be (1) in writing or promptly reduced to writing if the disclosure is verbal; (2) clearly identified as Proprietary Information by each page thereof being marked with the legend "Proprietary Information of (furnishing party)", and (3) delivered to a designated individual as provided in "d" below.

b.     No Member shall identify as proprietary information any information which is not in good faith believed by the party to be entitled to such marking.

c.     Each Member shall use the same degree of care to prevent disclosure or unauthorized use of the other Member's proprietary data that is used to prevent disclosure or unauthorized use of its own proprietary data.

d.     Each Member will designate in writing one or more individuals within its organization as the person(s) authorized to receive proprietary information exchanged between the Members pursuant to this Agreement.

The obligation with respect to handling and using proprietary information as set forth in this Agreement is not applicable to the following:

(1)     Information that is or becomes available to third parties, to the Client, or to the general public without restriction and without breach of this Agreement by the receiving Member.

(2)     Information that was in possession of the receiving Member prior to receipt from the disclosing Member or becomes known to the receiving Member independently of the disclosing Member, without breach of this Agreement by the receiving Member.

(3)     Information that is independently developed or becomes available to any

18

Member by inspection or analysis of products offered for sale.

    (4)    Information disclosed after expiration of this Agreement.

9.3    DUTY TO INFORM

Each Member shall keep the other Members fully and promptly informed of all progress, events and matters affecting or relating to the other Members' Contract performance and Scopes of Work and shall, without delay, provide all relevant information and cooperation reasonably requested by the other Members as relates to such contract performance, Scope of Work to be completed and any other reasonably required coordination and communication required to professionally and expeditiously complete the work as set out in the Contract.

9.4    NOTICES

All notices to be given pursuant to this Agreement shall be in writing, and in the English language and may be given by registered or certified mail or by telegram, telex, or facsimile at the addresses above set forth, and shall be effective upon receipt.

9.5    WAIVER

No member shall be deemed to have waived any provision of this Agreement unless such waiver shall be in writing and signed by such Member. No waiver shall be deemed to be a continuing waiver unless so stated writing.

9.6    ADDITIONAL MEMBERS

No third party shall become a Member of the Joint Venture under this Agreement without the prior written consent of all the Members.

9.7    ASSIGNMENT

No Member may assign or delegate this Agreement or any of its rights or obligations under this Agreement or the Contract, without prior written consent of the other Members, provided, however, any Member shall be free to assign or subcontract any part or the whole of its Scope of Work to any Affiliate. Nothing herein shall prevent any Member from placing or permitting the placing of orders to others for the supply of materials, equipment, supplies, products or services within such Member's Scope of Work, provided the placing of such orders shall not in any way relieve such Member from any of its obligations under this Agreement or the Contract.

9.8    APPLICABLE LAW

This Agreement shall be governed by and construed in accordance with the Laws of the State of California.

9.9     TERM OF AGREEMENT

9.9.1   This Agreement shall be effective as of the date first set forth above upon the execution by all the Members, and shall terminate upon the occurrence of any of the events listed below:

(a)     The Client provides notification that the Joint Venture has not been selected for negotiation of a Contract; or

(b)     The Client advises that no award to any offeror will be made; or

(c)     The Contract with the Client has been fully performed and closed out in accordance with its terms and conditions, full and complete payment has been made thereon and all rights and liabilities with respect to the Client or third parties have terminated, been released, or expired and there are no liabilities to be adjusted between the Members; or

(d)     The Contract has been terminated by the Client or by mutual agreement with the Client provided there are no liabilities to be adjusted between the Members; or

(e)     The Members with the concurrence of the Client agree in writing to terminate this Agreement; or

(f)     The Members, following good faith negotiations, are unable to agree upon a mutually acceptable Proposal to, or Contract with, the Client.

9.9.2   Termination of this Agreement shall not terminate rights and obligations of the Members which arose prior to such termination, but nothing in this Article 9.9.2 shall confer, create, or expand any rights on behalf of the Client or in any other third parties.

9.10    CONSEQUENTIAL DAMAGES EXCLUDED

Notwithstanding anything to the contrary elsewhere in this Agreement, no Member shall, in any event, be liable to any other Member for any indirect, incidental, special or consequential damages, including but not limited to, loss of revenue, cost of capital, loss of business reputation or opportunity whether such liability arises out of contract, tort (including negligence), strict liability or otherwise.

9.11    ENTIRE AGREEMENT

This Agreement contains the entire Agreement among the Members with respect to the subject matter hereof and supersedes any and all prior understandings, correspondence and agreements, oral or written, among the Members other than those agreements which may be attached hereto and made a part hereof. The rights and remedies of the Members as stated in this Agreement are to the exclusion of any other rights or remedies that may be available at law or in equity.

20

9.12    SEVERABILITY

Every part, term or provision of this Agreement is severable from others. Notwithstanding any possible future finding by duly constituted authority or court of competent jurisdiction that a particular part, term or provision is invalid, void or unenforceable, this Agreement has been made with the clear intention that the validity and enforceability of the remaining parts, terms and provisions shall not be affected thereby. The validity and effect of this Agreement, its interpretation, operation and all questions arising with respect to performance shall be determined by the Management Committee. Any unresolved disputes shall be decided in accordance with the provisions of Article 8.2.2 herein.

9.13    AMENDMENTS

No change, amendment or modification of this Agreement shall be valid or binding upon the Members unless such change, amendment or modification shall be in writing and duly executed by all Members.

9.14    TITLES

Heading titles contained herein shall in no way be construed as limited the intent of the subject matter they introduce and shall not be used in construing this Agreement.

9.15    NUMBER OF ORIGINALS

This Agreement shall be executed in two (2) counterparts, each of which shall be deemed an original.

IN WITNESS WHEREOF, the Members hereto have caused this Agreement to be executed by their respective authorized representatives as of the dates set forth below.

**TETRA TECH EM INC.**

By: MARK WALSH

Title: PRESIDENT

Date: 5/9/03

**SULLIVAN CONSULTING GROUP**

By: Steven E. Sullivan

Title: CEO

Date: 9 May 2003

22

# APPENDIX 1.0

# SCOPE OF WORK

Each member shall provide the services required to complete the Scope of Work contained in the Architectural/Engineering FFP ID/IQ Contract (Program) involving CERCLA/RCRA, UST Environmental Studies on Navy and Marine Corps Installations at various locations in CA, AZ, NV, UT, NM, AK, WA, OR, ID, and MT for Southwest Division, Naval Facilities Engineering Command (SWDIV). Senior technical staff from each Member will also serve as Delivery Order Managers for technical delivery orders and each Member will provide all of the services required to complete the delivery order. Each Member will also provide the Program Management services, as appropriate, as required for the implementation of the Program.

The Joint Venture Members agree that for the completion of the delivery orders under the Program, TtEMI will provide 70% of the total labor costs awarded by SWDIV and SCG will provided 30% of the total labor costs awarded by SWDIV. The Joint Venture Members also agree that for the completion of the delivery orders under the Program, TtEMI will receive 70% of the total dollar value of the delivery orders awarded by the Navy and SCG will receive 30 % of the total dollar value of the delivery orders awarded by the Navy. Each Member will make every effort to subcontract technical services to team members, Geofon and Lee Inc., as appropriate, to complete the scope of work. Each Member also agrees that an appropriate budget of about 5 to 15 percent of the awarded labor costs of each delivery order will be provided to the Program Manager to execute the Program Management activities and that percentage of the labor costs is inclusive of the aforementioned total labor costs percentage breakdown.

## APPENDIX 2.0

## STATEMENT OF PRICES

Each Member of the Joint Venture shall provide the prices of its firm for inclusion in the Cost Proposal submitted to Client.  Such prices shall be in accordance with federal cost accounting standards.

Each Member shall develop and negotiate its price for individual delivery orders that are assigned to the Member by the Joint Venture.

## APPENDIX 3.0

## INSURANCE REQUIREMENTS

Each Member shall maintain the following insurance policies:

A. General Liability Insurance, with a combined single limit of not less than $5,000,000 for each occurrence and not less than $5,000,000 in the aggregate, including completed Contracts Operations Liability Coverage with a combined single limit of $1 million for each occurrence and $1 million annual aggregate limit.

B. Automobile Liability Insurance, with a combined single limit of not less than $5,000,000 for each person and not less than $5,000,000 for each accident.

C. Worker's Compensation Insurance, in accordance with statutory requirements and Employer's Liability Insurance with limits of not less than $500,000 for each occurrence.

D. Professional Liability Insurance with limits of not less than $1,000,000 annual aggregate.

E. Contractor's Pollution Liability Insurance with a combined single limit of not less than $1,000,000 per occurrence and $2,000,000 annual aggregate limit.

Each Member shall submit to the other Member certificates of insurance indicating the coverages specified herein. The policies shall, where allowed by the carriers, name the Joint Venture as additional insured and all certificates shall provide that the insurance company shall give written notice to the Joint Venture at least thirty days prior to cancellation or any material change in any policy.

25

B

February 18, 2003

Mr. Ming Yee, Contract Specialist
U.S. Small Business Administration
San Diego District Office
550 West C Street, Suite 550
San Diego, California 92101

**Subject:**      **U.S. Small Business Administration Mentor-Protégé Application**

Enclosure (1):    Supplemental Information
Enclosure (2):    SBA Mentor Protégé Application

Dear Mr. Yee,

Sullivan Consulting Group (SCG) and Tetra Tech EM Inc. (Tetra Tech) are submitting enclosure (1) and
(2) for your review and consideration for admittance into the U.S. Small Business Administration (SBA)
Mentor-Protégé Program. As a participant in this important program, SCG will be able to foster a closer
working relationship with Tetra Tech and expand our technical and management capabilities.

Enclosure (1) provides a business synopsis of both SCG and Tetra Tech and additional information relevant
to our application. SCG and Tetra Tech have reviewed and agreed to the content, terms, and conditions of
the Mentor-Protégé agreement (Enclosure (2)). Upon formal approval from the SBA, SCG and Tetra Tech
will execute Enclosure (2).

SCG and Tetra Tech are excited about the potential business opportunities offered under the SBA Mentor-
Protégé program and would like to proceed as soon as possible. We appreciate your review, comment, and
approval of the application at your earliest convenience.

If you have any questions regarding this application, please contact either Daniel Chow at 415-222-8222 or
me at 619-260-1432.

Sincerely,

Steve Sullivan
Chief Executive Officer


cc:

Daniel Chow, Tetra Tech
Mike Wanta, Tetra Tech
Joanna Canepa, Tetra Tech
Jeff Nelson, SCG
Bill Ulmer, SCG
Kevin Hayford, SCG

**Supplemental Information**
**Tetra Tech EM Inc. ~ Sullivan Consulting Group**
**U. S. Small Business Administration Mentor-Protégé Program**

## Protégé (Sullivan Consulting Group)

1. Sullivan Consulting Group is in the Developmental Stage of the Small Business Administration (SBA) 8 (a) Business Development Program and is in good standing.

2. A Mentor-Protégé alliance with the proposed Mentor, Tetra Tech EM Inc., will benefit Sullivan Consulting Group in a number of areas, including financial, accounting, project and corporate management, technical capability, quality assurance and control, business development, and marketing.

3. Sullivan Consulting Group has worked closely with the SBA District office in San Diego, California for the past 2 years and has a comprehensive understanding of relevant SBA regulations and operating procedures. Sullivan Consulting Group will continue to hold regular meetings with the SBA District contract specialist, Mr. Ming Yee, to discuss progress and review any changes in procedures and regulations.

4. Sullivan Consulting Group is requesting Tetra Tech EM Inc. to be its Mentor under the SBA Mentor-Protégé program.

## Mentor (Tetra Tech EM Inc.)

1. Tetra Tech EM Inc. will serve as a large business mentor to the proposed protégé, Sullivan Consulting Group.

2. Tetra Tech EM Inc. is a wholly owned subsidiary of Tetra Tech Inc. (Tetra Tech), a large business headquartered in Pasadena, California. Tetra Tech has been in business since 1960 and is a publicly traded company in the spell out NASDA  Enclosed is a copy of Tetra Tech's annual report for fiscal year 2001 and 2002 indicating a financially strong and stable company.

3. Federal, state, and local government agencies made up over 90 percent of Tetra Tech EM Inc. clients. Our reputation of exceptional quality and responsiveness help Tetra Tech EM Inc. to build long-standing relationships with these clients. As an example, Tetra Tech EM Inc. has been working for the U.S. Environmental Protection Agency since 1984 and with the U.S. Navy since 1989. These two agencies and others have awarded numerous contracts to Tetra Tech EM Inc. to provide technical and management consulting services to them. Tetra Tech EMI currently holds over fifty large contracts with various federal government agencies.

4. As a mentor, Tetra Tech EM Inc. plans to assist Sullivan Consulting Group in a number of areas, including financial, accounting, project and corporate management, technical capability, quality assurance and control, business development, and marketing.

5. Tetra Tech EM Inc. is familiar with the SBA programs, regulations, and operating procedures. Tetra Tech EM Inc. has participated in a number of Mentor-Protégé program sponsored by various federal government agencies. As an active participant of these types of programs, Tetra Tech EM Inc. has worked closely with various SBA district offices and has been audited many times by SBA. As an example, we worked closely and successfully with the San Francisco SBA district office. This is Tetra Tech EM Inc.'s first application to be an active participant of the SBA Mentor-Protégé program. Tetra Tech EM Inc. anticipates to be working closely and successfully with the SBA San Diego, California office.

6. Tetra Tech EM Inc. is requesting to be a mentor to one firm, Sullivan Consulting Group that is headquartered in San Diego, California. Sullivan Consulting Group is currently our sole protégé under the U.S. Navy Mentor-Protégé program and our plan is to expand this relationship under the SBA Mentor-Protégé program. Our agreement with our previous protégé firms under the Department of Defense (DOD) program have ended and this application with The Sullivan Consulting Group will not impact the business relationships with these firms. All of former protégé firms have received significant benefits under the DOD program and became self-sustaining businesses in California.



## SBA MENTOR-PROTÉGÉ AGREEMENT

THIS AGREEMENT is entered into by and between Tetra Tech EM Inc., hereinafter referred to as "Mentor" or "Tetra Tech," and Sullivan Consulting Group, hereinafter referred to as "Protégé" or "SCG".

### WITNESSETH:

WHEREAS, the U.S. Small Business Administration, hereinafter "SBA," under Code of Federal Regulation (CFR) Section 124.520, established the Mentor-Protégé (M-P) Program, hereinafter the "Program," which was implemented by the SBA; and

WHEREAS, the purpose of this SBA program is to encourage the Mentor firm to assist small disadvantaged businesses (SDB) in enhancing their capabilities to satisfy contract and subcontract requirements of various government procurements, to increase the overall participation of SDBs as subcontractors and suppliers under Mentor contracts, other government agency contracts, and commercial contracts, and to foster the establishment of long term business relationships between SDBs, the Mentor and other such contractors, and

WHEREAS, Tetra Tech has received approval from the SBA to participate in the Program as a mentor to SCG, and

WHEREAS, the term of this Agreement shall commence on the date of approval of this agreement by SBA. The Agreement shall continue for a period of two (2) years thereafter unless earlier terminated pursuant to the provisions of Sections 10.0, and 11.0 of this agreement or extended as provided for in Article 12.0.

### 1.0    MENTOR FIRM INFORMATION

| | |
|---|---|
| NAME OF FIRM | Tetra Tech EM Inc. |
| MENTOR POINT OF CONTACT | Daniel Chow Vice President |
| CAGE CODE | OYEM5 |
| ADDRESS | 135 Main Street, Suite 1800 San Francisco, CA 94105 |
| TELEPHONE | (415) 543-4880 |
| FAX | (415) 543-5480 |
| E-MAIL | Daniel.chow@ttemi.com |
| HOMEPAGE | www.ttemi.com |

### 2.0    MENTOR ELIGIBILITY

Tetra Tech has been previously approved under the Department of Defense (DOD) and U.S. Environmental Protection Agency (EPA) M-P Programs and is still eligible to participate as a mentor. Tetra Tech is a large business and has been profitable for the past 20 years.

### 3.0    PROTÉGÉ FIRM INFORMATION

| | |
|---|---|
| NAME OF FIRM | SCG |
| PROTÉGÉ POINT OF CONTACT | Steve Sullivan Chief Executive Officer |
| ADDRESS | 409 Camino Del Rio South Suite 204 San Diego, CA 92108 |
| TELEPHONE | (619) 228-1001 |
| FAX | (619) 260-1421 |
| E-MAIL | Sullivan@onesullivan.com |
| HOMEPAGE | www.onesullivan.com |
| NAICS CODE | 5413, 5415, 5416 |
| % MENTOR OWNED | 0% |

### 4.0    PROTÉGÉ ELIGIBILITY

SCG is a disabled veteran-owned, small disadvantaged business, (SDB) as defined by section 8(d)(3)(C) of the Small Business Act (15 U.S.C. 637(D)(3)(C)), which is (i) eligible for the award of federal contracts; and (ii) a small business according to the Small Business Administration (SBA) size standard for the NAICS codes, 5413, 5415 and 5416, which represent the contemplated supplies or services to be provided by the protégé firm to the mentor firm; and (iii) certified by the SBA as an SDB. SCG is in good standing and in the development stage of the SBA 8(a) Business Development Program.

Tetra Tech does not own any part of SCG.

### 5.0    DEVELOPMENTAL ASSISTANCE PROGRAM

Tetra Tech and SCG have a strong, 4-year working relationship. In June 2002, Tetra Tech and SCG met in San Diego, California to develop a strategy for partnering on a M-P relationship.



Tetra Tech will provide SCG with technical transfer, training, and advice to meet the goals of this Program. Tetra Tech's initial developmental assistance shall consist of the following components:

- Facilitate SCG interaction with a minimum two federal departments, Department of the Navy and Department of Army – Tetra Tech will facilitate the interaction of SCG personnel with Navy and Army in order for SCG to gain experience and understanding of these two clients.

- Provide Proposal Preparation Support – Tetra Tech will support SCG in preparing proposals and Standard Form 254 and 255 submittals (for example, upcoming architect-engineer [A-E] indefinite delivery/indefinite quantity [ID/IQ] solicitations from Navy Naval Facilities Engineering Command Southwest Division (SWDIV) or Army Corps of Engineers (COE). Tetra Tech will provide training and assistance to ensure that SCG is capable of preparing responsive proposals to Navy or Army solicitations.

- Form a joint venture – Tetra Tech will form a joint venture with SCG to pursue contracts from federal and state government agencies.

- Assist SCG in finding key San Francisco Bay Area (Bay Area) staff members – Tetra Tech will provide Human Resources and recruiting support to facilitate the growth of SCG into the Bay Area.

Additionally, Tetra Tech seeks to identify and develop relationships for SCG with other firms that can lead to subcontracting and other major project opportunities.

Initial assessment results indicated the need to expand SCG's business capabilities and improve infrastructure capabilities. Three key areas were identified.

Need: Quality Assurance/Quality Control (QA/QC)

Goal: To further develop SCG's QA/QC methods to meet the standards of federal agencies.

Need: Contract/Finance Management Systems

Goal: To enhance SCG's ability to prepare successful proposals, develop business accounting principles, financial management skills and tools to increase market competitiveness and position. Strengthen marketing activities to broaden customer base and ensure stability in future revenues.

Need: Project Management and Expanded Technical Capability

Goal: To develop the skills of personnel and acquire management tools necessary to ensure effective and efficient project management, cost control, and schedule maintenance.

SCG's developmental progress under the Program shall be assessed by measuring: (a) an increase in gross revenues and in-house staff, and (b) the increase in the number and dollar value of contracts awarded to SCG by Tetra Tech, federal agencies, and other prime contractors.

The named administrators of this program will conduct a formal review every six (6) months to assess program progress. It is recognized that specific activities may be adjusted, as the Program develops to provide maximum benefit to SCG within the framework of this Agreement.

Tetra Tech's planned areas of developmental assistance to be provided to SCG pursuant to the M-P Agreement between the parties are as follows:

5.1    QUALITY ASSURANCE/QUALITY CONTROL

Planned activities are the following:

- Review and assess SCG existing QA/QC practices and procedures

- Provide recommendations for improving procedures

- Provide assistance in developing new procedures as required

- Assess client satisfaction with SCG technical deliverables

5.2    CONTRACT/FINANCE

Planned activities are the following:

- Assess current contract administration needs

- Assess current cost estimating practices, evaluate selected technical proposals, and conduct training in cost estimating and proposal preparation to include the following general topics:

- Responsiveness and responsibility

- Use of work breakdown structure

- Technical approach development

- Cost estimating, negotiations, back-up requirements and documentation

- Preparation and review of proposals

- Bid/No bid decision process



Provide strategic planning analysis for business and financial management:

- Using economic and market outlook for identifying new clients
- Business investment needs
- Review current accounting system
- Assist with database management
- Provide guidance on money management and financial reporting

### 5.3   PROJECT MANAGEMENT AND EXPANDED TECHNICAL CAPABILITY

Planned activities are the following:

- Tetra Tech will provide subcontracted work and training to expand SCG's technical capabilities and project management skills
- Offer SCG professional opportunities to participate in Tetra Tech's "Project Manager" training program
- Provide SCG with a comprehensive directory of technical experts in specific areas of interest to the Program
- Train SCG in the use of cost controls
- Train SCG in proper sequencing of project tasks

### 6.0   METRICS

The following are measurable means of assessing SCG's development under the Program:

- Expansion of technical abilities. SCG's staff will acquire new skills through technical transfer.
- Increase annual revenues.
- Immediate subcontracting opportunities. Tetra Tech will provide subcontracting opportunities to SCG.

### 7.0   DOD DIRECT CONTRACT AWARDS TO PROTEGE

Tetra Tech has assisted SCG to obtain two direct awards from the Navy SWDIV in February 2003.

### 8.0   FEDERAL AGENCY SUBCONTRACT AWARDS TO PROTEGE

SCG was awarded four federal subcontracts during the two preceding years.

### 9.0   POTENTIAL SUBCONTRACTS

Tetra Tech has awarded SCG three subcontracts in support of the Navy Sustainability Pilot Program, SMART Plan Outline and NELP Project.

Consistent with the extent and nature of our business base, it is anticipated that Tetra Tech will award to SCG approximately $200,000.00 in subcontracting work over a 1-year period. The anticipated subcontract type is firm fixed-price.

### 10.0   TERMINATION PROCEDURES (MENTOR)

Tetra Tech may terminate this Agreement, with or without cause, upon thirty (30) days written notice to SCG. If the termination is for cause, SCG will have thirty (30) days to respond to such notice of proposed termination and may rebut any finding believed to be erroneous, may offer a remedial program, or both. Upon prompt consideration of SCG response, Tetra Tech will either withdraw the notice of proposed termination and continue SCG participation in the Program, or effect the termination with a written notice.

### 11.0   VOLUNTARY TERMINATION PROCEDURES (PROTÉGÉ)

SCG may terminate this Agreement, with or without cause, upon thirty (30) days written notice to Tetra Tech. If the termination is for cause, Tetra Tech will have thirty (30) days to respond to such notice of proposed termination and may rebut any finding believed to be erroneous, may offer a remedial program, or both. Upon prompt consideration of Tetra Tech's response, SCG will either withdraw the notice of proposed termination and continue to participate in the Program, or effect the termination with a written notice.

### 12.0   ADDITIONAL TERMS AND CONDITIONS

#### 12.1   OPTIONS TO EXTEND PERIOD OF PARTICIPATION

By written agreement of the parties, Tetra Tech and SCG may extend the term of this Agreement for three, 1-year option periods.

#### 12.2   PUBLICITY

SCG shall obtain prior approval from Tetra Tech for any news release, public announcement,



advertisement, or any other form of publicity concerning activities in connection with this Agreement.

## 12.3    COMMITMENTS

Nothing in this Agreement shall grant to either Tetra Tech or SCG the right to make commitments of any kind for or on behalf of one another.

## 12.4    WARRANTIES

Tetra Tech warrants that it has the capability, experience, and means required to carry out the services contemplated by this Agreement and that it shall conduct the services in a diligent and workmanlike manner consistent with professional practices and standards for nationally recognized firms engaged in similar work.

Except as set forth above, Tetra Tech makes no guarantee of results or warranty, express or implied, in fact or by law, whether of merchantability or fitness for a particular purpose or otherwise, as to any of the materials or services furnished that may be performed pursuant to this agreement.

## 12.5    PROPRIETARY INFORMATION

The parties anticipate that under this Agreement it will be necessary for both to transfer to the other information of a proprietary nature.    Proprietary information shall be clearly identified as such by the disclosing party at the time of disclosure.

Each party agrees that it will use the same reasonable efforts to protect proprietary information that are used to protect its own proprietary information. Disclosures of such information shall be restricted to those individuals who are directly participating in the developmental assistance program identified in Article 5.0 hereof.

Neither party shall reproduce, disclose, or use proprietary information except as follows:

- Such information may be used to fulfill the obligations under this Agreement; and

- Such information may be used in accordance with any written authorization received from the disclosing party.

- The limitations on reproduction, disclosure, or use of proprietary information shall not apply, and neither party shall be liable for reproduction, disclosure, or use of information when any of the following conditions exist:

- If, prior to the receipt thereof under this Agreement, it has been developed independently

by the party receiving it, was lawfully known to the party receiving it, or has been lawfully received from other sources, providing such other source did not receive it unlawfully.

- Subsequent to the receipt thereof under this Agreement it is published without restriction by the party furnishing it, is disclosed as a result of the party furnishing it to others without restriction, or it otherwise comes within the public knowledge or becomes generally known to the public.

- If any part of the information has been or hereafter shall be disclosed in a United States patent issued to the party furnishing the information hereunder, then, after the issuance of said patent, the limitation on such information as disclosed in the patent shall be only that afforded by the United States Patent Laws.

- Neither the execution and delivery of this Agreement, nor the furnishing of any information by either party, shall be construed as granting to the other party either expressly, by implication, estoppel, or otherwise any license under any invention, patent, trademark, or copyright now or hereafter owned or controlled by the furnishing party.

- Notwithstanding the expiration of the other portions of this Agreement, the obligations and provisions of this Article 12.0 shall continue for a period of three (3) years from the date of expiration or termination of this Agreement.

## 12.6    RIGHTS IN INVENTIONS

Inventions shall remain the property of the originating party.    In the event of joint inventions, the parties shall establish their respective rights by negotiations between them.

## 12.7    GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of California, except as otherwise provided herein.

## 12.8    INSURANCE

Each party shall be responsible for maintaining insurance for its respective employees, facilities, and operations in the following amounts and coverage:

(A)    Workers Compensation, providing statutory benefits in compliance with the state having jurisdiction over each employee.    Employer's Liability in the amount of $1,000,000 per occurrence; and



(b)  Comprehensive General Liability including products, contractual and automobile (owned, nonowner, and hired vehicle) liability with a combined single limit per occurrence and annual aggregate of not less than $1,000,000 for bodily injury and property damage.

## 12.9   CORPORATE COMMITMENT

Upon execution of this Agreement, Tetra Tech shall communicate to each of its employees involved in subcontracting and project management the existence of this Agreement and the M-P relationship between Tetra Tech and SCG.

## 12.10   ENTIRE AGREEMENT

The foregoing articles contain the entire Agreement between the parties and supersede any prior oral or written agreements, commitments, understandings, or communications with respect to the subject matter of this Agreement.

## 13.0   MENTOR FIRM POINT OF CONTACT

| COMPANY/DIVISION NAME | Tetra Tech EM Inc. |
|---|---|
| NAME | Daniel Chow |
| TITLE | Vice President |
| ADDRESS | 135 Main Street, Suite 1800 San Francisco, CA 94105 |
| TELEPHONE | (415) 543-4880 |
| FAX | (415) 543-5480 |
| E-MAIL | Daniel.Chow@ttemi.com |

## 14.0   PROTÉGÉ FIRM POINT OF CONTACT

| COMPANY/DIVISION NAME | SCG |
|---|---|
| NAME | Steven Sullivan |
| TITLE | Chief Executive Officer |
| ADDRESS | 409 Camino Del Rio South, Suite 204 San Diego, CA 92108 |
| TELEPHONE | (619) 228-1001 |
| FAX | (619) 260-1421 |
| E-MAIL | sullivan@onesullivan.com |

## 15.9   MENTOR FIRM'S COGNIZANT ADMINISTRATIVE CONTRACTING OFFICER (ACO)

| NAME | James Liberatore |
|---|---|
| TITLE | Assistant Director of SBE |
| ADDRESS | DCM San Francisco 1265 Borregas Avenue Sunnyvale, CA 94089-1308 |
| TELEPHONE | (408) 543-7076 |
| FAX | (408) 541-0594 |
| E-MAIL | jliberatore@dcmdw.dcma.mil |

## 16.0   MENTOR FIRM COGNIZANT DEFENSE CONTRACT MANAGEMENT COMMAND (DCMC) CONTRACT ADMINISTRATION OFFICE (CAO)

| NAME | Joan Fosbery |
|---|---|
| TITLE | Assistant Director of SBE |
| ADDRESS | DCM San Francisco 1265 Borregas Avenue Sunnyvale, CA 94089-1308 |
| TELEPHONE | (408) 543-7042 |
| FAX | (408) 541-7084 |
| E-MAIL | jfosbery@dcmdw.dcma.mil |

## 17.0   PROTÉGÉ FIRM DCMC CONTRACT ADMINISTRATION OFFICER (ACO)

| NAME | Enid Allen |
|---|---|
| TITLE | Assistant Director of SBE |
| ADDRESS | DCM San Diego 7675 Dagget Street, Suite 200 San Diego, CA 92111-2241 |
| TELEPHONE | (858) 637-4922 |
| FAX | (858) 637-4926 |
| E-MAIL | eallen@dcmdw.dcma.mil |



## 18.0   REPORT AND REVIEW REQUIREMENTS

SCG and Tetra Tech will comply with the Program's reporting and review requirements as set forth under 13 CFR 124.520(f).

## 19.0   SIGNATURES OF BOTH PARTIES

Mentor

**_Daniel Chow_**

_____

_Signature_

**Title:  _Vice President_**
**Date:  _February 20, 2003_**

Protégé

**_Steven E. Sullivan, C.E.O._**

_____

_Signature_

**Title:  _Chief-Executive-Officer_**
**Date:  _February 20, 2003_**



**SMALL BUSINESS ADMINISTRATION**
550 WEST "C" STREET, SUITE 550
SAN DIEGO, CALIFORNIA 92101-3500

April 2, 2003

RECEIVED APR 0 3 2003

Mr. Steven Sullivan, Managing Director
Sullivan Environmental Solutions, LLC
dba Sullivan Consulting Group
409 Camino Del Rio South, Suite 204
San Diego, CA 92018

Dear Mr. Sullivan:

The 8(a) Mentor-Protégé Agreement dated February 20, 2003, between Sullivan Consulting Group and Tetra Tech EM Inc. has been approved by Luz Hopewell, Associate Administrator for 8(a) Business Development, Washington, DC.

The intent of the Mentor/Protégé Program is to enhance the development of the protégé and to encourage the mentors to provide various forms of assistance to the 8(a) program protégés. The mentor is responsible for certifying annually that it continues to possess good character and a favorable financial position. The protégé is required to report to the Small Business Administration their successes and/or any problems encountered during the protégé's proceeding year at the time they submit their annual updated business plan.

I wish you success in this alliance with Tetra Tech EM Inc.

Sincerely,

Anthony J. Vigil
Deputy District Director

cc: Daniel Chow



**Sternagle, Ed**

| | |
|---|---|
| **From:** | Takemoto, David |
| **Sent:** | Monday, July 18, 2005 8:12 AM |
| **To:** | Wanta, Michael |
| **Cc:** | Fetters, Randy |
| **Subject:** | RE: 1st BoR Project |

Mike- I'll be in the office on Wednesday to catch up on the BOR, Sullivan, etc..........What is a good time to get together? Lunchtime?

David Takemoto
Construction Director Western Region
TETRA TECH EM Inc.
1230 Columbia Street Ste. 1000
San Diego, CA. 92101
714-814-6014

**From:** Wanta, Michael
**Sent:** Friday, July 15, 2005 11:33 AM
**To:** Argus, Roger; Teel, John; Fetters, Randy; Takemoto, David
**Cc:** Walsh, Mark
**Subject:** 1st BoR Project

Gentlemen:

We have been notified this morning that the 1st large Bureau of Reclamation Project will be awarded to the Chadux/Newland Entities/Tetra Tech team, assuming successful negotiations and comfort level from all JV parties. We expect the RFP in the next 2-3 weeks, with a proposal due within 30 days thereafter. Here are the facts as they stand, with a brief synopsis of the SOW below –

- Project Size = $23-25 million over a 3-year period
- Project Location = Tribal lands in Southern Arizona
- The project will be incrementally funded
- 1st year award will be $8-10, follow-on years will have same funding levels
- Bonding:
  - Goal is for Newland and Chadux to pick up most of the bonding (80-85% or more); both firms are verifying capacity as I write this
  - Tetra Tech would bond only the work we perform (less than 20%); or $1-$1.5M the first year (*this is a change from my previous emails*)
- Project Roles
  - Project Team is proposed as a joint venture
  - Tetra Tech will be the project management entity, and probably assist Chadux with their tasks
  - Chadux will primarily be the material supplier and supply rental equipment, as needed
  - Newland would self-perform much of the construction work
- Finances
  - Allowable profit = 9%
  - Allowable contingency = 15% max
  - BoR typically pays within 15 days of invoice via electronic payment procedures

4/17/2008

- You can also bill for materials purchased, but not yet installed
  - Additional profit sharing strategy for all parties should costs come in under bid amounts, proportionate to amount of risk taken and work performed; however, there will be a minimum profit accrual rate of 6-9% applied as a cost to the project

Randy/Dave, I will need assistance from you starting early next week to set up a plan to make sure this goes well from the get go.  I'll be in touch.

Roger, Mark, do we still need a formal presentation to corporate assuming we only bond in the 15-20% range?

We will be learning more about the project next week, which will allow me to provide further details.

The project scope of work is: San Xavier Farm Rehabilitation (Southern Arizona)

San Xavier Farm Rehabilitation shall include, but not necessarily be limited to constructing flood channels and flood control structures; constructing thrust blocks for pipe line, valve vaults, and flood channel drop structures; furnishing and installing new steel piping, applying coatings to pipe fittings, valves, and tanks and other miscellaneous items; furnishing and installing valves and equipment for pressure reducing stations and line pipe installations; providing cathodic protection for steel fittings; constructing steel regulating tanks; furnishing and installing flow meters and fertilizer injection systems; removing and installing mechanical equipment; and installing Government-furnished power and telemetry cable.





## The Team

- ❖ Neil Talwar
- ❖ John Ferrante
- ❖ Randy Fetters
- ❖ Mike Wanta

## Objective

- ❖ Introduction to team members and companies
- ❖ Discuss synergies between lines of business
- ❖ Offer new approaches
- ❖ Define next step in building a successful relationship

## Success & Performance with Small Business Partners

- ❖ Nunn-Perry Awards: 2 awards for supporting DoD's Mentor-Protégé Program, March 2004
- ❖ Nearly $450 million in new contracts with three small business partners in last two years
- ❖ Majority of contracts were repeat business for the Tetra Tech/Small Business Partners
- ❖ Long term commitment between companies
  - – SBA & DoD Mentor Protégé Agreements



## Building Upon Our Success

- ❖ TriEco and Tetra Tech joined forces to complement each other in the environmental, A&E, and construction service areas
- ❖ Joint venture, mentor protégé partnership filed in SBA program
- ❖ Clients realize the benefits of working with a small company with added security of a large mentor behind them



## TriEco Profile

- ❖ 10 Members
- ❖ 8(a), Small Disadvantaged Business
- ❖ Environmental Remediation
  - – Low level radiation remediation
  - – Hazardous waste remediation
- ❖ Environmental Compliance & Permitting
- ❖ Construction Management



2

### Tetra Tech Profile

- ❖ Publicly-owned (NASDAQ: TTEK)
- ❖ $1.4 billion in revenue (2004)
- ❖ Full-service engineering and management consulting firm established in 1966
- ❖ Corporate headquarters in Pasadena, California
- ❖ 8,000 professionals spanning all environmental, engineering, science and management disciplines
 ❖ More than 350 offices worldwide

_____
_____
_____
_____
_____
_____
_____
_____

### Position in the Industry

- ❖ Engineering News-Record (ENR), Top 500 Design Firms Sourcebook, 2005
  **Overall Ranking #5**
  **Top 500 Design Firms**
- ❖ ENR
  Top Environmental Management Firm
  2005
  **Ranking #1**

_____
_____
_____
_____
_____
_____
_____
_____

### Office Locations in the United States



_____
_____
_____
_____
_____
_____
_____
_____



## Partnership with CAT Alliance Ltd.

- ❖ Headquarters in the UK
- ❖ Owned by 3 Leading European Consulting Firms
  (TAUW-Netherlands; COWI-Denmark; Enviros-UK)
- ❖ 5000 professionals worldwide
- ❖ Offices in 32 Countries (Western, Central and Eastern Europe;
  - Asia, China, and Australia; South America

> Tetra Tech has an exclusive strategic partnership with the
> CAT Alliance for worldwide services...

## Partnership with CAT Alliance Ltd. Services

- ❖ Core Services Based on Portfolio Management
  - Commercial Due Diligence Fortune 500 Corporations
  - Facility and Infrastructure Due Diligence
  - Environmental Due Diligence
  - Transaction and Asset Management
  - Social Impacts Due Diligence
- ❖ Representative Clients
  - GE Capital; BP; Shell; Unilever; DOW; Phillips; Hoechst; Eastman Kodak; Daimler Chrysler

*4*





## Partial Client Listing — Private Sector

- ALCOA
- Anaconda Minerals
- Atlantic Richfield
- Bank of America
- Bethlehem Steel
- Boeing
- British Petroleum
- Brunswick
- Capital Cities Broadcasting
- CIBA-Geigy
- Chevron
- Coope Industries
- Crown Zellerbach
- Cummins Engine
- Cypress-Amax
- Dupont
- Exxon
- Federal Express
- Firestone
- FMC
- Ford Motor
- General Electric
- General Motors
- Global Marine
- Getty Oil
- Hanson PLC
- Homestake Mining
- Honeywell
- Hughes
- International Nickel
- Kennecott Copper
- Litton Systems
- Lockheed
- Georgia Pacific
- Marathon Oil
- Merck
- Mobil Oil
- Monsanto
- Motorola
- Pegasus Gold
- Penrizod
- Phillips Petroleum
- Rockwell International
- Rohn Industries
- Rohm & Haas
- Shell Oil
- Sherwin Williams
- Siemens
- Sun Oil
- Texaco
- Titanium Metals Corp
- USA Waste Services





## Project Focus - Engineering

- Exxon Bayway Refinery Upgrade
- Chevron Bayway Refinery Upgrade
- ICI Joplin Explosive Incineration Project
- NY Air National Guard C5A Aircraft Hangar, Taxiway, and Parking Apron
- Full service A&E and Environmental services for Sprint, Verizon, Nextel, T-Mobile wireless build-out for the New York major Trading Area.

## Construction Services and Management

**We specialize in industrial construction projects. Our clients know they can count on us to meet their needs with creative means and without production interruptions.**

❖ New Commercial Construction

❖ Renovation

❖ Retrofitting



## Construction                                    *Areas of Service*

❖ Construction management
❖ Pre construction planning/design/ construction services
❖ Architecture and landscape construction services
❖ Agricultural construction services
❖ Civil/structural construction services
❖ Communications construction services
❖ Mechanical/electrical construction services
❖ Process construction services
❖ Design-Build / construction
❖ Cost estimating construction services
❖ Plant environmental controls and waste management construction services
❖ Plant closure/cleanup construction services

## Project Focus - Construction

❖ Multi-service contract with Boeing covering manufacturing facilities, tenant improvements, laboratory facilities, clean rooms, and seismic upgrades

❖ Design/Build of facility modifications for the Ground Based Midcourse Defense, Upgraded Early Warning Radar

❖ Quality Assurance Inspection, Chemical Weapons Incinerator, Umatilla Army Depot



### Resource Management

- Tetra Tech solves complex environmental management challenges worldwide to ensure clean air, land and water for future generations
- Tetra Tech addresses critical issues associated with:
  – Environmental risk management
  – Watershed management
  – Solid, hazardous, and nuclear waste management
  – Groundwater cleanup and environmental restoration
  – Air and water quality
  – Productive reuse of economic assets
  – Sustainable development of natural resources
  – Unexploded ordinance



### Resource Management — Areas of Service

- Air and water quality consulting
- EMS/ISO 14001
- Energy management
- Environmental engineering
- Environmental information management, GIS, and knowledge management
- Environmental risk management
- Groundwater/contaminated site investigations and remediation
- Homeland security risk management
- Multimedia compliance support
- Natural resource management and planning
- O&M support
- Risk assessment and modeling
- Unexploded ordinance (UXO)/sustainable range management
- Waste management
- Watershed management

### Property Transactions – Value Focus

A full transaction and contracting "tool box" includes:

- Sale of property "as-is" (including cleanup liabilities)
- Sale of property with Raytheon retaining environmental liability
- Traditional contract vehicles & strategies
- Guaranteed Fixed-Price Remediation (GFPR)

## Property Transactions, cont'd

Sale of Property "As-Is"

- ❖ Property value helps off-set cleanup costs
- ❖ Avoids cleanup delaying sale of property
- ❖ Aligns cleanup with end use



_____
_____
_____
_____
_____
_____
_____

## Property Transactions, cont'd

Guaranteed Fixed Price Remediation

- ❖ Cost savings reported from competitive GFPR solicitations
- ❖ Good tool for "upside-down" properties where cleanup costs exceed property value
- ❖ GFPR can lead to "as-is" sale through subsuming contract to buyer



_____
_____
_____
_____
_____
_____
_____

## Project Focus - Redevelopment

- ❖ Former Maxwell House Coffee Company Site Hoboken NJ- 500 million redevelopment brownfield project along the Hudson River, with a 12 million dollar remediation
- ❖ Former Hercules Burlington Facility- 135 acre redevelopment project along the Delaware River, with a 3.5 million dollar remediation.
- ❖ Former Owens Corning Facility Berlin N.J. Currently performing environmental due diligence for redevelopment and acquisition by a prospective purchaser.
- ❖ Former Van Leer Chocolate Facility Jersey City N.J. 100 million dollar redevelopment project on a heavily contaminated site. Cost for remediation estimated at 12 million dollars.
- ❖ Kaplan Properties Philadelphia PA- 40 acre brownfield redevelopment project.



_____
_____
_____
_____
_____
_____
_____

**Our Competitive Value**

❖ Cost savings realized through less overhead

❖ Fast reaction time to client's needs

❖ Shorter learning curve

❖ Depth of resources with broad experience base

❖ We know Raytheon's clients (Armed forces) and stake holders (regulatory agencies and local communities)



_____

_____

_____

_____

_____

_____

_____

Question and Answer

_____

_____

_____

_____

_____

_____

_____

_____

E

## Fitzgerald, Kenneth (SD)

**Subject:**              FW: ANC SBA Mentor Protégé Agreement Update

From: Wanta, Michael
Sent: Tuesday, March 22, 2005 5:39 PM
To: Argus, Roger
Subject: ANC SBA Mentor Protégé Agreement Update


Roger:


Here is an update on the ANC SBA Mentor Protégé agreement -


We are presently in discussions with the SBA regarding terms of the agreement.  We expect to get approval of the agreement in the next 3 months or so.


Given our existing SBA M-P agreement with Sullivan, we are being careful that there is no conflict - essentially we need to focus on a different region and business line, which is our plan.  So, I do not believe we will be able to address the Navy's request to set up an ANC JV for performing A-E environmental work at SWDIV.  We will not be using any other SBA M-P to address the Navy's request on this focus area as long as we are in the partnership with Sullivan.


Let me know if you have any questions.  Thanks.


Mike



**Sternagle, Ed**

| | |
|---|---|
| **From:** | Argus, Roger |
| **Sent:** | Friday, July 08, 2005 12:40 PM |
| **To:** | Takemoto, David |
| **Cc:** | Sullivan, Steve; Fetters, Randy; Wanta, Michael; 'Owens, Mark'; 'Bowen, Jim'; 'Borja, Phillip' |
| **Subject:** | RE: Heritage- Global |

If they are bringing opportunities to the table, I say proceed. We need to be cognizant of our partnership with Sullivan to make sure we don't get into any conflict situations. Additionally, we should look at how Sullivan's capabilities might fit in on these opportunities.

Roger

**From:** Takemoto, David
**Sent:** Wednesday, July 06, 2005 1:54 PM
**To:** Argus, Roger
**Cc:** Sullivan, Steve; Fetters, Randy; Wanta, Michael; Owens, Mark; Bowen, Jim; Borja, Phillip
**Subject:** Heritage- Global

Roger- Heritage-Global has approached us with some private sector work and some public sector work to partner on as a JV entity. I believe that the projects and profitability, particularly in the LA market are present given the current market conditions. If they are bringing prospective work to the table I think we need to listen.

What do you suggest?

Thanks

David Takemoto
Construction Director Western Region
TETRA TECH EM Inc.
1230 Columbia Street Ste. 1000
San Diego, CA. 92101
714-814-6014

4/17/2008

G

## Sternagle, Ed

| | |
|---|---|
| **From:** | Wanta, Michael -- EMI |
| **Sent:** | Wednesday, January 18, 2006 2:35 PM |
| **To:** | EMI.RegionalManagers |
| **Cc:** | Conti, Nino -- EMI; Alexander, Gil -- EMI; Fetters, Randy -- EMI |
| **Subject:** | Third SBA Mentor-Protégé Firm approved by SBA |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

Everyone:

I wanted to let you know that we were just notified this afternoon that our 3rd small business partner (TriEco) received approval from the SBA for our 3rd concurrent Mentor-Protégé agreement. Given that the SBA typically only allows large businesses to have one protégé firm at a time, I believe this latest approval is a great demonstration of the SBA's confidence in EMI's small business partnerships (doesn't hurt when you win over $430M contracts since 2003 with your SB partners either ☺).

We now have the following firms in the SBA mentor-protégé program --

- **Sullivan International Group**
  - Based in San Diego, CA
  - [ http://www.onesullivan.com/ ]
- **St George Chadux Corp.**
  - a subsidiary of St George Tanaq Corp based in Anchorage, AK
  - [ http://www.stgeorgetanaq.com/ccserv/envrem.html ]
- **TriEco, LLC** [ http://trieco.net/ ]
  - based in Louisville, KY

Special thanks to **Rich Coomes** and **Gil Alexander** for developing the relationship with TriEco, and for their help in getting the TriEco SBA M-P set up.

We can form small business joint ventures with all 3 of these firms where EMI can manage the work, control cash flow, perform a vast majority of the work, and qualify as a small business. The SBA M-P agreement can also allow you to do the same for sole source 8a awards, but it is a bit trickier. (fyi, we are in the middle of preparing some information that will serve as a SB partnering reference for us moving forward. I hope to have that completed in early Feb.)

Please let me know if you have any general questions, or contact Rich or Gil regarding are latest SB partner, TriEco. Thanks.

Mike Wanta
Tetra Tech EM Inc.
619-321-6720
mobile: 619-961-7333

H



I

4/28/2008

Sullivan

- 8a negotiated awards up to $3M from VA
- Initial 10 projects bid without Tt involvement (Fall 2004) - $8.2M
- Tt support for initial projects
  - PM oversight
  - No profit risk – FFP: oversight time, bond cost + 1/3 of budgeted profit.
  - Bonding
  - Added Full Time PMs to 2 big projects
  Results:
  - Good Tt profit on small revenue  $500k @ 20%
  - Projects completed – No defaults – Happy client
  - Marginal profit for Sullivan (7%)
  - Payment – 50 days
- Current Project bids co-developed with Tt & Sullivan
  - Basis: 10% margin (max allowed by VA) + 15% contingency built in throughout
  - Tt at the table during negotiations w/ VA
- Execution
  - Tt on-site PM on each project (attach staffing plan & org chart for each project)
  - Tt & Sullivan determine most cost effective work split with open disclosure of costs and 51/49% profit split
  - Tt can self-perform as much as we can do cost effectively
  - Sullivan willing to sub to us as much as we want to satisfy bonding company comfort requirements (but because of EMI's G&A & Tt subs work profit is eroded)
  [Original concept was low Tt revenue with high ROS given adequate PM oversight]

**Future options**
- Original:
  - Grow VA & Navy (and other gov. agencies) negotiated award 8a construction with realistic goal $10M-$20M/yr
- Fetter's Model
  - Sullivan sell construction business to St. George Chadux (super 8a)
  - Tt relationship with St. George Chadux for 85% of revenue and associated profit.
  - Negotiated awards of any value from gov. agencies: realistic goal >$20-$50M/yr
- Closeout option A
  - Don't bond current jobs & closeout Sullivan relationship on construction work
- Closeout option B
  - Bond currently awarded project or both to avoid contract default and maintain client reputation.



**Sternagle, Ed**

| | |
|---|---|
| **From:** | Teel, John |
| **Sent:** | Monday, January 24, 2005 3:43 PM |
| **To:** | Fetters, Randy |
| **Cc:** | Wanta, Michael |
| **Subject:** | RE: Sullivan Projects |

Guys - We should talk about how to approach Sullivan about this...

**From:** Fetters, Randy
**Sent:** Mon 1/24/2005 3:24 PM
**To:** Teel, John
**Cc:** Wanta, Michael
**Subject:** Sullivan Projects

John,

These projects really need full time TtEMI supervision. They are all general construction projects (i.e. multiple subcontracts issued). The one's involving health care facilities carry a very high labiality risk.

For bonding, general insurances liability, contract management and performance obligation (Liquidated Damages, Warranty and Long Term General Liability) I would suggest that TtEMI assign a general superintendent to over see these project on a full time bases.

The VA is a notoriously hard customer to deal with, and I do not believe, Sullivan has the necessary strength in construction management personnel or procedures to cover TtEMI interests.


Randy F. Fetters
Facilities Construction Program Manager
Tetra Tech EM Inc.



## Sternagle, Ed

| | |
|---|---|
| **From:** | Teel, John |
| **Sent:** | Friday, April 22, 2005 4:51 PM |
| **To:** | Fetters, Randy |
| **Subject:** | RE: Joe Bermudez |

Great job!  Hopefully he won't feel obligated to stay with Sullivan when we finally get the other things going...

**From:** Fetters, Randy
**Sent:** Fri 4/22/2005 4:20 PM
**To:** Teel, John; Argus, Roger
**Cc:** Wanta, Michael; Rob Gurnick (robgurn@centurytel.net)
**Subject:** FW: Joe Bermudez

He may look like a convict, but the customer always love him.

Thanks, Randy

Randy F. Fetters
Tetra Tech EMI
1230 Columbia Street
San Diego, CA 92101
Cell-714-720-9981
Fax-619-525-7186

**From:** Allgire, Russell O. [mailto:Russell.Allgire@med.va.gov]
**Sent:** Friday, April 22, 2005 1:40 PM
**To:** 'mowens@onesullivan.com'
**Cc:** 'jbowen@onesullivan.com'; Fetters, Randy
**Subject:** Joe Bermudez
**Importance:** High

Hello, My name is Russell Allgire and I'm the COTR for the Step Down Project in Bldg 100-3C-109/111 at the Palo Alto Va Hospital. Since this projects inception I have seen 2 project managers, 2 foreman and several different sub contractors. Personally I felt this project was starting to become a BIG C.F. I just want to let you know that when the last project manager ( Joe Bermudez ) came aboard he was handed a bucket of S--- and he turnred this project around. Joe has been side blinded with several issues that wasn't communicated to him and he has been jumping through hoops and bending over backwards to get this project done on time and satisfy the VA. I feel Joe is a great asset to your orginization and should be reconized for his extreme professionalisim and ability to get the job done. If it wasn't for Joe this project wouldn't be finished on time.

*Russell O Allgire*
VAPAHCS
3801 Miranda Ave
Palo Alto Ca. 94304
650-493-5000 x68031

L





**Search**

About Us    Services    Investor Relations    News    Contact Us    Home

*Are you interested in receiving news releases and other email from Home Solutions? If so, please sign up for our email newsletter.*

**Email:**

Go

## Company Expected to Complete $15 Million in Work in 2007

March 21, 2007, Dallas, TX - (Business Wire) - Home Solutions of America, Inc. (NASDAQ: HSOA; the "Company" or "Home Solutions"), a provider of recovery, restoration and rebuilding/remodeling services, announced today that its Fireline Restoration, Inc. subsidiary ("Fireline") is part of a joint venture that was awarded a $50 million contract to provide a wide range of engineering services to the Naval Facilities Engineering Command Southwest (NAVFAC SW). Work will commence at the beginning of April and will be supported by the new Fireline joint venture offices in Seattle, Washington. Home Solutions' portion of the work is $15 million, which is expected to be completed during 2007. The work is not included in the Company's previously announced backlog.

The joint venture between St. George Chadux Corporation (SGC), a Native American corporation, Fireline and a third contractor, will support the U.S. Navy's Installation Restoration Program (IRP) and the Base Realignment and Closure (BRAC) Program under the firm-fixed price, indefinite delivery/indefinite quantity contract. Under the contract, the joint venture will provide a wide range of engineering, environmental science, and other technical services at U.S. Navy and U.S. Marine Corps installations located primarily in the western United States. SGC have participated in a number of government contracts and has completed more than $600 million in work on government projects since 1989. Fireline will perform environmental and restoration services work at Naval and Marine Corps installations principally in California, as well as Arizona Nevada, Utah, New Mexico, and other Department of Defense installations nationwide.

"We are pleased to work with St. George Chadux Corporation on this government contract," said Brian Marshall, President of the Company's Restoration and Construction Services Division. "We are beginning what we hope to be a long future on governmental projects, and are pleased that we were able to meet the high performance standards necessary to meet the Navy's requirements. Fireline is in the process of bidding on nearly $680 million of such opportunities in the next year that will potentially, if awarded, provide revenue opportunities over the next five years."

### About St. George Chadux Corporation

St. George Chadux Corporation is a rapidly growing professional services company specializing in engineering and environmental services. St. George Chadux Corporation is an SBA-certified 8(a) Small Disadvantaged Business and Alaskan Native Corporation Owned Firm that specialize in providing cost-effective solutions for both commercial and government clients.

### About Home Solutions of America, Inc.

Home Solutions of America, Inc. is a provider of recovery, restoration and rebuilding/remodeling services to commercial and residential areas that are (i) prone to flooding, hurricanes, tornados, fires or other naturally occurring and repetitive weather related emergencies; and/or (ii) experiencing robust housing development. Its Fireline subsidiary is involved in providing construction services, rebuilding, catastrophic storm response and contents restoration for commercial, industrial and residential properties. Based in Tampa, Fireline is certified in multiple aspects of the restoration industry, including smoke, fire, water and mold. The Company has operations in California, Texas, Florida, Alabama, Georgia, Louisiana, Mississippi and South Carolina. For additional information, please visit the Company's Web site at http://www.hsoacorp.com.

*Cautionary Notice*
*Statements included in this update that are not historical in nature are intended to be, and are hereby identified as, "forward-looking statements" for purposes of the safe harbor provided by Section 21E of the Securities Exchange Act of 1934, as amended by Public Law 104-67. Forward-looking statements may be identified by words including "anticipate," "believe," "intends," "estimates," "expect," and similar expressions. The Company cautions readers that forward-looking statements including, without limitation, those relating to the Company's future business prospects, contracts to be performed, and new opportunities associated with the anticipated rebuilding of the New Orleans area, are subject to certain risks and uncertainties that could cause actual results to differ materially from those indicated in the forward-looking statements, due to factors such as those relating to economic, governmental, technological, and other risks and factors identified from time to time in the Company's reports filed with the SEC.*

© 2002 - 2006 Home Solutions of America, Inc. All rights reserved
Privacy Policy  Disclaimer



**Sternagle, Ed**

| | |
|---|---|
| **From:** | Teel, John |
| **Sent:** | Tuesday, March 08, 2005 2:48 PM |
| **To:** | Fetters, Randy |
| **Cc:** | Wanta, Michael |
| **Subject:** | Sullivan Construction Jobs |

Randy - Now that I have completely digested what you guys shared with me today, this is what I believe needs to happen:

- Re-baseline the project that you guys described today.
- Develop go forward plan to get us to complete the project with minimal pain.
- Review the subcontract(s)) that Sullivan has in place to see if we can put some required pain on the subs. They need to make it right, if possible.
- We need a brief (one-page) plan to provide to Sullivan of how the project will be managed to completion. We need to get them to turnover project completely...They cannot charge to the project at all, or minimally as defined by you.

Other Projects

- We need to review all other projects that we have bonded for them.
- We need to know status and whether or not we need to take those over to.
- Re-baseline those that are at risk.
- Review all subcontracts
- Summary document of status of the other projects and the risks associated with each.

If needed, I am willing to come to San Diego at the end of the week to meet with Sullivan, and layout the go forward plan and make them understand that neither company can afford one failure.

Call me when you get a chance so we can discuss plan and schedule.  505 417-3978.

Thanks!

4/17/2008



## Sternagle, Ed

**From:**         Teel, John
**Sent:**          Wednesday, March 09, 2005 1:23 PM
**To:**            Fetters, Randy; Wanta, Michael
**Subject:**     RE: B122 VA RENO - Design-Build Single Level Parking Structure RFQ for Portions of
Construction

**Follow Up Flag:** Follow up
**Flag Status:**    Completed

Let's not get into with them yet...Let's get the go forward plan together first and then we will meet with them to layout the plan...This will not be a negotiation.  We will tell them (nicely) what the plan will be....

**From:** Fetters, Randy
**Sent:** Wed 3/9/2005 1:02 PM
**To:** Wanta, Michael; Teel, John
**Subject:** FW: B122 VA RENO - Design-Build Single Level Parking Structure RFQ for Portions of Construction

I think these guy's have missed the point. We are not going in to give them a quote and take over their liability. We can come up with a recovery plan and implement it, but they need to understand that they are on the hook for any over runs.

I do not think they even have a good idea how much trouble they are in yet. Most estimate for parking structures come in at $12k to $14k per stall. This parking structure has 338 stalls,
at $12k per stall that $4,056,000. Sullivan is at $2.9 m. The $12k is for construction cost only, not A&E

Randy F. Fetters
Tetra Tech EM Inc.
Office: 619-525-7188
Cell:   714-720-9981

**From:** Bowen, Jim [mailto:jbowen@onesullivan.com]
**Sent:** Wed 3/9/2005 12:30 PM
**To:** Hadiwibawa, Stephanie
**Cc:** Owens, Mark; tompellett@sbcglobal.net; George Ghusn; Fetters, Randy
**Subject:** B122 VA RENO - Design-Build Single Level Parking Structure RFQ for Portions of Construction

We need to get an RFQ out to Ttemi for the above referenced project...

The POC is Randy Fetters, Director of Construction (714) 720-9981 cell  randy.fetters@ttemi.com

The drawing/spec packages located in the following folders have already been delivered to Ttemi (Randy Fetters):

N:\Open Projects\B122 VA RENO - Design-Build Single Level Parking Structure\Technical\Project Drawings\2005-02-15 Construction Drawings

N:\Open Projects\B122 VA RENO - Design-Build Single Level Parking Structure\Technical\Project Specifications\2005-02-15 Construction Specifications



**Sternagle, Ed**

**From:**   Teel, John
**Sent:**    Tuesday, July 26, 2005 2:55 AM
**To:**       Wanta, Michael
**Cc:**       Fetters, Randy
**Subject:** RE: Sullivan Meeting Update/Corporate Presentation

I'm stuck in Cleveland and Pittsburgh this week and you are headed to Hawaii...I have to work on that.  How about we shoot for early next week?  Maybe you guys come to ABQ on Monday?

**From:** Wanta, Michael
**Sent:** Mon 7/25/2005 11:51 PM
**To:** Fetters, Randy; Teel, John
**Cc:** Takemoto, David
**Subject:** Sullivan Meeting Update/Corporate Presentation

Randy/John:

Dave and I met with Sullivan today.  Not much happened due to a last minute conflicting meeting with Steve Sullivan.  (We heard he finally realized things aren't going well on all the construction projects.)

We didn't walk out with too many knives in our back, but will be meeting again on Tuesday morning to continue to work on our SB strategy with them.  We'll update you after the meeting.
~~~~~~~~~~~
Regarding our corporate presentation ...

I have a meeting in Honolulu Thursday afternoon.  I get stuck going to all the tough locations ☺

I'm not sure I can get back Thursday evening, but will let you know soon.  We really need to get going on the presentation.  I don't think we'll have a tough time out-doing the example I sent out last week, but we do need to meet.

Mike

P

**Sternagle, Ed**

| | |
|---|---|
| **From:** | Argus, Roger |
| **Sent:** | Wednesday, August 31, 2005 12:32 PM |
| **To:** | Wanta, Michael; Fetters, Randy; Takemoto, David |
| **Subject:** | RE: Newland and Sullivan Issue |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Thanks for the heads up; I strongly suggest we stay out of the fray – play dumb.

**From:** Wanta, Michael
**Sent:** Wednesday, August 31, 2005 11:28 AM
**To:** Fetters, Randy; Takemoto, David; Argus, Roger
**Subject:** Newland and Sullivan Issue

Gentlemen:

Newland's patience has finally worn thin on payments for both the Reno Parking Garage and Boulder City WAP projects. They do plan to inform the clients they have not been paid and plan to invoke the Miller Act (not exactly sure what it is). I am not able to hold off Newland any longer, and they have provided proof (via emails from Mark Owens) that they are being repeatedly blown off by Sullivan on payments we approved to be paid a long time ago.

I'm not sure if we would be affected by this, but I understand the government can tap into Sullivan's other federal contracts to get Newland paid. I know Todd Dugan at Newland is very contract-savvy, so I suspect he knows what he's doing here and has a good case. Any suggestions on what we can do to help Sullivan would be appreciated.

Mike Wanta
Tetra Tech EM Inc.
619-321-6720
mobile: 619-961-7333



## Sternagle, Ed

| | |
|---|---|
| **From:** | Takemoto, David |
| **Sent:** | Friday, October 07, 2005 11:07 AM |
| **To:** | Fetters, Randy |
| **Subject:** | RE: Construction |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Be nice if he could at least spell John's and my name correctly before he tries to intimate the level of our qualifications based on the input from Mark Owens, who I presume delivered the message to the ballerina.

Does the pubah know that he is $1,000,000.00 negative based on his own report? Just what the hell is someone smoking here?

I agree with Mike that we need to exit this bipolar and bi-whatever relationship.

BY THE WAY WHO WAS THIS ORIGINAL SENT TO FROM SS BESIDES YOU AND MIKE?

David Takemoto
Construction Director Western Region
Tetra Tech EM Inc.
1230 Columbia Street  Suite 1000
San Diego, CA. 92101
714-814-6014  Wireless

**From:** Fetters, Randy
**Sent:** Friday, October 07, 2005 10:44 AM
**To:** Takemoto, David
**Subject:** FW: Construction

FYI

**From:** Fetters, Randy
**Sent:** Friday, October 07, 2005 8:09 AM
**To:** Wanta, Michael; Walsh, Mark; Teel, John; Argus, Roger
**Subject:** RE: Construction

Guys,

I'll be on a plane much of Friday, but can get people started on some of the items via email.  I'll cc John, Roger and Randy on those requests, so we all can follow up on the items.  Just so we're all clear on my position with Sullivan, I am once again providing my recommendation from an email I sent to all of you, except Mark, on Sept. 26th.

"We should develop a phase-out plan for construction, and possibly environmental work.  I'm not suggesting we drop everything, but develop a good solid plan that protects both companies.  I believe now would be a good time to address the issue with Sullivan."

I have included my understanding to the items noted by Steve below –

4/21/2008

*"Over the past year there have been ongoing problems with the Sullivan / TTEMI construction partnering efforts. You and I have spoken at length on these issues and had hoped that our folks would be able to work together to resolve any of these concerns on a case by case basis. The following are key factors that have exasperated these issues:*

*1.   TTEMI assuming responsibility for much of the Project Management of existing Sullivan VA direct awards and then pulling key people assigned off the projects / breaking project continuity shortly after assignment for other "priority TTEMI projects" (i.e UTAH, etc.)..... "*

<u>Wanta's understanding:</u> Out of all the projects Sullivan has under the VA and Bureau of Reclamation, there were only two projects where TtEMI personnel were assigned or involved – (1) the Reno parking garage and (2) the Palo Alto project.  On those projects, EMI had an assigned PM; however, that person did not have traditional PM authority.  For example,

- We had no control over who was on the site or performing the work
- Both projects were grossly underbid; and if you bid a project grossly our of whack, the PM has little accurate information by which to manage the project – you basically end up flying by the seat of your pants
- We had no control over subcontractors
- We had no control over subcontract language
- We also were not involved for the full duration of the project
- We had no control over the scope off work bought from the subcontractors, as a result:
    1.   The Palo Alto Project had sustained over $100,000 in subcontract change order within the first 6 weeks of the start of the project, TtEMI was ask by Sullivan to be come involved around week 8.
    2.   The Reno Project excavation had been bought out and the sub contract issued with out any of the subcontractors being given the soils report. Excavation bid increased by $400,000

Fetters thoughts: These are only two of many issue that needed to be address by the time TtEMI was ask for assistance by Sullivan. The Reno project was admittedly; by Mark Owen, already $500,000 over budget when Sullivan ask TtEMI for assistance (not including the additional cost of $400,000 for excavation). The cost over run in subcontractor change orders; had TtEMI not of assisted Sullivan on these projects, would have been staggering.

*2.   TTEMI PM's authorizing thousands of dollars of client requested changes without notifying either Sullivan or TTEMI management that these have occurred (an audit that was completed today by Bill Ulmer revealed more a hundred thousand). This includes several significant items - (i.e. a conference room that was not even part of the scope in Palo Alto that no one was aware of until today...).*

<u>Wanta's understanding:</u> The PM had no authority to authorize changes or issue subcontracts, so I don't know how out-of-scope work was or could have been performed.  That's all I know about this issue – it's all new news to me.

Fetters thoughts:  For close to a year, Greg People reported to me; as one of my project managers, on the construction of The City of Hope Hospital; an $110,000,000 project (as the lead of the change order group). During this time, Greg display extreme discipline in all change order protocol. I find it very hard to believe that he would direct any major out of scope work, to be done with out the proper protocol being followed. I will follow up with Greg and get an understanding of this work.

*3.   TTEMI hiring incompetent personnel (Dave Takomoto...) who created more problems / only worsened matters....*

<u>Wanta's understanding:</u> No input on personnel experience, but based on Dave's resume, he has more relevant construction experience than the entire organization at Sullivan.

<u>Fetters thoughts:</u>  I have known Dave, for over 6 years and have both work and followed his professional career for this period of time. A comment such as this is clearly made out of shear frustration and unworthy of a reply.

*4.   Had Sr. MGT (Roger and Mike) trying to manage construction work they are not qualified to oversee.*

<u>Wanta's understanding:</u> Roger and I were not managing or overseeing any construction work whatsoever.  Roger

4/21/2008

and I facilitated communication between the companies and worked to get EMI's financial books in order. No construction experience would be required for that role.

Fetters thoughts: My Team has received nothing but positive support and sound guidance from both Roger and Mike. Both have been very clear that about TtEMI's objective's in developing a professional relationship between TtEMI and Sullivan, as will as providing guidance on how to constructively reach these goals.

5.    *TTEMI & Sullivan never had an opportunity to build teams that could work together because both companies were hiring unknowns and sending them away to manage multi-million dollar projects...*

Wanta's understanding: We had two people on two sites, and input from Dave and Randy on the same two projects. Dave and Randy were familiar with the skill sets of the two EMI personnel at those sites. [You might want to ask Steve why he would send personnel he didn't know to manage a multi-million dollar job site EMI bonded. Sounds like a very risky issue for EMI.]

Fetters thoughts: If Mr. Sullivan took the time to understand the careful thought that was put into the development of this Team and the relationships between the Team Members, he would understand that this statement is not correct.

6.    *TTEMI (San Diego) pretending to know more about construction than Sullivan - only the new people TTEMI hired had industry knowledge but never were kept on the job long enough to provide the necessary expertise. FYI > I was told today that Greg Peoples never wanted to work in Palo Alto and that this was the first construction project he has ever overeseen....*

Wanta's understanding: I don't understand Steve's point, but I do know that Greg has had the PM role on many construction projects.

Fetters thoughts: I have known Greg, for over 3 years and have both work and followed his professional career, for this period of time. A comment such as this is clearly made out of shear frustration and unworthy of a reply.

*Today I learned that my construction folks have been given an ultimatum (TTEMI manages everything or forget it...). This ironically comes from another person who does not know (forgive the expression) "jack squat" about construction.*

Wanta's understanding: The "ultimatum" comes from our bonding company (Sullivan's previous bonding company), not EMI. The person delivering the message is irrelevant.
Fetters thoughts: I agree with Mike

*I am requesting that you have John Teal stand down and in order to preserve this relationship, I highly recommend you call me as soon as possible.*

Wanta's understanding: The issue has nothing to do with John. We are simply addressing the bonding company's concerns, and developing a plan that protects both companies.
Fetters thoughts: I agree with Mike

Randy

4/21/2008

R

## Sternagle, Ed

| | |
|---|---|
| **From:** | Fetters, Randy -- EMI |
| **Sent:** | Monday, January 23, 2006 2:00 PM |
| **To:** | Coker, Victoria -- EMI; Gurnick, Robert -- EMI |
| **Subject:** | FW: B122 VA RENO - Design-Build Single Level Parking Structure RFQ for Portions of Construction |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

For your reading pleasure.

Randy Fetters
Tetra Tech EM Inc.
1230 Columbia Street, Suite 1000
San Diego, CA 92101
Telephone  (619) 525-7188
Fax        (619) 525-7186
Cell       (801) 404-9283
randy.fetters@ttemi.com

**From:** Teel, John
**Sent:** Wednesday, March 09, 2005 1:23 PM
**To:** Fetters, Randy; Wanta, Michael
**Subject:** RE: B122 VA RENO - Design-Build Single Level Parking Structure RFQ for Portions of Construction

Let's not get into with them yet...Let's get the go forward plan together first and then we will meet with them to layout the plan...This will not be a negotiation.  We will tell them (nicely) what the plan will be....

**From:** Fetters, Randy
**Sent:** Wed 3/9/2005 1:02 PM
**To:** Wanta, Michael; Teel, John
**Subject:** FW: B122 VA RENO - Design-Build Single Level Parking Structure RFQ for Portions of Construction

I think these guy's have missed the point. We are not going in to give them a quote and take over their liability. We can come up with a recovery plan and implement it, but they need to understand that they are on the hook for any over runs.

I do not think they even have a good idea how much trouble they are in yet. Most estimate for parking structures come in at $12k to $14k per stall. This parking structure has 338 stalls, at $12k per stall that $4,056,000. Sullivan is at $2.9 m. The $12k is for construction cost only, not A&E

Randy F. Fetters
Tetra Tech EM Inc.
Office: 619-525-7188
Cell:   714-720-9981

**From:** Bowen, Jim [mailto:jbowen@onesullivan.com]
**Sent:** Wed 3/9/2005 12:30 PM
**To:** Hadiwibawa, Stephanie
**Cc:** Owens, Mark; tompellett@sbcglobal.net; George Ghusn; Fetters, Randy
**Subject:** B122 VA RENO - Design-Build Single Level Parking Structure RFQ for Portions of Construction

We need to get an RFQ out to Ttemi for the above referenced project...

The POC is Randy Fetters, Director of Construction (714) 720-9981 cell  randy.fetters@ttemi.com

The drawing/spec packages located in the following folders have already been delivered to Ttemi (Randy Fetters):

N:\Open Projects\B122 VA RENO - Design-Build Single Level Parking Structure\Technical\Project Drawings\2005-02-15 Construction Drawings

N:\Open Projects\B122 VA RENO - Design-Build Single Level Parking Structure\Technical\Project Specifications\2005-02-15 Construction Specifications

Please coordinate the formal RFQ to Ttemi in writing.

Document what is sent with the RFQ (including drawings and specs already delivered) and copy Tom Pellett.  We are looking for them to bid the portions of the project that they can self perform in an effort to improve the budget.

Time frame to mobilize for construction is April/May 2005.

Davis-Bacon wages with certified payroll apply.  You will need to send a copy of these (from our prime contract) with the RFQ.

The bid is to note all exceptions clearly.  If no exceptions then the bid should state "no exceptions."

All review questions relative to the cost estimate of the project should be coordinated through Tom Pellett as the main POC.

Any company background/corporate type questions can be directed toward me or Mark Owens.  Keep us all in the loop including George Ghusn.

Jim Bowen



**Sternagle, Ed**

**From:**     Teel, John
**Sent:**     Saturday, October 08, 2005 11:32 AM
**To:**        Fetters, Randy
**Subject:** RE: Alabama is a Go

Call me as soon as we hear something....I would like to make sure we have some kind of paper in place, even if it is a letter of intent.  I want to make sure that we can get a job number open and that we have the right set-up with Tri-Eco.

F...Sullivan on the Construction stuff!

John

**From:** Fetters, Randy
**Sent:** Sat 10/8/2005 10:08 AM
**To:** Teel, John
**Subject:** Alabama is a Go

John,

We should have a Notice to Proceed in 2 hrs.

Randy

T

**Sternagle, Ed**

| | |
|---|---|
| **From:** | Bob Pawlowski [bpawlowski@stgeorgechadux.com] |
| **Sent:** | Wednesday, December 14, 2005 12:00 PM |
| **To:** | Fetters, Randy -- EMI |
| **Cc:** | Wanta, Michael -- EMI; Anderson, Bill -- EMI |
| **Subject:** | RE: Bid OPP |

Randy:

I am always interested in pursuing NOAA work, as we have past performance under both cooperative agreements for construction and rehabilitation and years of contracts for environmental remediation.

And we will identify the MP for a JV approach at this time, so that it is approved when solicited for.

Bob

---

**From:** Fetters, Randy -- EMI [mailto:randy.fetters@ttemi.com]
**Sent:** Wednesday, December 14, 2005 10:32 AM
**To:** Bob Pawlowski
**Subject:** FW: Bid OPP

Bob,

What do you think?

Randy Fetters
Tetra Tech EM Inc.
1230 Columbia Street, Suite 1000
San Diego, CA 92101
Telephone   (619) 525-7188
Fax          (619) 525-7186
Cell         (801) 404-9283
randy.fetters@ttemi.com

---

**From:** Argus, Roger -- EMI
**Sent:** Wednesday, December 14, 2005 11:28 AM
**To:** Westberry, Keith -- EMI; Wanta, Michael -- EMI; Korzekwa, Bob -- EMI; Anderson, Bill -- EMI
**Cc:** Johnson, Mark -- EMI; Fetters, Randy -- EMI
**Subject:** RE: Bid OPP

Bill,

I'd rather we look at something like this with St. George Chadeaux.

Thanks,

Roger

---

**From:** Westberry, Keith -- EMI
**Sent:** Wednesday, December 14, 2005 6:42 AM
**To:** Wanta, Michael -- EMI; Korzekwa, Bob -- EMI; Argus, Roger -- EMI
**Cc:** Johnson, Mark -- EMI

**Subject:** Bid OPP

```
Gents are we pursuing this one with Sullivan?  If not, maybe we could....Its a
sources sought notification at this point...sounds like it would be right up our
alley.
```

### RFP/RFI/RFQ
| | |
|---|---|
| Project Name | **Construction Contract with Design Capabilities** |
| Owner | **National Oceanic and Atmospheric Administration** |
| Location | **SEATTLE, WA** |
| Zip Code | **98115** |
| County | **KING, WA** |
| Sector | **Federal** |
| Contact Name | **Sharon Kent, Contract Specialist**    Phone **(206) 526-6035** |
| Submittal Date | **12/23/2005** |
| Value | **$100,000.00 to $5,000,000.00** |
| Related Documents | **click to view** |
| Guide Ref Num | **4142410 - 12/13/2005** |
| Project Num | **Reference-Number-AB133A-06-SS-0001** |

**ONVIA**
Business Builder

CLICK HERE To
Research This
Opportunity

Federal Business Opportunities Synopsis General Information Document Type: Sources Sought Notice
Solicitation Number: Reference-Number-AB133A-06-SS-0001 Posted Date: Dec 13, 2005 Original Response
Date: Dec 23, 2005 Current Response Date: Dec 23, 2005 Original Archive Date: Jan 07, 2006 Current Archive
Date: Jan 07, 2006 Classification Code: Y -- Construction of structures and facilities Set Aside: Total Small
Business Naics Code: 236220 -- Commercial and Institutional Building Construction Contracting Office Address
Department of Commerce, National Oceanic and Atmospheric Administration (NOAA), Western Administrative
Support Center, 7600 Sand Point Way, Northeast, Seattle, WA, 98115-6349 Description NOTICE: This is a
request for information only. The information provided in response to this notice will assist the Government in
determining the extent of the small business and socio-economic market for the type of work described herein.
The intent of the announcement is to identify sources that are qualified Small Business concerns, including Small
Business, Small Disadvantaged, Women owned and Veteran Owned firms for a Multiple Award Task order
Contract (MATOC) for the Department of Commerce (DOC), National Oceanic and Atmospheric Administration
(NOAA), Western Region Acquisition Division (WRAD). The MATOC will be a Construction contract with Design
capabilities. The MATOC will be an Indefinite-Delivery Type Contract awarded to at least 3 but not more than 5
contractors with a Joint Total Acquisition Value (JTAV) of $50M. The MATOC will be for a base period of 5 years
with no option periods. Individual Task Orders issued under the resultant contracts will be competed amongst the
awardees, unless exempted under FAR 16.505. The various facilities repair, rehabilitation, remodeling and major
construction projects for this solicitation may include, but are not limited to, laboratories, weather forecast offices,
administrative offices, docks, piers, public visitor centers and other NOAA and DOC owned facilities. The majority
of the work will be for projects located west of the Mississippi of the United States. Projects which may be
procured through this solicitation may be located in, but not limited to, the states of Washington, California,
Colorado, Wyoming, Montana, Oregon, Utah, Alaska, Hawaii, Louisiana, Texas, Mississippi and Florida. Firms
that respond to this announcement must demonstrate their ability to provide full construction and design service
capabilities. Bid bond capacity will be required to be submitted on each project in the amount of 20% of the total
proposed price or $3M, whichever is less. The estimated average price range of most projects could be anywhere
between $100,000 to $5,000,000. The types of work to be accomplished may include, but are not limited to
design-build and/or construction with incidental design of biology laboratories, chemical laboratories, special use
laboratories, office and administrative buildings, interior design and furnishings, docks, piers, bulkheads, seawater
tanks and supply systems, piping and utility systems, sewers, water supply systems, fire detection and fire
sprinkler systems, building renovation, power supply systems, electrical renovations, mechanical piping systems,
lab gas systems, ventilation hoods and devices for laboratories, HVAC systems, emergency power systems, UPS
systems, demolition of buildings, housing, weather forecast offices and other facilities. Investigation, studies and
design services incidental to building design and construction may also be included. The types of skills required
may include, but are not limited to, estimators, CADD operators, draftsmen, superintendent, industrial hygienist,
architect, interior designer, environmental engineer, structural engineer, mechanical engineer, electrical engineer,
civil engineer, geologist, truck driver, equipment operators, laborer, electrician and other construction tradesmen.
Specific needs will not be known until projects are determined. The NAICS code is 236220 with a size standard of
$28.5M. NOTE: THIS SYNOPSIS IS NOT CONSIDERED A REQUEST FOR PROPOSAL BUT A REQUEST
FOR INFORMATION ONLY. No solicitation document is available. No contract will be awarded on the basis of

responses received to this notice. Interested firms should submit in writing, its name, address, point of contact, telephone number, business type and size and a brief synopsis regarding its capability to provide the required Construction and Design services. The following is the information that must be addressed in the response to assist the Government in determining the availability of qualified small business concerns for the requirement: 1) Demonstrate construction experience similar to the above listed projects or projects of similar complexity; 2) Demonstrate that the firm possess either internally or as a member of their team/joint venture, a full services licensed architect-engineer design team with experience similar to the above listed projects or projects of similar complexity. Also, state if teams or joint venture have worked on previous projects or if the team/joint venture would be assembled for this solicitation; 3) A list of at least 5 but no more than 10 projects, which are similar in size and complexity of those listed above with points of contact from the customer; 4) Demonstrate the ability to operate outside of the firms home office immediate area; 5) Demonstrate the ability to manage multiple projects simultaneously. It is the government intent to analyze responses from firms which can operate in the areas of consideration as specified above. In the event that firms are not considered qualified in these locations, the government may seek firms which can provide the required services nationally. Detailed information must be submitted by mail to the U.S. Department of Commerce, NOAA, WRAD, 7600 Sand Point Way N.E., Seattle, WA 98115-6349, ATTN Rose N.S Olds, or to the email address below by 12:00 noon, January 6, 2006. Questions of any nature may be addressed to rose.n.olds@noaa.gov. NO TELEPHONE INQUIRIES WILL BE HONORED.. NOTE: The Point of Contact for this sources sought is as follows. Point of Contact: Rose N.S. Olds, Contract Specialist, Phone 206-526-4395, Fax 206-527-6936, email Rose.N.Olds@noaa.gov PLEASE DISREGARD the Point of Contact Information that references Sharon Kent. Point of Contact Sharon Kent, Contract Specialist, Phone (206) 526-6035, Fax (206) 526-6025, Email sharon.s.kent@noaa.gov Place of Performance Address: The majority of the work will be for projects located West of the Mississippi of the United States, and Florida.

```
Keith Westberry
Program Manager
350 N. St. Paul, STE 2600
Dallas, Texas 75201
Ph: (214) 740 - 2034
Fax: (214) 922-9715
Cell: (469) 371-0990
```

U

## Sternagle, Ed

**From:**    Wanta, Michael -- EMI
**Sent:**    Thursday, March 23, 2006 11:49 AM
**To:**      Fetters, Randy -- EMI
**Subject:** RE: Contract V261C-2156 Parking Structure


I don't own a gun, sorry.

Glad I'm not you, but at least you'll have a cool CEO or GM job soon where we can work on good projects moving forward.

Mike Wanta
Tetra Tech EM Inc.
1230 Columbia Street, Suite 1000
San Diego, CA 92101
619-321-6720
cell: 619-961-7333

**From:** Fetters, Randy -- EMI
**Sent:** Thursday, March 23, 2006 10:45 AM
**To:** Wanta, Michael -- EMI
**Subject:** FW: Contract V261C-2156 Parking Structure
**Importance:** High


Could someone just shoot me, please.

Randy Fetters
Tetra Tech EM Inc.
1230 Columbia Street, Suite 1000
San Diego, CA 92101
Telephone  (619) 525-7188
Fax        (619) 525-7186
Cell       (801) 404-9283
randy.fetters@ttemi.com

**From:** Sullivan, Steve [mailto:sullivan@onesullivan.com]
**Sent:** Thursday, March 23, 2006 10:24 AM
**To:** Walsh, Mark -- EMI; Bernstein, Ed -- Tt, Inc.
**Cc:** Fetters, Randy -- EMI; Ulmer, Bill; Borja, Phillip; Sternagle, Ed
**Subject:** FW: Contract V261C-2156 Parking Structure
**Importance:** High


Hi Mark,

We received a phone call from Maggie this morning stating that she needed to let us know that in order to preserve the government's rights to terminate / place the Reno project in default, she had to provide a formal notice (the email we received this morning) that we did not meet the original completion date and that we are in "Technical Default". She stated this is a formality that she as the contracting officer is required to initiate. She also said she was very happy with the progress in Reno and that as long as the forward momentum continues there should not be any problems or further actions related to a default proceeding. But, to ensure that the work progresses, Sullivan will be taking a very proactive / aggressive effort to ensure that there are no issues related to schedule slippage, etc. to include regular site visits, meetings with contracting personnel and other activities that will ensure we have full visibility on the project. At this point, there cannot be any missed project update meetings / weekly reports and Bill will most likely require Randy to speak with him several times each week

regarding any difficulties, etc. they may be encountering with the project and quickly helping to resolve these concerns to ensure we stay on track. I am happy with the progress we are making and as I have stated before, by mid June this will all be behind us and we will have successfully accomplished our mutual objectives.

Thank you again for all of your support!

Steve

---

**From:** Neidigh, Margaret VHAREN [mailto:Margaret.Neidigh@va.gov]
**Sent:** Thursday, March 23, 2006 9:51 AM
**To:** Sullivan, Steve; Ulmer, Bill; Borja, Phillip; Owens, Mark
**Cc:** Allen, Jeff VHAREN; Feiler, Philip VHAREN; ming.yee@sba.gov; randy.fetters@ttemi.com; Redstar -- EMI
**Subject:** Contract V261C-2156 Parking Structure
**Importance:** High

Please see the attached letter.



*Maggie Neidigh*
*Contracting Officer*
*VA Nevada Health Care System*
*1000 Locust Street*
*Reno, NV 89502-2597*

☎ *: 775-328-1226*
📠 *: 775-328-1703*
*Cell: 775-691-7619*

https://www.sf.med.va.gov/cca/index.htm

Do business with the VA by connecting to:

http://www.bos.oamm.va.gov/cgi-bin/WebObjects/BosPublic.woa

Confidentiality note: This e-mail is intended only for the person or entity to which it is addressed, and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, or copying of this e-mail or the information herein by anyone other than the intended recipient is prohibited. If you have received this e-mail in error, please notify the sender by reply e-mail, and destroy the original message and all copies.



## Sternagle, Ed

| | |
|---|---|
| **From:** | Fetters, Randy -- EMI |
| **Sent:** | Monday, August 14, 2006 5:12 PM |
| **To:** | Neidigh, Margaret VHAREN |
| **Subject:** | Sources Sought Notice VA-261-06-RP-0085 ER Expansion |
| **Attachments:** | CCR SBA Firm Profile Tanaq.doc; RF RESUME 3 11 06.doc |

Hello, Maggie

I would like to reintroduces myself, as of 8/21 Tetra Tech has lent me to Tanaq Service (Through an executive sharing SBA program) and I will be Tanaq new General Manager. Tanaq is both 8a and Hub-Zone certified and is interested in proposing on this project.

I have attached my resume and will be able to support the VA requirements, for a team with medical back ground. Bonding will not be an issue.

I will continue to support the close out of the Sullivan Parking Garage project.

See tomorrow☺

Randy Fetters
General Manager
St. George Chadux Corporation
4000 Old Seward Hwy, Suite 104
Anchorage, AK 99503
Phone (907) 272-9886
Fax  (907) 272-9855
Cell  (801) 404-9283



## Sternagle, Ed

| | |
|---|---|
| **From:** | Bernstein, Ed -- Tt, Inc. |
| **Sent:** | Thursday, February 02, 2006 7:31 AM |
| **To:** | Fetters, Randy -- EMI |
| **Subject:** | Sullivan |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Randy, if you run into any problems in getting what you need out of EMI, Sullivan or otherwise, do not hesitate to call me. I will make sure you get whatever you need.
I am renewing the Mentor/Protégé agreement with the SBA for Sullivan. I know you are pretty tied up, but if you can swing it, I would like your help in meeting with the SBA if you think that is still necessary. I told Mark I don't want Roger involved in this any longer. Someone needs to keep Steve Sullivan under control. I appreciate your help. I spoke to the bonding company yesterday regarding the "Letter of Concern" they received. I told them about the meeting with the VA and our plan going forward. They are satisfied for now. Do you anticipate we may get the same type of letter in Palo Alto.

Ed Bernstein
Vice President, Contracts & Legal
**Tetra Tech, Inc.**
3475 E. Foothill Blvd.
Pasadena, CA. 91107
(626) 470-2482 - direct dial
(626) 470-2682 - direct fax
ed.bernstein@tetratech.com

---

PLEASE NOTE:  This message, including any attachments, may include privileged, confidential and/or inside information.   Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and maybe unlawful.  If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.



## Sullivan, Steve

**From:** Kirschbaum, John
**Sent:** Thursday, April 17, 2008 10:59 AM
**To:** Sullivan, Steve
**Subject:** FW: sullivan

Steve: FYI  this is most disturbing

John Kirschbaum PE
Senior Vice President
Sullivan International Group, Inc
550 California St, Suite 610
Sacramento Tower
San francisco, CA  94104
P: 415-321-1784
F: 415-693-0972
C: 402-203-4723
jkirschbaum@onesullivan.com
www.onesullivan.com
*SBA 8(a) & SDVOB Certified*

**From:** McMindes, Daniel C SPD@SPK [mailto:Daniel.C.McMindes@usace.army.mil]
**Sent:** Wednesday, April 16, 2008 8:29 PM
**To:** Kirschbaum, John
**Subject:** RE: sullivan

As you know I have been trying to place the current tasks on award to Sullivan for a few months.  During the process I was alerted that Ed Sussenguth (not sure of the spelling) had indicated to Steve Linder (USEPA) that Sullivan was not financially solvent, that there were significant risks with using Sullivan and that Tetra Tech would be reluctant to work under Sullivan on any contract supporting EPA.  This generated quite a bit of concern from EPA and I had to make several calls to EPA to make sure that they were comfortable with Sullivan on these tasks.  I have not had this happen before on any contract or with any 8a.  I am not entirely over the process of 'smoothing' over the damaged impressions.

Interactions like this create a situation that at best is hard to deal with.  I believe that until Sullivan starts to perform (and in some cases even afterward) that it will be difficult to overcome the first impression.  Tetra Tech has supported this particular program for over 10 years and has significant influence over EPA and the State Board for selection of support contractors.  We currently employ 5 full time people on similar tasks from Tetra Tech.

If you have any other concerns, please let me know.  I am sorry that this occured and I sincerely hope that our project is a huge success.  I look forward to working with Sullivan.

Dan McMindes REA
Cell - 415-297-0367
EPA - 415-972-3401 mcmindes.dan@epa.gov
ACE - 916-557-7399 daniel.c.mcmindes@usace.army.mil
24/7 - 916-961-3852 mcmindes@sbcglobal.net

4/21/2008



# ST. GEORGE TANAQ CORPORATION

1011 E Main, Ste. 303
PUYALLUP • WASHINGTON • 98372
(253) 770-3831
Fax: (253) 770-3069

November 12, 2007

Mr. John Kirschbaum, PE
Sullivan International Group, Inc
550 California St, Suite 610
Sacramento Tower
San Francisco, CA  94104

Dear Mr. Kirschbaum:

Per your request, I am submitting a statement of my authority to enter into preliminary talks about the opportunity of St. George Chadux Corporation in purchasing The Sullivan International Group Inc.

St. George Chadux Corporation, is an Alaska corporation ("Chadux") organized pursuant to the Alaska Native Claims Settlement Act, as amended (43 USC §§ 1601 *et seq.*). All major purchase by Chadux must be approved by The Board of Directors of Chadux.

As the President of St. George Chadux Corporation, I have full corporate power and authority to explore and negotiate the purchase of properties and assets in order to carry on Chadux current operating business model; such as the purchase of Sullivan International Group, Inc. ("Sullivan"). If the purchase of Sullivan is seen to fit within the business model of Chadux, a full purchase plan will be provide to The Board of Directors of Chadux for their approval, before the purchase of Sullivan by Chadux could be finalized; The Board of Directors of Chadux would have to approve that purchase.

Sincerely,

Randy F. Fetters
President